## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ERNEST K. LEHMANN & ASSOCIATES OF MONTANA, INC., and MOUNT ROYAL JOINT VENTURE, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action 07cv00762 (HHK) |
| | ) | |
| DIRK KEMPTHORNE, Secretary of the Interior, *et al.*, | ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

COME NOW, Plaintiffs, Ernest K. Lehmann & Associates of Montana, Inc., and Mount Royal Joint Venture, by and through their attorneys, Mountain States Legal Foundation, and move, pursuant to Fed. R. Civ. P. 56, for summary judgment because there is no genuine issue as to any material fact and because Plaintiffs are entitled to a judgment as a matter of law. Support for this Motion is contained in: (1) the administrative record lodged by Defendants with this Court; and (2) the Memorandum of Point and Authorities in Support of Plaintiffs' Motion for Summary Judgment, which is filed concurrently herewith.

WHEREFORE, Plaintiffs respectfully request that summary judgment be entered in their favor.

DATED this 3rd day of December 2007.

Respectfully Submitted By:

MOUNTAIN STATES LEGAL FOUNDATION


/s/ Steven J. Lechner
Steven J. Lechner, D.C. Bar No. AZ 0001
William Perry Pendley, Esq.
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)
lechner@mountainstateslegal.com

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ERNEST K. LEHMANN & ASSOCIATES OF MONTANA, INC., and MOUNT ROYAL JOINT VENTURE, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action 07cv00762 (HHK) |
| | ) | |
| DIRK KEMPTHORNE, Secretary of the Interior, *et al.*, | ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Steven J. Lechner, Esq.
William Perry Pendley, Esq.
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)
lechner@mountainstateslegal.com

Attorneys for Plaintiffs

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. iv

GLOSSARY ......................................................................................................... vii

INTRODUCTION ................................................................................................ 1

LEGAL BACKGROUND ..................................................................................... 1

FACTUAL BACKGROUND................................................................................ 2

    I.      EXPLORATION AND LOCATION ............................................... 2

    II.     DISCOVERY................................................................................... 3

    III.    DELINEATION AND DEVELOPMENT ....................................... 4

    IV.    THE BLM PREVENTS DEVELOPMENT .................................... 4

    V.      THE "VALIDITY EXAMINATION"............................................. 7

    VI.    THE CONTEST............................................................................... 9

    VII.   THE ALJ'S DECISION.................................................................. 13

    VIII.  THE IBLA'S DECISION ............................................................... 13

ARGUMENT........................................................................................................ 14

    I.      THE IBLA'S LONGSTANDING PRACTICE OF PLACING
          THE BURDEN OF PERSUASION ON THE CLAIMANT IN
          A GOVERNMENT CONTEST VIOLATES THE APA .................. 14

    II.    THE IBLA ERRED IN RULING THAT THE BLM
          PRESENTED A *PRIMA FACIE* CASE ......................................... 18

          A.     Mr. Gruber Utilized An Erroneous Interpretation Of
                The Mining Law .................................................................... 18

          B.     Mr. Gruber Erroneously Utilized And Improperly
                Applied Circular 831.............................................................. 21

          C.     Mr. Gruber Failed To Conduct An Objective Analysis......... 27

|  | | **Page** |
|---|---|---|
| | D. Mr. Gruber Failed To Apply The Group Claim Rule | 28 |
| III. | ELAM PROVED, BY A PREPONDERANCE OF THE EVIDENCE, A DISCOVERY ON THE SIX CONTESTED CLAIMS | 30 |
| | A. A Prudent Man Would Be Justified In The Further Expenditure Of His Labor And Means, With A Reasonable Prospect Of Success, In Developing A Valuable Mine On ELAM's Six Contested Claims, Eight Valid Claims, And Other Property Interests | 30 |
| | 1. The IBLA erroneously relied on the oxidation/ leachability issue in rejecting Mr. Lehmann's model | 33 |
| | 2. The Prudent Man Rule does not require a guaranteed success | 35 |
| | 3. The so-called "marketability test" does not apply | 36 |
| | B. ELAM Proved A Discovery On EB 6 | 37 |
| | C. ELAM Proved A Discovery On RE 2 | 40 |
| IV. | THE IBLA ERRED IN DECLARING THE SIX CONTESTED CLAIMS INVALID BECAUSE THE BLM PREVENTED ELAM FROM ACQUIRING FURTHER EVIDENCE OF ITS DISCOVERY | 42 |
| CONCLUSION | | 45 |
| CERTIFICATE OF SERVICE | | 46 |

**TABLE OF AUTHORITIES**
[Asterisk (*) indicates authority upon which the brief chiefly relies]

**Page**

**Cases**

*Best v. Humboldt Placer Mining Co.*, 371 U.S. 334 (1963) ......................... 1

*\*Castle v. Womble*, 19 L.D. 455 (1894)............................................... 2, 19, 23, 27, 35, 44

*Director, Office of Workers' Compensation Programs v. Greenwich Colliers*, 512 U.S. 267 (1994)........................................................... 14, 15

*Foster v. Seaton*, 271 F.2d 836 (D.C. Cir. 1959).......................................... 16, 17

*H. H. Yard*, 38 L.D. 59 (1909).................................................................. 15

*Hammer v. Garfield Mining & Milling Co.*, 130 U.S. 291 (1889) ............... 15

*Ickes v. Underwood*, 141 F.2d 546 (D.C. Cir. 1944), *cert. denied*, 323 U.S. 713 (1944)........................................................................... 16

*Keith O'Leary*, 63 I.D. 341 (1956) .................................................... 14

*Lara v. Secretary of the Interior*, 820 F.2d 1535 (9th Cir. 1987) ................. 36

*Marathon Oil Co. v. Lujan*, 751 F.Supp. 1454 (D. Colo. 1990), *aff'd in part and rev'd in part on other grounds*, 937 F.2d 498 (10th Cir. 1991)...... 14

*Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745 (D.C. Cir. 2007) ............................................................................... 7

*Mount Royal Joint Venture*, 153 IBLA 90 (2000) ........................................ 7, 43

*Original Chippewa Cree Tribe*, IBLA 89-561 ............................................. 4

*Schlosser v. Pierce*, 93 I.D. 211 (1986) ........................................... 28

*Silva v. Lynn*, 482 F.2d 1282 (1st Cir. 1973) ................................................. 27

*State of California v. Doria Mining and Engineering Corp.*, 17 IBLA 380 (1974).......................................................................................... 15

*Steadman v. SEC*, 450 U.S. 91 (1981) ........................................................... 15

**Page**

*Teller v. United States*, 113 F. 273 (8th Cir. 1901)..........................................    16

*The Blackfeet Tribe*, 103 IBLA 228 (1988).....................................................    3

*U.S. v Feezor, et al.*, 130 IBLA 146 (1994)....................................................    24

*United States v. Artero*, 121 F.3d 1256 (9th Cir. 1997)................................    18

*United States v. Bunker Hill & Sullivan Min. & Concentrating Co.*,
48 L.D. 598, 1922 WL 2308 (1922) .........................................................    19

*United States v. Cactus Mines Limited*, 79 IBLA 20 (1982) .........................    17, 28

*United States v. Coleman*, 390 U.S. 599 (1968) ...........................................    36, 37

*United States v. Collord*, 128 IBLA 266 (1994)............................................    24, 26, 28, 29, 36

*United States v. Dresselhaus*, 81 IBLA 252 (1984)........................................    17, 18, 24

*United States v. Foresyth*, 15 IBLA 43 (1974) ..............................................    43

*United States v. Foresyth*, 100 IBLA 185 (1987) ..........................................    28-29

*United States v. Herr*, 130 IBLA 349 (1994)................................................    15

*United States v. Hooker*, 48 IBLA 22 (1980) ................................................    18, 19, 20

*United States v. Larsen*, 9 IBLA 247 (1973) .................................................    23

*United States v. Mavros*, 122 IBLA 297 (1992) ............................................    42, 43

*United States v. Miller*, 138 IBLA 246 (1977) ..............................................    20

*United States v. Miller*, 165 IBLA 342 (2005) ..............................................    17

*United States v. Parker*, 82 IBLA 344 (1984) ...............................................    42

*United States v. Strauss*, 59 I.D. 129 (1945).................................................    14

*United States v. Winters*, 78 I.D. 193 (1971) .................................................    18

*Vanderbilt Gold Corp.*, 126 IBLA 72 (1993) .................................................    24

*Wilbur v. U.S. ex rel. Krushnic*, 280 U.S. 306 (1930) ...................................    14

**Page**

**Constitutional Provision**
U.S. Const. amend. V ................................................................ 14

**Statutes**
5 U.S.C. § 551 *et seq.*, Administrative Procedure Act................................. 14-15, 17

5 U.S.C. § 556(d) ................................................................ 14, 15, 17

30 U.S.C. § 22, *et seq.*, General Mining Law of 1872................................. 1, 9-11, 15-21, 38, 44

30 U.S.C. § 22 ................................................................ 1, 16, 44

30 U.S.C. § 23 ................................................................ 1

30 U.S.C. § 29 ................................................................ 17

**Other Authorities**
58 *Fed. Reg.* 41,289- 41,291 (Aug. 3, 1993) ................................................. 6-7

60 *Fed. Reg.* 38,852-38,853 (July 28, 1995) ................................................. 7

Bureau of Land Management, Handbook for Mineral Examiners (1989)..... 21, 22, 24, 33

Bureau of Land Management, Handbook for Mineral Examiners (2007)..... 22

Haggard, J., and Curry, J.S., *Recent Developments In The Law of Discovery*, 30 Rocky Mt. Min. L. Inst. (1984) ................................................. 35

Maley, T., *Mineral Law* (6th ed. 1996)................................................. 28

McKinstry, H.E., *Mining Geology* (Prentice Hall 1948) ................................................. 22, 23

Mullen, R.W., *The "Prudent Man" Ain't What She Used To Be Many Years Ago*, 49 Rocky Mt. Min. L. Inst., 10-1 (2003)................................................. 35, 44

Reeves, G., *The Origin and Development of the Rules of Discovery*, VIII Land and Water L. 1 (1973)................................................. 35, 36

S. Rep. No. 752, 79th Cong., 1st Sess. (1945)................................................. 15

Sherwood, D., *Mineral Discovery: Is The Prudent Man Dead*, 44 Rocky Mt. Min. L. Inst., 10-1 (1998) ................................................. 35

*Webster's II New College Dictionary* (1999) ................................................

## **GLOSSARY**

| | |
|---|---|
| AR | Administrative record lodged by Defendants with this Court |
| BLM | Bureau of Land Management |
| Department | U.S. Department of the Interior |
| IBLA | Interior Board of Land Appeals |
| Mining Law | General Mining Law of 1872, 30 U.S.C. § 21 *et seq.* |
| opt | Ounces per ton |
| ppb | Parts per billion (1,000 ppb = 0.0292 opt (AR 965)) |
| Secretary | Secretary, U.S. Department of the Interior |
| USGS | United States Geological Survey |

**INTRODUCTION**

Plaintiffs, Ernest K. Lehmann and Associates of Montana, Inc., and Mount Royal Joint Venture (collectively "ELAM") are seeking judicial review of the decision of the IBLA that declared six of ELAM's mining claims invalid for lack of discovery.

**LEGAL BACKGROUND**

The General Mining Law of 1872 ("Mining Law"), 30 U.S.C. § 22 *et seq*., provides:

> [A]ll valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase, by citizens of the United States . . . .

30 U.S.C. § 22. This unilateral offer by Congress becomes a vested property right upon "discovery." 30 U.S.C. § 23 ("[N]o location of a mining claim shall be made until the *discovery* of the vein or lode within the limits of the claim located.") (emphasis added); *Best v. Humboldt Placer Mining Co*., 371 U.S. 334, 336 (1963) (An unpatented mining claim is "valid against the United States if there has been a *discovery of mineral* within the limits of the claim.") (emphasis added).

Because Congress did not define the term "discovery," the Secretary established the following rule to be used to evaluate whether a "discovery" has been made:

> [W]here minerals have been found and the evidence is of such a character that a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine, the requirements of the statute have been met. To hold otherwise would tend to make of little avail, if not entirely nugatory, that provision of the law whereby "all valuable mineral deposits in lands belonging to the United States . . . are . . . declared to be free and open to exploration and purchase." For, if as soon as minerals are shown to exist, and at any time during exploration, before the returns become remunerative, the lands are to be subject to other disposition, few would be found willing to risk time and capital in the attempt to bring to light and make available the mineral wealth, which lies concealed in the bowels of the earth, as Congress obviously must have intended the explorers should have proper opportunity to do.

*Castle v. Womble*, 19 L.D. 455, 457 (1894).

This "Prudent Man Rule" has two separate requirements. First, the evidence must show that minerals have been found within the limits of a mining claim. The second requirement is, based on the facts offered to prove the first requirement, would a "person of ordinary prudence" be "justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine." Importantly, the first requirement is related to the facts as they presently exist. The second requirement is prospective in that it relates to the effect the facts in the first requirement would have on the conduct of "a person of ordinary prudence."

## FACTUAL BACKGROUND

### I.    EXPLORATION AND LOCATION.

The Sweet Grass Hills are an area of plains and volcanic buttes located near the Canadian border in Liberty and Toole Counties, Montana. AR 1176-1177, 1185-86, 1192 -93. In 1983, ELAM began to explore the Sweet Grass Hills for gold and silver. AR 955, 1204, 2020-21. This exploration activity consisted of, *inter alia*, the collection of 288 stream sediment samples at a sample density of five samples per square mile over an area encompassing approximately 55 square miles within the Sweet Grass Hills, including the Tootsie Creek drainage on East Butte. AR 955. As a result of this sampling program, a strong anomaly for gold and silver was identified in the Tootsie Creek drainage on East Butte. AR 956. Based upon this anomaly, ELAM began locating mining claims and acquiring other real property interests (patented mining claims, private mineral leases, and private surface leases) on East Butte in Sections 19, 20, 29, and 30, T.36N, R.5E., MPM. *See* AR 1453. ELAM would ultimately locate/acquire fourteen unpatented mining claims in the Tootsie Creek drainage: Patricia ("P") 7, 8, 14-16, 18, and 20; Butte ("B") 47-48; East Butte ("EB") 4-6; and Royal East ("RE") 1-2. *See* AR 1453. These

unpatented mining claims, along with ELAM's other property interests, comprise the claim block that was established to effectively mine a low-grade, large tonnage, disseminated gold deposit, commonly referred to as the Tootsie Creek Deposit. AR 1453 (depicting ELAM's holdings).

## II.    DISCOVERY.

In 1985, ELAM, along with its joint venture partner, Santa Fe Pacific Mining Company ("Santa Fe"), began a geological mapping and geochemical sampling program that resulted in the collecting of 441 geochemical rock and soil samples on a 250 by 250 foot grid, including a one square-mile area grid within the Tootsie Creek drainage in Sections 19 and 30. AR 956, 2022-2028; *see also* AR 1457 (map depicting results of geochemical sampling program). That same year, ELAM and Santa Fe submitted a plan of operations ("1985 Plan of Operations") to further define the Tootsie Creek Deposit. AR 1200-01. On June 30, 1986, the BLM approved the 1985 Plan of Operations and defended its decision against a challenge brought by some American Indians. *The Blackfeet Tribe*, 103 IBLA 228 (1988). Later that year, in accordance with the 1985 Plan of Operations, ELAM and Santa Fe constructed approximately 11,700 feet of road and trenches for the purpose of exposing bedrock for sampling. AR 1296-1372, 1957, 2033-41; *see also* AR 1459 (depicting results of trench and rock sampling).

The next year, ELAM and Santa Fe undertook a drilling program on East Butte. *See* AR 1957. Under this program, ELAM and Santa Fe drilled seven reverse circulation holes totaling 2,585 feet (TCM-1, TCM-2,-2A, TCE -1 through TCE- 5). AR 2052-57; *see also* AR 1459 (locations of drill holes); AR 1461 and 1463 (cross-sections of drill holes). During the drilling of these holes, samples were generally taken every five feet and later assayed. AR 2052-57. Later that year, ELAM and Santa Fe drilled four more holes with a "Winkie" drill rig (TSF-1 through TSF-4). AR 2052-57; *see also* AR 1459 (locations of drill holes); AR 1462 (cross-

3

sections of drill holes). These four drill holes totaled 601.7 feet, from which 467.8 feet of core was recovered and sampled and assayed in five-foot increments. AR 2052-57.

In 1988, ELAM entered into a new joint venture with Cominco American Resources, Inc. ("CARI"). AR 1201, 1958. During 1988, ELAM and CARI collected and analyzed 39 rock samples and re-assayed samples previously collected by ELAM and Santa Fe. AR 1201. That year, ELAM and CARI also proposed an amendment to the 1985 Plan of Operations to drill nine more holes and to construct 3,000 feet of trenches. AR 1201, 2035. On June 20, 1989, the BLM approved the amendment to the 1985 Plan of Operations (AR 603-06) and again defended its decision against a challenge brought by some American Indians. *See* AR 698 (citing *Original Chippewa Cree Tribe*, IBLA 89-561). Under the amendment to the 1985 Plan of Operations, ELAM and CARI constructed 2,125 feet of road trenches from which sample were collected and assayed. ELAM and CARI also drilled three reverse circulation drill holes (EBR-1, EBR-2, and EBR-3) having a combined footage of 1,170 feet. AR 1459 (depicting locations of drill holes); AR 1464 (depicting cross-sections of drill holes). This footage was sampled in 5-foot intervals and these samples were later assayed. AR 2061.

In sum, through the end of 1989, ELAM and its partners had drilled 14 drill holes totaling 4,356.7 feet from which over 800 samples were collected and assayed. AR 1219, 1228-29, 1296-1452, 2061-62; *see also* AR 1459 (locations of drill holes). They also had constructed approximately 13,700 feet of roads and trenches from which over 1,300 samples were collected and assayed. AR 1219, 1228, 1296-1335; *see also* AR 1459 (locations of trenches and samples).

## III.   DELINEATION AND DEVELOPMENT.

In 1991, ELAM entered into another joint venture with Manhattan Minerals (U.S.), Ltd., to further delineate and develop the Tootsie Creek Deposit. AR 962, 1201, 1219, 1958; *see also*

2006-07, 2080-81, 2240-41. That year, ELAM and Manhattan Minerals, *inter alia*, conducted field work on East Butte, collecting 49 float, talus, and outcrop samples. AR 962, 1201, 1219, 2080-81.

In January 1992, the BLM issued a Record of Decision ("ROD") on the Sweet Grass Hills' portion of the West HiLine Resource Management Plan ("RMP"). AR 1201, 1958; *see also* AR 1960-61. The ROD designated the federal surface estate in the Sweet Grass Hills Area as an "area of critical environmental concern" ("ACEC"). AR 1958. Importantly, the BLM determined that mineral location and development was compatible with the ACEC. AR 1958, 1961. Thus, the BLM left the federal locatable mineral estate in Sweet Grass Hills open to further mineral entry and location. AR 1201-02, 1958, 1961-62.

## IV.    THE BLM PREVENTS DEVELOPMENT.

On February 25, 1992, after the future management of the Sweet Grass Hills had been established, ELAM and Manhattan Minerals submitted a Plan of Operations ("1992 Plan of Operations") to build 28,000 feet of road to expose bedrock for further trench sampling and to serve as a location for 39 in-road drill sites, all of which would serve to further delineate the Tootsie Creek Deposit. AR 962, 1202, 1958, 1963-66. On July 7, 1992, the BLM issued an ROD and an Environmental Assessment ("EA") on the 1992 Plan of Operations. In the ROD, the BLM decided to delay approval of the 1992 Plan of Operations until after preparation of an Environmental Impact Statement ("EIS"), effectively delaying ELAM's activities for, at least, another year.[1] AR 1202, 1962-1967.

---

[1] ELAM unsuccessfully appealed that decision. AR 1202, 1966-67.

In January 1993, the BLM released the draft EIS for the 1992 Plan of Operations. AR 1202.  In the draft EIS, the BLM analyzed the potential impacts of the 1992 Plan of Operations with regard to, *inter alia*, allegations that the area was of religious importance to some American Indians.  AR 1202.  Because ELAM had agreed on mitigation measures to address those alleged concerns, the BLM concluded that the 1992 Plan of Operations would have no adverse environmental impacts.  AR 1202.  Thus, the BLM recommended, as its "Preferred Alternative," that the 1992 Plan of Operations be approved.  AR 1202, 1967.

The BLM's attitude then changed.  AR 1202.  On June 8, 1993, Josh Drew, Special Assistant to the Director of the BLM, wrote a memorandum to the Director regarding the pending 1992 Plan of Operations.  AR 1141-43.  In that memorandum, Mr. Drew advised the Director that the "BLM feels the [draft EIS] is adequate."  AR 1142.  Mr. Drew also advised the Director that "the earliest the plan of operations could be approved would be September; in fact, State Director Bob Lawton assured [ELAM] that this would be the case."  *Id*.; *see also* AR 1971. Egregiously, Mr. Drew then advised that "[w]ith careful handling, the approval [of the 1992 Plan of Operations] could be delayed many months or even years."  AR 1142.  Mr. Drew also recommended that the BLM "actively pursue measures to prevent mineral activity in [the Sweet Grass Hills."  AR 1143.

In order to "prevent mineral activity," the BLM filed a petition with the Department to withdraw the entire federal locatable mineral estate in the Sweet Grass Hills Area from mineral entry and location for 20 years.  On August 3, 1993, notice was published in the *Federal Register* that the Department had approved the BLM's petition.  58 *Fed*. *Reg*. 41,289- 41,291 (Aug. 3, 1993); *see also* AR 1971.  The publication of this notice segregated the entire federal locatable

6

mineral estate in the Sweet Grass Hills from mineral location and entry for two years.[2]  58 *Fed*.

*Reg*. at 41,290.

By letter, dated August 9, 1993, the BLM notified ELAM and Manhattan Minerals of the

segregation and that the BLM planned to reassess the "long-term management options" for the

Sweet Grass Hills by amending the RMP, which had just been completed in January 1992.  AR

1471, 1973.  That letter further provided that, "as part of the interim management" during the

RMP amendment process "the BLM was suspending the processing of 1992 Plan of Operations

and the finalization of the EIS.  AR 1471.  The BLM further advised that it intended to examine

ELAM's claims for validity, and that the information acquired from the validity examination

along with the land management changes made during the RMP amendment process would then

be used by the BLM is reaching a final decision regarding the 1992 Plan of Operations.[3]  AR

1471.  In short, the BLM had ensured that approval of the 1992 Plan of Operations "[w]ould be

delayed many months or even years."  AR 1142, 1202.

## V.    THE "VALIDITY EXAMINATION."

On September 21, 1993, the BLM sent another letter to ELAM regarding the upcoming

validity examination.  AR 1025-26.  In that letter, the BLM explained that "[t]he test for

discovery is critical to the examination, and *the need for a physical exposure of ore grade*

*mineralization for each mining claim is required to meet this test*."  AR 1025 (emphasis added).

The BLM also asked ELAM to provide its sampling data and its plans as to how the Tootsie

---

[2] Shortly before this two-year segregation period expired, the Department approved another withdrawal petition from the BLM, which segregated the same lands from mineral entry and location for another two years.  60 *Fed. Reg.* 38,852-38,853 (July 28, 1995).  ELAM's challenge to the back-to-back segregation periods and the Department's withdrawal of these lands in 1997 is described in *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745 (D.C. Cir. 2007).

[3] The BLM had no authority to suspend consideration of the 1992 Plan of Operations pending the outcome of the validity examination.  *Mount Royal Joint Venture*, 153 IBLA 90, 96 (2000).

Creek Deposit would be mined.  AR 1025-26.  In response, Mr. Lehmann provided Mr. Gruber

with a voluminous amount of materials, including access to all the sampling and assay data that

had been acquired by ELAM in the previous nine years.  AR 964-66; *see also*, AR 1727-28 (Mr.

Gruber testifying that Mr. Lehmann was "very responsive" in providing information regarding

the claims); AR 1145-54 (list of information provided by Mr. Lehmann); AR 1980.  Mr. Gruber

verified the accuracy of the data provided by Mr. Lehmann and found the data to be very

professional and reliable.  AR 964-68.

On September 15, 1995, Mr. Gruber completed his report regarding his examination of

ELAM's 14 claims ("Gruber Report").  AR 933.  In his Report, Mr. Gruber concluded that all 14

claims are held by ELAM in "good faith" and in "compliance with all assessment work

requirements."  AR 937.  Mr. Gruber also concluded that a "physical exposure of a valuable

mineral exists upon each of the 14" unpatented claims held by ELAM.  AR 938; AR 971 ("Gold

and silver mineralization on [ELAM's claims] is present and undeniably widespread.  Each

unpatented mining claim contains a physical exposure of in place mineralized rock – a

prerequisite for satisfying the 'test of discovery[.]'").  Mr. Gruber then concluded that eight of

the claims were valid (P 7-8 18, 20; EB 4-5; B 47-48), and six of the claims were invalid (RE 1-

2, EB 6, and P 14-16).[4]  AR 937-938.  Although the Gruber Report contains an economic

analysis proving that the eight claims were valid, there is no analysis regarding the six

purportedly invalid claims.  Instead, the Gruber Report summarily concludes that those claims

are invalid because they did not contain an exposure of cutoff grade mineralization.  AR 938-39.

On November 15, 1995, ELAM received a copy of the Gruber Report.  AR 46, 1977.

---

[4] That the BLM considered RE 1-2 and EB 6 invalid came as a surprise because the BLM had
advised ELAM that it was only concerned with the validity of P 14-16.  AR 1472-76, 1962-63,
1985-87.

Shortly thereafter, ELAM demanded that the BLM file a contest against the claims reported to be invalid in the Gruber Report.  AR 46, 1999-2000.

## VI.    THE CONTEST.

On March 4, 1996, the BLM filed a Complaint contesting the claims reported to be invalid in the Gruber Report, *i.e.*, RE 1-2, EB 6, and P 14-16 (the "Six Contested Claims").  AR 1-4.  In its Complaint, the BLM alleged that "minerals had not been found within the limits" of those claims "in sufficient quantities and/or quality to constitute a discovery of a valuable mineral deposit."  AR 2-3.  ELAM timely filed an Answer to the Complaint, in which it denied all of the allegations in the Complaint.  AR 5-9.  ELAM also asserted, as an alternative defense, that the actions of the BLM in refusing to approve the 1992 Plan of Operations prevented ELAM from acquiring additional evidence to defend against the charges in the Complaint.  AR 9.

On October 20, 1997, ELAM filed a Motion for Partial Summary Judgment asserting that the Gruber Report proved the validity of the EB 6 and RE 2 claims.  AR 91-126.  Specifically, ELAM cited a portion of the Gruber Report (AR 977) wherein Mr. Gruber determined that a valuable mineral deposit exists on both the EB 6 and RE 2 claims.  AR 97-100.  ELAM also pointed out that Mr. Gruber determined that "reserves" exist on both of those claims.  *Id*.  Thus, based upon by Mr. Gruber's own analysis, ELAM submitted that a discovery had been made on both of those claims.  AR 97-100.

The BLM responded by arguing that the Mining Law requires an exposure of cutoff grade mineralization on each claim.  AR 133.  Thus, the BLM contended that both EB 6 and RE 2 contained only one in-place physical exposure of mineralized rock at, or above, Mr. Gruber's cutoff grade, and that those exposures were on overlapping senior claims.  AR 130-37.  Therefore the BLM contended that EB 6 and RE 2 were invalid because when two overlapping

claims share a common discovery point, only the senior clam is valid. *Id*. As a result, the BLM moved that partial summary judgment be entered in its favor by declaring both EB 6 and RE 2 invalid. AR 137.

ELAM replied by arguing that the Mining Law does not require a physical exposure of cutoff grade mineralization for a discovery. AR 156-58. ELAM also proffered evidence that shows both EB 6 and RE 2 contained exposures of mineralized rock above the BLM's cutoff grade that are not within overlapping senior claims. AR 160-61. Thus, ELAM renewed its request that summary judgment be entered in its favor because the BLM's own evidence proved that a discovery had been made on both the EB 6 and RE 6 claims, even under the BLM's erroneous interpretation of the Mining Law. *Id*.

On January 7, 1998, Administrative Law Judge ("ALJ") Harvey C. Sweitzer denied the Motions for Partial Summary Judgment. AR 197-99. In so doing, ALJ Sweitzer held that, to establish a discovery there must be "an exposure of at least cutoff grade mineralization on each claim." AR 198. ALJ Sweitzer then concluded that factual disputes existed as to whether EB 6 and RE 2 contain exposures of mineralized rock at, or above, the BLM's cutoff grade that are not within overlapping senior claims. AR 198. Because of these purported factual disputes, ALJ Sweitzer determined that he could not grant summary judgment in favor of either party. AR 198-99.

On March 30, 1998, ALJ Sweitzer commenced a 5-day hearing that ended on April 3, 1998.[5] *See* AR 1501-2337. During the BLM's case in chief, Mr. Gruber testified that he used

---

[5] Immediately prior to the hearing, the BLM provided ELAM evidence of the BLM's new analysis of the Six Contested Claims. This evidence had been prepared during the month preceding the hearing and consisted of, *inter alia*: (1) a so-called "Addendum" (AR 1103-07); (2) a "Modified Plate 3" (AR 1077); (3) another "Modified Plate 3" (AR 1094); (4) "Modified Drill Hole Cross-Sections (AR 1078-81); and (5) a "Modified Attachment 15" (AR 1082).

10

the classification scheme in a USGS Circular, entitled *Principles of a Resource/Reserve Classification for Minerals*, (1980) (hereinafter "Circular 831"), to conduct his validity examination.[6]  AR 1539-40 (In order to "prov[e] discovery you need to quantify reserves, and I . . . relied on a . . . method designed by the [USGS] to distinguish between resources and reserves."); *see also* AR 972, 1642-43.

Based upon Circular 831, Mr. Gruber testified that he drew 200-foot-radius circles around all the drill holes and called the inside of the circles "identified resources."  AR 1649-51; *see also* AR 1094 ("identified resources" depicted as overlapping green arcs).  From these "identified resources," Mr. Gruber purportedly determined his "demonstrated resources," which he equated with "reserve base."  AR 1094 (depicting "reserve base" in pink).  Mr. Gruber's "reserve base" consisted of eight deposits containing 604,915 tons in three zones: the Main Gold Zone, the East Gold Zone, and the South Fork Gold Zone.  AR 977.  From this "reserve base," Mr. Gruber somehow determined that only six deposits, containing 387,942 tons, constituted "reserves," *i.e.*, valuable mineral deposits.  AR 973.  Mr. Gruber then determined that those 387,942 tons could be mined in 83 days (AR 981), at a total cost of $4,302,600 (AR 990), would produce 12,973 ounces of gold and 43,672 ounces of silver (AR 91), and would generate a profit of $948,380 (before taxes).  AR 991.

Based upon this mine model, Mr. Gruber then determined his cutoff grade, *i.e.*, the lowest grade that would cover the cost of the total project.   Mr. Gruber then applied his cutoff grade to

---

Although ELAM challenged the use of this new analysis and these new exhibits, ALJ Sweitzer ruled that ELAM's only remedy was to ask for a continuance.  AR 456-58.  Because ELAM's development plans had already been delayed for six years, further delay was not a viable option.
[6] Noticeably absent from Circular 831 is how the terms used therein relate to the issue of discovery under the Mining Law.  *See* AR 1086-89.

ELAM's claims.  AR 1762.  In Mr. Gruber's mind, only those claims that had an exposure of his

cutoff grade within one of his identified valuable mineral deposits were valid.  AR 1762.

In response, Ernest K. Lehmann, a mining geologist with over 40 years experience and

President of ELAM, submitted his "Report on the Geology and Mineral Development of the

Tootsie Creek Gold Deposit" ("Lehmann Report").[7]  AR 1169-1470.  In his Report and through

testimony, Mr. Lehmann demonstrated that the Tootsie Creek Deposit was a low-grade, large-

tonnage, disseminated gold deposit that covered the six contested claims, the eight valid claims,

as well as surrounding property interests held by ELAM.  AR 1169-1470, 2041-42.  Mr.

Lehmann explained that there are two types of gold mineralization within the Tootsie Creek

Deposit: (1) a carbonate-hosted contact metamorphic gold deposit closely analogous to the gold

deposit mined in the Kendall District in the North Moccasin Mountains in Montana; and (2) a

large-volume, low-grade stockwork gold deposit analogous to the deposits being mined at the

Zortman-Landusky Mines in the Little Rocky Mountains of Montana.  AR 1226-27.  Because of

the close proximity of the two types of mineralization, Mr. Lehmann determined that they could

be profitably mined in a single, large volume, open pit operation that covered nearly the entire

claim block, most of the patented Malvina Claim, and a portion of the patented No. 1 Placer

Claim.  AR 1229-30, 1465-70.  Accordingly, Mr. Lehmann designed a sophisticated, but

conservative, open-pit mine model based upon similar successful mines in the western United

States.  AR 1230-31.

Under Mr. Lehmann's model, the mine would operate for 10.89 years, during which time

98 million tons of ore would be processed and 1,087,000 ounces of gold equivalent (gold plus

---

[7] Mr. Lehmann graduated *cum laude* in geology from Williams College in 1951.  AR 1161-66.
He is a Certified Profession Geologist and a licensed Profession Geologist in three States.  *Id*.

silver) would be recovered.  AR 1236-41, 1251-52.  The mine would also generate $434,915,000 in total revenues, $77.7 million of which would be profit (before income tax), resulting in an internal rate of return of 11.95 percent.  AR 1251-52.  Based upon this analysis, Mr. Lehmann concluded that a "prudent man would be justified in expending more money" with a reasonable prospect of success, in developing a valuable mine with the Six Contested Claims, the eight valid claims, and the other property interests held by ELAM.  AR 1252.

## VII.   THE ALJ'S DECISION.

On April 28, 1998 ALJ Sweitzer issued a decision (AR 396-460) in which he decided to follow his earlier ruling and require that each claim contain an "exposure of at least cutoff grade mineralization within a deposit found to be valuable."  AR 428.  Applying this test, ALJ Sweitzer held that EB 6 and RE 2 were invalid, even though Mr. Gruber's report and testimony established that valuable mineral deposits containing reserves existed on both claims.  AR 424-28.  With respect to the other four claims, ALJ Sweitzer essentially ruled that they were invalid because Mr. Gruber had not identified any valuable mineral deposits containing cutoff grade mineralization on those claims.  AR 447-52.

## VIII.   THE IBLA'S DECISION.

On May 28, 1999, ELAM filed a timely appeal with the IBLA.  AR 461-64.  On March 16, 2004, the IBLA issued a decision in which it affirmed ALJ Sweitzer's decision, albeit in a modified form.  AR 687-756.  First, the IBLA reversed ALJ Sweitzer's ruling that, to support a discovery, each claim must contain an "exposure of at least cutoff grade mineralization within a deposit found to be valuable."  AR 740.  Instead, the IBLA ruled that an exposure of cut-off grade ore was simply one "indicator of fact" that may be relevant to the overall validity determination.  AR 740.  The IBLA then purportedly reviewed the facts and determined that a

discovery had not been made on EB 6 or RE 2, or any of the other contested claims, because the

minerals exposed on those claims by ELAM were not within the valuable mineral deposits

identified by Mr. Gruber.  AR 742-43.

## ARGUMENT

**I.    THE IBLA'S LONGSTANDING PRACTICE OF PLACING THE BURDEN OF
PERSUASION ON THE CLAIMANT IN A GOVERNMENT CONTEST
VIOLATES THE APA.**

The IBLA ruled that the BLM needed to present only a *prima facie* case of invalidity and

then the burden shifted to ELAM to overcome the BLM's case by a preponderance of evidence.

AR 691-92.  Although this standard has been applied by the IBLA and the Department for many

years, *e.g., United States v. Strauss*, 59 I.D. 129, 136 (1945), it is in direct contravention of the

Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*

An unpatented mining claim is a property interest protected by the Fifth Amendment.

*Wilbur v. U.S. ex rel. Krushnic,* 280 U.S. 306, 316 (1930) (An unpatented mining claim *"*is

property in the fullest sense of that term.").  This valuable property right may not be declared

invalid at the whim of the Department.  *See Marathon Oil Co. v. Lujan*, 751 F.Supp. 1454, 1462

(D. Colo. 1990), *aff'd in part and rev'd in part on other grounds*, 937 F.2d 498 (10th Cir. 1991).

Instead, the Department must afford a claimant notice and an opportunity for hearing in

accordance with the APA before it declares a mining claim invalid.  *Keith O'Leary*, 63 I.D. 341,

344 (1956).

The APA provides, *inter alia*, that: "[e]xcept as otherwise provided by statute, the

proponent of a[n] . . . order has the burden of proof."  5 U.S.C. § 556(d).  Importantly, having the

"burden of proof" means that the "proponent of an order" has the "burden of persuasion."

*Director, Office of Workers' Compensation Programs v. Greenwich Colliers*, 512 U.S. 267, 276

14

(1994). Moreover, to satisfy the "burden of persuasion," a "proponent of an order" must prove

its case by a "preponderance of the evidence." *Steadman v. SEC*, 450 U.S. 91, 97-101 (1981).

Thus, under the APA, "except as otherwise provided by statute," the "proponent of an order" has

the burden of proving its case by a preponderance of the evidence.

There is nothing in the Mining Law regarding the burden of proof when the government

challenges a mining claim for lack of discovery. Thus, the APA places the burden of persuasion

on the "proponent of an order." 5 U.S.C. § 556(d). In this case, the BLM was the "proponent of

an order" because it sought an order declaring the Six Contested Claims invalid. AR 3

("Contestant requests that it be allowed to prove its allegations and *that said mining claims be*

*declared null and void*.") (emphasis added).[8]

This conclusion is also supported by a long line of cases holding that, in a private contest,

the rival claimant has the burden of persuasion. *E.g.*, *Massirio v. Western Hills Mining Ass'n*.,

78 IBLA 155, 160 (1983) (contestant in a private contest is the proponent of an order). In fact,

because the government thinks of itself as a rival claimant when it contests a mining claim, *H. H.*

*Yard*, 38 L.D. 59, 67 (1909), there is no reason why it should not have the same burden.[9]

---

[8] This conclusion is supported by the fact that the BLM is trying to change the *status quo.* In
passing the APA, Congress recognized that "no agency is entitled to presume that the conduct of
any person . . . is unlawful." *Greenwich Colliers*, 512 U.S. 279 (quoting S. Rep. No. 752, 79th
Cong., 1st Sess., 22 (1945)). Thus, it must be presumed that all mining claims are valid until
declared invalid following the proper procedures. Therefore, because the BLM is trying to
change the *status quo* and is seeking, in effect, a forfeiture of private property, it is only
reasonable that it should have the burden of persuasion. *Cf. Hammer v. Garfield Mining &
Milling Co*., 130 U.S. 291, 301 (1889) (a rival claimant must prove lack of assessment work by
clear and convincing evidence); *United States v. Herr*, 130 IBLA 349, 358 (1994) (government
must prove lack of assessment work by clear and convincing evidence).

[9] The unfairness of the Department's current practice was demonstrated in *State of California v.
Doria Mining and Engineering Corp*., 17 IBLA 380 (1974). In that case, the State of California
filed a private contest challenging the validity of mining claims over which its easement crossed.
*Id*. at 383-84. Because the State was seeking a declaration of invalidity, it had the burden of
persuasion. *Id*. at 389. The federal government then intervened on the side of the State and the

It is anticipated that the Department will rely on *Foster v. Seaton*, 271 F.2d 836 (D.C.

Cir. 1959) for the proposition that the IBLA properly placed the burden of persuasion on ELAM.

In that case, the mining claimant argued that the government, as the "proponent of an order,"

should have the burden of persuasion. *Id*. at 837-38.  In rejecting that argument, the court ruled:

> [Mining claimants], and not the Government, are the true proponents of a rule or
> order; namely, a ruling that they have complied with the applicable mining laws.
> One who has located a claim upon the public domain has, prior to the discovery of
> valuable minerals, only "taken the initial steps in seeking a gratuity from the
> Government." *Ickes v. Underwood*, [141 F.2d 546, 549 (D.C. Cir. 1944), *cert.*
> *denied*, 323 U.S. 713 (1944)]; [30 U.S.C. § 22].  Until he has fully met the
> statutory requirements, title to the land remains in the United States. *Teller v.*
> *United States*, [113 F. 273, 281 (8th Cir. 1901)].  Were the rule otherwise, anyone
> could enter upon the public domain and ultimately obtain title unless the
> Government undertook the affirmative burden of proving that no valuable deposit
> existed.  We do not think that Congress intended to place this burden on the
> Secretary.

*Id*. at 838.

This ruling shows three things.  First, the court had a jaundiced view of the Mining Law

and the perceived abuses thereunder.  Indeed, this is evident from the court's characterization of

the Mining Law as a "gratuity" and its citation to two cases, both of which involved parties who

were abusing the Mining Law.  *Underwood,* 141 F.2d at 546 (claims located after plans for a

dam became known); *Teller*, 113 F. 279-284 (removal of timber).

Second, this ruling shows a lack of knowledge regarding the Mining Law.  No mining

claimant may enter upon the public domain, locate a mining claim, and ultimately obtain title to

the land without having to prove discovery.  Instead, the Mining Law expressly requires that,

before a patent is issued, the mining claimant must prove that he has satisfied all the

prerequisites for the issuance of a patent, including discovery, when he submits his patent

---

burden of persuasion suddenly shifted to the mining claimant.  *Id*.  Where the burden of
persuasion lies should not depend on whether the federal government is a party.

16

application. 30 U.S.C. § 29. Thus, the court's fear that all the public domain would be patented

to unscrupulous mining claimants was not justified.

Finally, and most importantly, the court failed to realize the difference between the

situation where the federal government contests the issuance of a patent (hereinafter "patent

contest") and where the federal government contests a mining claim (hereinafter "claim

contest"). In a patent contest, the patent applicant arguably should have the burden of persuasion

because the Mining Law requires him to prove all the prerequisites for issuance of a patent. 30

U.S.C. § 29. Thus, the APA's system for determining who has the burden of persuasion may not

apply in a patent contest. *See* 5 U.S.C. § 556(d) ("*Except as otherwise provided by statute*, the

proponent of a rule or order has the burden of proof.") (emphasis added). In addition, in a patent

contest, the patent applicant not only has to prevail against the issues raised by the federal

government, but also must prove that he has satisfied all the prerequisites for the issuance of a

patent. *United States v. Miller*, 165 IBLA 342, 356 (2005). Thus, in the alternative, it could be

argued that, in a patent contest, the patent applicant is the "proponent of an order" because he is

seeking a declaration that he has satisfied all the prerequisites for issuance of a patent.

By contrast, in a claim contest, if a mining claimant prevails that does not mean he is

entitled to a patent. Instead, it only means that the claimant successfully defended against the

issues raised by the federal government as to the validity of the claim. *United States v.*

*Dresselhaus*, 81 IBLA 252, 257 (1984) (citing *United States v. Cactus Mines Limited*, 79 IBLA

20, 27 (1982). In fact, if the government loses a claim contest, it may contest the claim again.

*Miller*, 165 IBLA at 381-84. Thus, in a claim contest, the claimant is neither seeking, nor may

he receive, a declaration of validity and the concomitant entitlement to a patent. Therefore, the

basis for the court's ruling in *Foster, i.e.*, that a mining claimant is seeking a declaration of

validity and the concomitant entitlement to a patent, has no applicability in a claim contest.

Accordingly, this Court should hold unlawful and set aside the IBLA's decision because the

IBLA erroneously placed the burden of persuasion on ELAM.

## II.    THE IBLA ERRED IN RULING THAT THE BLM PRESENTED A *PRIMA FACIE* CASE.

Assuming, *arguendo,* that the BLM had the burden of presenting only a *prima facie* case

that there was no discovery of the Six Contested Claims, the BLM failed to do so.  The IBLA

ruled that "the Government establishes a *prima facie* case when the mineral examiner testifies

that he has examined a claim and found the mineral values insufficient to support a finding of

discovery."  AR 691 (quoting *Dresselhaus*, 81 IBLA at 257).  Missing from this ruling are two

necessary elements.  First, the mineral examiner's opinion must be based upon the proper legal

standards.  *United States v. Hooker*, 48 IBLA 22, 31 (1980) (The use of "improper standards"

renders a "mineral examiner's ultimate conclusion of invalidity" "fatally defective[.]"); *cf.*

*United States v. Artero*, 121 F.3d 1256, 1260-1262 (9th Cir. 1997) (defense expert failed to

present a *prima facie* case because he used the wrong criteria in his statistical analysis).  Second,

the mineral examiner's opinion must be based upon "probative evidence [regarding] the

character, quality and extent of the mineralization allegedly discovery by the claimant."  *United*

*States v. Winters*, 78 I.D. 193, 195 (1971).  In the instant case, Mr. Gruber conveniently ignored

most of ELAM's evidence by conducting his mineral examination: (a) under an erroneous

interpretation of the Mining Law; (b) in violation of the BLM's own procedures; (c) in violation

of the Prudent Man Rule; and (d) in total disregard for the "Group Claim Rule."

### A.    Mr. Gruber Utilized An Erroneous Interpretation Of The Mining Law.

Mr. Gruber began his validity examination under the erroneous interpretation that the

Mining Law requires "a physical exposure of ore grade mineralization [on] each mining claim" to satisfy the test for discovery.  AR 1025.  He continued under this erroneous interpretation when he prepared his Report:

> [T]here is an absolute requirement for an in-place, physical exposure of above-cutoff-grade mineralized rock on each claim in order for individual claims to meet the test of discovery.

AR 972 (emphasis added).  This erroneous interpretation of the Mining Law, under which Mr. Gruber performed his examination, has never been the standard for discovery.

The Prudent Man Rule does not require an exposure of commercial quality or quantity of ore to sustain a discovery.  *United States v. Bunker Hill  & Sullivan Min. & Concentrating Co.*, 48 L.D. 598, 1922 WL 2308, *6 (1922) ("In connection with the matter of discovery it must *not* be understood that an actual disclosure of commercial ore is essential to a sufficient and adequate discovery.") (emphasis added).  Instead, the only inquiry into value contemplated by the Prudent Man Rule is a prospective inquiry, *i.e.*, whether the minerals exposed indicate that a person of ordinary prudence "would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a *valuable* mine."  *Castle*, 19 L.D. at 457 (emphasis added).  To require an exposure of ore grade minerals is asking a claimant to prove certain profitability, which can never be proven until after the mineral deposit has been mined.

Because Mr. Gruber conducted his examination under an erroneous interpretation of the Mining Law and subsequently asserted opinions based upon this erroneous interpretation, the BLM failed to present a *prima facie* case that any of the claims were invalid.  *See Hooker*, 48 IBLA at 28.  At a minimum, the BLM failed to present a *prima facie* case with respect to EB 6 and RE 2.  Indeed, this is evident from the underlying decisions.

ALJ Sweitzer approved of Mr. Gruber's erroneous interpretation of the Mining Law

19

regarding cutoff grade, albeit with trepidation. AR 424-28. In fact, ALJ Sweitzer noted that, if

an exposure of cutoff grade mineralization were not a requirement, the BLM would not have

presented a *prima facie* case with respect to RE 2 and EB 6 because, *inter alia*, Mr. Gruber

identified a valuable mineral deposit on each those claims. AR 424-25, 428.

On appeal, the IBLA rejected ALJ Sweitzer's ruling that an exposure of cutoff grade

mineralization within a mineral deposit determined to be valuable is required to establish

discovery. AR 740 ("Judge Sweitzer went too far in adopting cutoff grade as if it were a rule of

law."). This ruling should have resulted in the IBLA holding that the BLM failed to present a

*prima facie* case with respect to EB 6 and RE 2 because the BLM did not prove the absence of an

exposure of below cutoff grade mineralization within Mr. Gruber's identified valuable mineral

deposits.[10] *See* AR 428.

The IBLA, however, failed to grasp the significance of its ruling and how that ruling

defeated the BLM's purported *prima facie* case as to those two claims. Instead, the IBLA

blindly ruled that the BLM presented a *prima facie* case when Mr. Gruber testified that he

examined the claims and found the mineral values insufficient to support a discovery. AR 743-

744. The flaw with this ruling is that Mr. Gruber's testimony regarding the purported lack of

discovery on EB 6 and RE 2 was based upon his erroneous interpretation that an exposure of

cutoff grade mineralization had to exist within his identified valuable mineral deposit. AR 743

(citing AR 1695-96, 1836-37). Testimony regarding lack of discovery based upon an erroneous

interpretation of the law does not establish a *prima facie* case. *Hooker*, 48 IBLA at 31.

---

[10] Once the IBLA reversed ALJ Sweitzer's ruling regarding cutoff grade, it should have
remanded for further proceedings. *See United States v. Miller*, 138 IBLA 246, 279 n.19 (1997)
(fundamental fairness generally requires a new hearing if an ALJ uses an erroneous
interpretation of the Mining Law.). Indeed, ELAM spent a considerable amount of time and

Therefore, because Mr. Gruber conducted his examination under an erroneous interpretation of the Mining Law and subsequently asserted opinions based upon this erroneous interpretation, the BLM failed to present a *prima facie* case that any of the Six Contested Claims were invalid. At a minimum, the BLM did not present a *prima facie* case with respect to EB 6 and RE 2. Thus, this Court should hold unlawful and set aside the IBLA's decision.

**B.    Mr. Gruber Erroneously Utilized And Improperly Applied Circular 831.**

During the hearing, the BLM introduced into evidence the BLM Handbook for Mineral Examiners that was in effect at the time of Mr. Gruber's examination (hereinafter "1989 Handbook"). AR 760-887. Although the 1989 Handbook sets forth the procedures and criteria for conducting mineral examinations (*see* AR 761 ) and Mr. Gruber testified that the 1989 Handbook is the "most comprehensive" and "widely used guidance" for conducting validity examinations (AR 1516-17), he failed to use it in conducting his validity examination. Instead, as demonstrated above, Mr. Gruber chose to use Circular 831.

Circular 831, however, was not designed to be used by mineral examiners in conducting validity examinations. Instead, Circular 831 is simply a classification scheme developed by the USGS and the U.S. Bureau of Mines for all minerals (solids and liquids) so that there would be some consistency in nomenclature regarding the Nation's mineral resources to assist in long-term public and commercial planning. AR 1089, 2313. Indeed, as explained by David Abbot, former Regional Geologist for the U.S. Securities and Exchange Commission (AR 2307-08), Circular 831 is merely a document to be used to classify mineral resources after the deposit or reservoir has been evaluated and is not to be used to evaluate a deposit or reservoir in the first instance.

---

energy chasing a "red herring" regarding cutoff grade that ALJ Sweitzer released when he erroneously denied ELAM's Motion for Partial Summary Judgment.

AR 2317-18; *see also* AR 2318-19 (classification scheme in Circular 831 is "useless").

That Mr. Gruber erroneously utilized Circular 831 in conducting his mineral examination is confirmed by both the 1989 Handbook and the latest version of the handbook.[11]  Indeed, the 1989 Handbook does not even mention Circular 831 (AR 760-887), although it does describe a classification scheme consisting of the terms "proven," "probable," and "possible" reserves. AR 795-96.  The 1989 Handbook also provides that "[f]or purposes of discovery[,] proven and probable reserves can be used to calculate the economics of the property" and that "[i]n a contest proceeding involving discovery, the probative value of proven and probable reserves is much greater than that of possible reserves."  AR 796.  Thus, under the 1989 Handbook, "proven," "probable," and "possible" reserves may be considered in determining whether a discovery has been made.  *Id.*

More importantly, the 2007 Handbook expressly advises mineral examiners to:

> [U]se extreme caution when using ore/reserves or resources terminology to confirm the discovery of a valuable mineral deposit.  *There is no direct correlation between these terms and the validity determination standards because they differ in purpose.*

2007 Handbook at V-6 (emphasis added).  As a result, the 2007 Handbook advises that, if use of a classification scheme is necessary, the definitions from McKinstry, H.E., *Mining Geology* (Prentice Hall 1948),  *i.e.*, "proven," "probable" and "possible" reserves are to be used.  2007 Handbook at V-4.

The 2007 Handbook also advises against using the classification scheme in Circular 831 because the "McKelvey" diagram upon which it is based was designed for:

> [M]ineral resource inventories and land use planning and not for classifying resources and reserves on specific mineral properties.  *The McKelvey diagram*

---

[11] On September 11, 2007, the third edition of the BLM's Handbook for Mineral Examiners was released ("2007 Handbook").  The relevant portion of the 2007 Handbook is attached hereto as Exhibit 1.

> *lacks the precision necessary to properly classify resources and reserves for economic reporting purposes or determinations of validity using the prudent person rule.*

*Id*. at V-7 (emphasis added). Thus, although the classification scheme in Circular 831 "is well suited to its intended purpose, the estimation of the reserves of a district or nation[,] [i]t is less satisfactory for valuing a single mine." *Id*. (quoting McKinstry, at 472).

To make matters worse, not only did Mr. Gruber erroneously utilize Circular 831, he improperly applied it. Mr. Gruber testified that he drew 200-foot-radius circles around all the drill holes and called the inside of the circles "identified" resources.[12] AR 1649-51; AR 1094 (depicting "identified" resources as overlapping green arcs). From these "identified resources," Mr. Gruber somehow determined his "demonstrated resources," which he equated with "reserve base." AR 1673-74; AR 1094 (depicting "reserve base" in pink). Then, from this "reserve base," Mr. Gruber somehow determined his "reserves" and called these valuable mineral deposits. AR 1094 (depicting "reserves" in black).

The fundamental flaw with Mr. Gruber's application of Circular 831 is that he mistakenly believed that a showing of "reserves," as defined in Circular 831, was an absolute prerequisite for proving a discovery. AR 974, 1642-43. This has never been the law. "Reserves," as used in Circular 831, indicates guaranteed success. AR 1090 (defining "reserves" as that part of the "reserve base" that could be economically produced). The Prudent Man Rule requires only a "reasonable prospect of success." *Castle*, 19 L.D. at 457. Thus, Mr. Gruber's entire analysis was fatally flawed.

---

[12] By drawing these circles, Mr. Gruber ignored the bulk of ELAM's data. *See e.g.,* AR 1094 (depicting trench and rock samples outside of Mr. Gruber's circles). This is not the proper way to evaluate whether a discovery has been made. It is well established that once the existence of minerals is established (as demonstrated by the trench and rock samples), geological inference may be used to evaluate extent of the mineralization. *United States v. Larsen*, 9 IBLA 247, 262

Moreover, in accordance with the Prudent Man Rule, the 1989 Handbook provides that, in addition to proven reserves (*i.e.*, Mr. Gruber's reserves), probable and possible reserves may be used to establish discovery. AR 795-96. Because Circular 831 suggests that "inferred" reserves equate to "possible" reserves (AR 1090), Mr. Gruber should have considered "inferred reserves" in his analysis. Instead, Mr. Gruber rejected "inferred reserves" out of hand. Indeed, this is evident from his Report:

> The [IBLA] has also held the Inferred Reserves (also a subset of Identified Reserves) may not be used to satisfy the test of discovery. *U.S. v Feezor, et al.*, 130 IBLA 146 (1994).

AR 973. This excerpt is a complete misstatement of the law, as explained by ALJ Sweitzer:

> There is no doubt that Mr. Gruber inaccurately characterized the [IBLA's] standard regarding the use of inferred reserves as an absolute prohibition against their use in proving a discovery. In fact, the [IBLA] has held "that there may be circumstances in which an 'inferred reserve' could be considered in support of a discovery finding."

AR 424 (quoting *Vanderbilt Gold Corp.*, 126 IBLA 72, 83 (1993)).[13] Thus, Mr. Gruber skewed his analysis to the detriment of ELAM. In fact, this is abundantly clear from the map he prepared at the 11th hour.

On this 11th-hour map, Mr. Gruber outlined his "identified" resources in green, his "reserve base" in pink, and his "reserves," in black. AR 1094. Under Circular 831, the large area between Mr. Gruber's green lines and his pink lines is, by definition, "inferred resources." AR 1093. Within these "inferred resources" there are "inferred reserves" or "inferred reserve

---

(1973). Simply drawing circles is not the application geological inference and, in fact, requires no skill.

[13] "Inferred reserves" must be considered when determining whether discovery exists because "prudent miners often commit to development based upon a reasonable expectation that additional ore will be exposed." *United States v. Collord*, 128 IBLA 266, 348, n. 25 (1994) (Mullen, J., dissenting); *see also Dresselhaus*, 81 IBLA at 270 (finding discovery with respect to three claims because there was "a reasonable expectation that more ore will be developed through orderly operation of the mine.").

base," depending on whether Figure 1 or Figure 2 of Circular 831 is used.  AR 1093.  Despite the

huge amount of "identified resources" depicted on Mr. Gruber's map, he found only 47,271 tons

of "inferred reserves" in Main Gold Zone (AR 1094), which he purposefully excluded from his

analysis.  AR 933.  That Mr. Gruber concluded that there were only 42,721 tons of "inferred

reserves" is neither reasonable nor logical, considering the huge areas of "identified resources"

upon which samples had been taken.  *See* AR 1094.

The ramifications of Mr. Gruber's mistake are particularly evident with respect to RE 1

and RE 2.  On his 11th-hour map, Mr. Gruber indicated a large area of "identified" resources

located around TCM-1, which was drilled from the east side of RE 1 diagonally east into RE 2.

AR 1094.  Because this area has drill hole samples and surface samples (AR 1094, AR 1456,

1459, 1461), under Circular 831, this area of "identified" resources includes "measured" and

"indicated" resources.  AR 1090.  More importantly, using Figure 2 of Circular 831, this area of

"identified resources" necessarily includes "reserve base" and "inferred reserve base," both of

which may used to prove discovery.  Mr. Gruber, however, simply ignored this area in his

analysis.  As a result, the BLM failed to present a *prima facie* case that RE 1 and RE 2 were

invalid.[14]

----

[14] This is especially true considering that the "contact zone," *i.e.*, the area where the young
igneous rocks contact the older sedimentary rocks, runs through this portion of both RE 1 and
RE 2.  *See* AR 952, 957, 1062; *see also* AR 1455-56 (cross section depicting ELAM's
interpretation of the mineralization in the "contact zone").  Although, Mr. Gruber recognized that
this "contact zone" was the ideal place for gold (AR 955-62, 973-75, 1636-37), he closed his
eyes to this geological evidence when he drew his circles and classified this area as "identified"
resources.  *See* AR 1094.  This was inexcusable considering that the geochemical samples (AR
1475), the trench samples (AR 1459), and the TCM-1 drill hole (AR 1461) all confirm the
existence of gold in this area.  *See also* AR 1465 and 1467-69 (depicting RE 1-2 in relation to
ELAM's proposed pit).  A "person of ordinary prudence" would not ignore this compelling
geological and physical evidence.  Instead, he would expend his "labor and means, with a
reasonable prospect of success, in developing a valuable mine" on RE 1 and RE 2.  Thus,
contrary to Mr. Gruber's erroneous assertions, discovery was made on RE 1 and RE 2.

Mr. Gruber made another error with respect to RE 1 when he classified the portion of that claim outside of the "identified resources" around TCM-1 as "undiscovered resources." AR 1094. Circular 831 defines "undiscovered resources" as "[r]esources, the existence of which are only postulated . . . . ." AR 1090. "Postulate" means "to assume without proof." *Webster's II New College Dictionary* (1999). The error that Mr. Gruber made is that there is evidence of resources on that portion of RE 1. Indeed, approximately 1,400 feet of trench samples were taken on that portion of RE 1. AR 1063, 1459. Thus, under Circular 831, Mr. Gruber should have classified this portion of RE 1 as "indicated" or "measured" resources."[15] AR 1086-1093. More importantly, if these resources had been properly classified as either "indicated" or "measured," or even "inferred," then these resources necessarily would have included "reserve base" or "inferred reserve base" (AR 1093), both of which may used to prove discovery. Because Mr. Gruber misclassified this portion of RE 1, the BLM failed to present a *prima facie* case that RE 1 was invalid.

Mr. Gruber made this same error with respect to P 14-16. From each of those claims, rock samples were taken that contained gold. AR 1094, 1325-26, 1459. Despite these samples, Mr. Gruber classified those claims as "undiscovered resources." AR 1094. Again, the existence of actual samples means that, under Circular 831, the resources are no longer "undiscovered." AR 1090-91. At a minimum, the resources are "identified," which necessarily means there are "inferred," "indicated," or "measured" resources on those claims. AR 1093, AR 2138 ("There is an identified mineralization of gold on [P 14-16], and so I would move them at least into the

---

[15] The geochemical sampling also indicates strong evidence of gold on this portion of RE 1. AR 1475. Based upon this geochemical evidence alone, Mr. Gruber, at a minimum, should have classified this portion of RE 1 as "inferred" resources. *Cf. Collord*, 128 IBLA at 331 (Mullen, J., dissenting) (geochemical evidence may be used to classify resources as "inferred" resources.);

'identified resource' category, and not leave them in the . . . 'undiscovered' category."); *see also*, AR 1475 (depicting geochemical evidence of gold on P 14-16). Because Mr. Gruber misclassified P 14-16, the BLM failed to present a *prima facie* case that those claims were invalid.

### C.    Mr. Gruber Failed To Conduct An Objective Analysis.

The Prudent Man Rule is expressed in objective terms. *Castle*, 19 L.D. at 457 ("a person of ordinary prudence"). Mr. Lehmann repeatedly advised Mr. Gruber that the Tootsie Creek Deposit was a low-grade, large-tonnage, disseminated gold deposit and asked that Mr. Gruber analyze it as such. AR 1472-80, 1980-81. The U.S. Bureau of Mines made a similar recommendation. AR 1157-60. Despite these requests, Mr. Gruber ignored the bulk of ELAM's data and subjectively focused on the isolated, high-grade zones, and proceeded to develop a model to mine only those discrete little zones.[16] AR 2265-66. More importantly, by developing a model to mine only the high grade zones, he purposefully created an unreasonable high cutoff grade that he then used to invalidate ELAM's claims. *See* AR 1761-62.

Mr. Gruber concluded that his "reserve base" consisted of eight deposits containing 604,915 tons. AR 973-76, 1094. Inexplicitly, Mr. Gruber's "reserves," from which he calculated his cutoff grade, came from only six of these deposits and totaled only 387,942 tons. AR 977. Thus, Mr. Gruber left 216,973 tons of valuable ore in the ground, which is something that a "person of ordinary prudence" would never do.

---

*see also* AR 964 (Mr. Gruber acknowledging that the geochemical information is an "indicator of mineralization[.]").

[16] A mineral examiner should not ignore a mine model endorsed by a federal agency with greater expertise. *See Silva v. Lynn*, 482 F.2d 1282, 1285 (1st Cir. 1973) (federal agency may not ignore comments from a sister agency).

Mr. Gruber tried to justify not mining those 216,973 tons on the grounds that: (1) he was trying to use the "least costly" mine model; and (2) he wanted to complete mining within one year. AR 1692-93; *see also* 1761. These are astonishing assertions for a purported mineral examiner. A "person of ordinary prudence" does not design the "least costly" model that can be completed in one year. Instead, he designs a mine model that maximizes profits. By subjectively focusing on the isolated, high-grade zones so as to create an unreasonably high cutoff grade to make it easier to invalidate ELAM's claims, Mr. Gruber failed to conduct an objective analysis in violation of the Prudent Man Rule. As a result, the BLM failed to establish a *prima facie* case that any of the Six Contested Claims were invalid.

### D.     Mr. Gruber Failed To Apply The Group Claim Rule.

It is well established that a group of mining claims may be considered together for purposes of determining whether discovery exists on each of the claims. *Schlosser v. Pierce*, 93 I.D. 211, 223-25 (1986); *United States v. Foresyth*, 100 IBLA 185, 250 (1987). This "Group Claim Rule" is premised on economies of scale, *i.e.*, the spreading of costs over a larger tonnage may allow for the mining of marginal claims. *Collord*, 128 IBLA at 348 (Mullen, J., dissenting) ("By spreading the indirect, capital, and/or fixed costs over a larger tonnage, lower grade resources can often be mined at a profit."). This Group Claim Rule is particular applicable with respect to low-grade, high-tonnage mineral deposits, such as the Tootsie Creek Deposit. *See* Maley, T., *Mineral Law*, 537 (6th ed. 1996).

To establish discovery for a group of mining claims under the Group Claim Rule:

[A] claimant must prove that a valuable mineral is actually present on each of the claims. Once mineral is demonstrated to be present, the proof of sufficient quality and quantity of mineral to warrant development can take into consideration the overall mining operation.

*Cactus Mines Limited*, 79 IBLA 20, 32, n.2 (1984) (Mullen, J., concurring); *Schlosser*, 93 I.D. at

224-225; *Foresyth*, 100 IBLA at 250.  In other words, a claimant must demonstrate that locatable minerals are present on each claim and then the minerals from those claims, as well as the minerals from other properties held by the claimant, may be aggregated for purposes of determining whether there is a reasonable prospect of success in developing one valuable mine. *Collord*, 128 IBLA at 348 (Mullen, J., dissenting). ("The test [is] . . . whether a prudent man would develop a mine, rather than would he develop a claim.")

In the instant case, Mr. Gruber admitted that ELAM had exposed gold and silver on each of the Six Contested Claims.  AR 971.  Thus, under the Group Claim Rule, Mr. Gruber should have aggregated the minerals from all of ELAM's claims (valid and purportedly invalid) and the other property interests held by ELAM (*e.g.*, the Malvina and the Placer No. 1 claims) to determine whether there was reasonable prospect of success in developing one valuable mine. Mr. Gruber, however, failed to do this – probably because he knew what he would be compelled to conclude.  Instead, he high-graded the Tootsie Creek Deposit to establish an unreasonably high cutoff grade and left 216,973 tons of valuable ore in the ground!  AR 973-77.

Although the "economies of scale" in a mining operation may not be a straight line function, it is beyond doubt that Mr. Gruber's overall mining cost of $11.09/ton (AR 991) would have been lower had he mined all the valuable ore he identified.  With a lower overall mining cost, Mr. Gruber would have been able to mine what he perceived to be lower grade deposits, which would have meant more valuable mineral deposits and more valid claims, *e.g.*, RE 1-2.[17] Additional valid claims, however, would have been contrary to the BLM's stated goal of "prevent[ing] mineral activity in [the Sweet Grass Hills]."  AR 1143.  This may explain why Mr.

---

[17] Mr. Gruber testified, based upon a "quick analysis," that the samples taken from TCM-1 did not reveal a valuable mineral deposit on RE 1 or RE 2, because the grades were purportedly too

Gruber left 216,973 tons of valuable ore in the ground.  Whatever the reason – ignorance or undue influence – Mr. Gruber failed to apply the Group Claim Rule and, thus, his opinion regarding lack of discovery did not establish a *prima facie* case for the BLM.

## III.    ELAM PROVED, BY A PREPONDERANCE OF THE EVIDENCE, A DISCOVERY ON THE SIX CONTESTED CLAIMS.

### A.    A Prudent Man Would Be Justified In The Further Expenditure Of His Labor And Means, With A Reasonable Prospect Of Success, In Developing A Valuable Mine On ELAM's Six Contested Claims, Eight Valid Claims, And Other Property Interests.

Assuming, *arguendo*, that ELAM had the burden of persuasion, ELAM proved, by a preponderance of the evidence, there was a reasonable prospect of success in developing a valuable mine on its Six Contested Claims, eight valid claims, and other property interests.  In his Report and through testimony, Mr. Lehmann demonstrated that a low-grade, large-tonnage, disseminated gold deposit covered the Six Contested Claims, the eight valid claims, as well as surrounding property interests held by ELAM.  AR 1456, 2043.  Mr. Lehmann explained that there are two types of gold mineralization within the Tootsie Creek Deposit:  (1) a carbonate-hosted contact metamorphic gold deposit; and (2) a large volume, low-grade stockwork gold deposit.  AR 1226-27, 1229, 1251, 2016-20, 2043-44, 2082-83.  Because of the close proximity of the two types of mineralization, Mr. Lehmann concluded, based on his decades of experience, that they could be profitably mined in a single, large volume, open pit operation covering nearly the entire claim block, most of the Malvina, and a portion of the No. 1 Placer.   AR 1229-30, 1251, 2082; *see also* AR 1465-70 (depicting proposed pit).  Accordingly, Mr. Lehmann designed a sophisticated, but conservative, open-pit mine model based upon similar successful mines in the western United States.  AR 1230-31, 2084-86.

---

low.  AR 1664-72.  If he had applied the Group Claim Rule and mined the 216,973 tons of valuable ore he left in the ground, his "quick analysis" may have come out differently.

Under Mr. Lehmann's model, the higher grade material, which contains the bulk of the recoverable gold and silver, would be crushed and agglomerated ("C&A" ore) prior to heap leaching. AR 1231, 2084-86. By contrast, the lower grade material ("run-of-mine" or "ROM" ore) would be removed and placed directly on the heaps without further processing. AR 1231, 2084-85. The advantage of Mr. Lehmann's model was that the recoveries from the C&A ores were increased and any recovery realized from the ROM ores was an additional bonus because those ores would have to be removed irregardless in order to mine the C&A ores. AR 1231, 2084-85, 2098-99; 2320-21.

Once the type of model was determined, Mr. Lehmann then went through an iterative process to determine the cutoff grade for the two types of ore. AR 1231-32, 2097-99. Using the capital and operating costs from Pegasus' Florida Canyon Mine (modified for local conditions),[18] a mine dilution factor of 5 percent, royalties of 2 percent, state taxes of 1.6 percent, leaching recovery rate of 50 percent for ROM ore and 75 percent for C&A ore, leaching cost of $0.60/ton, and a gold price of $400/oz, Mr. Lehmann determined a cutoff grade of 400 ppb for C&A ore and 114 ppb for ROM ore. AR 1232-33, 2086-87, 2099-3000.

Mr. Lehmann then analyzed the 1,928 rock, trench, and drill hole samples that were taken from within his proposed pit and determined that 18.31 percent of the material within his proposed pit contained his C&A ore cutoff grade of 400 ppb, and that 31.07 percent contain his ROM ore cutoff grade of 114 ppb. AR 1234-35, 2200-01, 2203-04. The remaining 50.62

---

[18] The IBLA complained that Mr. Lehmann's adjustments for "local conditions" were unexplained. AR 751. This is not true. Mr. Lehmann explained that he included additional costs for acquiring land ($350,000), up to five miles away, so that the heaps would not be located in the Tootsie Creek drainage. AR 1240, 2086-87. Mr. Lehmann also explained that he included additional costs for road construction ($562,000) and construction of a power line ($7,914,000). AR 1240, 2087-88.

percent of the material was identified as waste. *Id*. From these figures he then determined his

stripping ratio was 1.03:1. AR 1234-35.

Mr. Lehmann then divided his proposed pit into 400-foot wide cross-sections. AR 1236,

1243, 1423, 1465-70. He then measured the volume of each cross-section and converted the

volume of each cross-section into short tons by using a conversion factor of 12.5 cubic feet per

ton. AR 1236-38. By adding the tonnage within each cross-section, Mr. Lehmann determined

that 206 million tons were within his proposed pit. AR 1236-38. Using a 5 percent dilution

factor (AR 1239), Mr. Lehmann determined that, by mining 51,156 tons per day, 350 days per

year, the life of the mine would be 10.89 years. AR 1240. Mr. Lehmann then applied the

respective percentages of C&A and ROM ores to the total tonnage mined and concluded that he

would mine 35,636,000 tons of C&A ore containing 901,000 ounces of gold equivalent and

60,488,000 million tons of ROM ore containing 186,000 million ounces of gold equivalent. AR

1237. Ultimately, Mr. Lehmann concluded that the mine would generate total revenues of

$434,915,000, profits of $77.7 million (before income taxes), and produce an internal rate of

return of 11.95 percent. AR 1251-52. Based upon this analysis, Mr. Lehmann concluded that a

"prudent man would be justified in expending more money" with a reasonable prospect of

success in developing a valuable mine with the Six Contested Claims, the eight valid claims, and

the other property interests held by ELAM. AR 1252; *see also* AR 2325-26 (Mr. Lehmann's

model "has a sound, reasonable geologic basis" and ELAM has "a reasonable prospect of

developing a mine.").

>### 1.    The IBLA erroneously relied on the oxidation/leachability
>         issue in rejecting Mr. Lehmann's model.

The IBLA used the oxidation/leachability issue as support for its decision to reject Mr.

Lehmann's model. AR 744-45. The oxidation/leachability issue, however, was created by Mr.

Gruber to justify his "high-grading" of the Tootsie Creek Deposit.

Mr. Gruber testified that, in conducting his validity examination, he relied on a report prepared in 1983 by M. Stephens Enders and Leslie M. Rogers ("Enders/Rogers Report"). AR 1535-39; AR 1068-1076. Specifically, Mr. Gruber cited the Enders/Rogers Report for his proposition that oxidation is the controlling factor on the ability to recover gold in a heap-leach operation because of the leachability of the oxidized ores. AR 1535-39. Then, by focusing exclusively on the well oxidized portions of the gold deposits (and ignoring the non-oxidized portions), Mr. Gruber came up with discrete little mineral deposits. *E.g.*, AR 1063. Mr. Gruber's reliance on the Enders/Rogers Report was badly misplaced.

First, the Enders/Rogers Report is not a textbook on how to evaluate low-grade, large-tonnage, disseminated gold deposits, such as the Tootsie Creek Deposit. Instead, it is a paper describing the mining program that was being implemented by Pegasus at its Zortman and Landusky Mines. AR 1068-76. Second, the Enders/Rogers Report was written in 1983, *i.e.*, fifteen years before the hearing in the instant case. AR 1068. The Enders/Rogers Report also predated Pegasus' 1993 Form 10-k by 10 years. In that Form, Pegasus disclosed that, although "ores exploited to date [12/31/93] have come from the oxidized zones" (AR 916), "there are additional probable oxide and sulfides reserves of 61.4 million tons."[19] AR 918.

Finally, Mr. Gruber placed more reliance on an inapplicable, outdated report than he did on the BLM's own "bottle roll" tests. For example, the BLM conducted a "bottle roll" test on a sample taken from TSF-3 at a depth of 20-30 feet, which showed a recovery of 77.78 percent of the gold in place. AR 897, 1079, 1782. Mr. Gruber indicated that this sample was taken from an

---

[19] Under the 1989 Handbook, "probable" reserves may be used to determine discovery. AR 795-96. Thus, the sulfide deposits on ELAM's claims should have been considered by Mr. Gruber.

oxide zone.  AR 1079, 1782-83.  On cross-examination, however, Mr. Gruber conceded that the "driller's log" indicated that this sample, was actually taken within a non-oxide zone, *i.e.*, a sulfide zone!  AR 1781-85.  Similarly, the BLM conducted three "bottle roll" tests on samples taken from TCM-2,-2A in a sulfide zone at depths of 310-315, 315-320, and 335-340 feet.  AR 898-900.  These three tests showed recoveries of 48.84, 45.70, and 42.86 percent, respectively. *Id*.  Thus, the BLM's own tests showed favorable recoveries for the sulfide zones and established that oxidation/leachability was not an issue.

In fact, Mr. Lehmann was "encouraged" by the results of the BLM's "bottle roll" tests because they showed high recovery rates and indicated that relatively low amounts of cyanide would be needed to extract the gold and silver.  AR 2087-89, 2205-07, 2210.  In Mr. Lehmann's opinion, these facts indicated that the gold was not "refractory," but occurs as "native gold" or "electrum," which would make the gold very amenable to cyanide leaching.  AR 2089-90, 2206. In any event, Mr. Lehmann planned to enhance leachability by crushing and agglomerating the higher grade ore.  AR 1230-31.

As the foregoing demonstrates, the oxidation/leachability issue was not the determinative issue that the IBLA erroneously thought it to be.  It certainly does not defeat Mr. Lehmann's model or the inescapable conclusion that a "person of ordinary prudence" "would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine" with ELAM's Six Contested Claims, eight valid claims, and other property interests.

## 2.    The Prudent Man Rule does not require a guaranteed success.

As demonstrated in the instant case, and the other mining claim cases that came before it, the IBLA believes that the Prudent Man Rule requires a showing of a guaranteed success.  AR 690, 744-756; *see also* Reeves, G., *The Origin and Development of the Rules of Discovery*, VIII Land and Water L.1, 3 (1973) ("'[Reasonable prospect of success' has virtually been replaced by the requirement that economic feasibility be presently demonstrable."); Mullen, R.W., *The "Prudent Man" Ain't What She Used To Be Many Years Ago*, 49 Rocky Mt. Min. L. Inst., 10-1, 10-10 to 10-18 (2003).  Contrary to the belief of the IBLA, the Prudent Man Rule "does not require a showing that a mine would be successful; only that there is a reasonable prospect that a mine would be successful."  Haggard, J., and Curry, J.S., *Recent Developments In The Law of Discovery*, 30 Rocky Mt. Min. L. Inst., 8-1, 8-3 to 8-4 (1984).  In fact, the Prudent Man Rule, as originally articulated, purposefully requires less than a "guaranteed success" in order to encourage the investment of capital in the development of the Nation's mineral resources. *Castle*, 19 L.D. at 457.

Here, ELAM presented a sophisticated mine model, based upon all the evidence that ELAM had accumulated and Mr. Lehmann's 40-years of experience, that showed a significant amount of profit may be made by mining the low-grade, large-tonnage, disseminated gold deposit that covered the Six Contested Claims, the eight valid claims, as well as surrounding property interests held by ELAM.  AR 1167-1470.  The IBLA, however, essentially "fly-specked" the model and suggested that it was "speculative and lacking sufficient proof." AR 750.  Just as the "prudent man" need not prove guaranteed success, he also need not appear at a claim contest with a feasibility study and his banker.  *See* Sherwood, D., *Mineral Discovery: Is The Prudent Man Dead*, 44 Rocky Mt. Min. L. Inst., 10-1, 10-11- to 10-13 (1998).  Nor does

the "prudent man" need to show a certain return on investment. *Collord*, 128 IBLA at 321 (Byrnes, C.J., concurring in part and dissenting in part). Instead, the "'prudent man' can and will take reasonable economic risks[,]" "otherwise he [w]ould not be in the business of mining." *Id*. Thus, the "reasonable prospect of success" component of the Prudent Man Rule necessarily includes the "possibility of failure." *Id*. at 348 (Mullen, J. dissenting). Therefore, contrary to the belief of the IBLA, ELAM did not have to prove that success was guaranteed.

### 3.    The so-called "marketability test" does not apply.

In requiring ELAM to show that mining on the Six Contested Claims would be a guaranteed success, the IBLA relied on the so-called "marketability test" from *United States v. Coleman*, 390 U.S. 599, 600-603 (1968). AR 690. In that case, the Supreme Court purported to refine the Prudent Man Rule by engrafting thereon the marketability test, which the Department had been applying to "common variety" minerals, *i.e.*, minerals of widespread occurrence. *Coleman*, 390 U.S. at 601-03. As interpreted by the Department, the marketability test requires a claimant, in order to establish a discovery, to show, as a present fact, that the minerals on his claim can be "extracted, removed and marketed at a profit." *Coleman*, 390 U.S. at 600.

Although the Supreme Court believed that the Prudent Man Rule and the "marketability test were "complement[ary]," *id*. at 602, the two are irreconcilable. Reeves, G., *The Origin and Development of the Rules of Discovery*, VIII Land and Water L. Rev., at 56-57. Indeed, it is impossible to reconcile "reasonable prospect for success" with "presently marketable at a profit." *Id*. Because the two tests are irreconcilable, the marketability test cannot be applied to minerals, such as gold and silver, that are indisputably marketable. Instead, its use, if any, must be limited to minerals of widespread occurrence. *See Lara v. Secretary of the Interior*, 820 F.2d 1535, 1540-41 (9th Cir. 1987) (refusing to apply the present profitability component of the

marketability test to claims located for gold). Thus, the IBLA erred in relying on *Coleman* and the so-called marketability test in requiring ELAM to prove that mining the Six Contested Claims would be a guaranteed success. Accordingly, this Court should hold unlawful and set aside the IBLA's decision.

### B.    ELAM Proved A Discovery On EB 6.

In his East Gold Zone, Mr. Gruber identified 5 "mineral deposits," which he called "Blocks 1-5." AR 974-75. Of those 5 minerals deposits, Mr. Gruber somehow determined that only Blocks 1-4 were valuable mineral deposits. AR 977-78. Importantly, Block 3 lies within north part of B 48 and extends northwest across an approximately 10-foot-wide sliver of EB 6, and continues on into EB 5. AR 1066. In general terms, Block 3 is a 25 foot by 100 foot rectangle with a depth of 30 feet. AR 1006, 1066.

Although Mr. Gruber determined that Block 3 contributed 6,806 tons to his reserve base (AR 975), he determined that it contained only 4,723 tons of reserves.[20] AR 909. Of those 4,723 tons, Mr. Gruber determined that 4,327 tons and 120 tons would be mined from EB 5 and B 48, respectively. AR 978. The remaining reserves within Block 3 (*i.e.*, 276 tons) necessary are within EB 6.

Notwithstanding that Mr. Gruber determined that EB 6 contained a valuable mineral deposit with 276 tons of reserves, the IBLA ruled that no discovery had been made on EB 6 because of its belief that ELAM had not exposed minerals on EB 6 within Mr. Gruber's valuable mineral deposit. AR 744. In short, the IBLA ruled that if a claimant does not expose minerals within a valuable mineral deposit identified by the government's expert, there can be no

---

[20] The discrepancy between the size of Block 3 and the amount of reserves recovered therefrom is probably due, in part, to the fact that Mr. Gruber mined only 20 feet of a deposit he determined to be 30 feet deep. *Compare* AR 910 with AR 1006.

discovery.  This ruling is unprecedented and has no support in the Mining Law or the facts.

First, ELAM submits that, when the BLM's mineral examiner determines that a valuable mineral deposit containing reserves exists on a mining claim, discovery is proven.  In fact, it is hard to image a more convincing case for discovery than when the government's own expert determines that a valuable mineral deposit containing reserves exists on a claim, especially when that expert is trying to disprove discovery.  This conclusion is even more compelling in the instant case because the relevant portion of EB 6 is a 10-foot-wide sliver that is bracketed by two adjoining claims held by ELAM upon both which exists the same valuable mineral deposit.  AR 1066.  The IBLA's ruling that a discovery does not exist on EB 6 is a perversion of the Mining Law.

Second, assuming, *arguendo*, that a claimant must expose minerals within a valuable mineral deposit identified by the mineral examiner, ELAM submits that the size of the valuable mineral deposit must be accurately reported by the mineral examiner.  Block 3 is located in what Mr. Gruber identified as "vuggy marble."  AR 1625-26; AR 1065 (depicting the "vuggy marble" in pink).  Based upon Mr. Gruber's geological cross-section (AR 1065), the "vuggy marble" is approximately 75 feet wide at the surface and extends vertically approximately 135 feet from an elevation of 5,475 feet to 5,340 feet, at which point the augite-syenite-porphyry intrusion appears.  AR 1065.  Why Mr. Gruber chose to limit the depth of Block 3 to 30 feet is truly a mystery.  *See* AR 1610-11 (Mr. Gruber testifying that it was possible to mine to a depth of 100 feet); AR 744 (IBLA acknowledging that the mineral deposit Mr. Gruber identified on EB 6 extended downward to an elevation of 5,340 feet).  This is especially true considering this portion of the "vuggy marble" is all within Mr. Gruber's "oxide zone."  AR 1080; *see also* AR 975 ("[O]xidation is developed best in carbonate rock and ranges in depth from 120 feet (TCE-3) to

500 feet (TCE-1).").  Thus, because Mr. Gruber unnecessarily truncated the size of the valuable mineral deposit on EB 6, ELAM should not be required to expose minerals within that valuable mineral deposit.  Indeed, requiring an exposure within the portion of the valuable mineral deposit that crosses the sliver of EB 6 seems like overkill considering that Mr. Gruber had already proved that the 276 tons of reserves within that sliver could be mined at a profit!

In any event, ELAM did expose minerals on EB 6 within Mr. Gruber's truncated valuable mineral deposit.  To determine the grade of Block 3, Mr. Gruber took the average of three of ELAM's samples, *i.e.*, MTL R 852 (2,530 ppb), MTL R 853 (960 ppb), and MTL R 854 (960 ppb).  AR 1006.  Importantly, MTL R 854 was taken on EB 6.  AR 1328; *see also* AR 2104 ("[A]t least one sample of 960 ppb plots on EB-6."); *compare* AR 1066 (showing Mr. Gruber erroneously plotted this sample as being on EB 5).  Mr. Gruber would not use a sample to determine the grade of a valuable mineral deposit if he did not intend to mine the area where the sample was taken.  Thus, ELAM exposed minerals within Mr. Gruber's valuable mineral deposit on EB 6.

This conclusion is supported by the drill hole data.  TCE-1 was collared on EB 5 and was drilled diagonally to the southwest at 45 degrees (AR 1066) and crossed through EB 5, EB 6, B 48, and bottomed on the Malvina Claim.  *Id*.  At 40 feet, TCE-1 entered EB 6 and then exited EB 6 at 60 feet.  AR 1430, 1456, 1463.  This 20-foot interval was sampled in 5-foot segments and the four samples assayed at 220, 360, 210, and 222 ppb.  AR 1395, 1430, 2102.  The true depth of this interval is approximately 28 feet to 42 feet, and this interval is within both Mr. Gruber's "oxide zone" and the "vuggy marble" he mined.  AR 1080, 1625-1626.  More importantly, because this interval started at 28 feet true depth and Mr. Gruber "conservative[ly]" estimated the depth of Block 3 as being 30 feet, ELAM exposed minerals within Mr. Gruber's valuable

mineral deposit on EB 6.[21]

Accordingly, even under Mr. Gruber's model, ELAM satisfied the IBLA's new test for discovery. Therefore, this Court should hold unlawful and set aside the portion of the IBLA decision that declared EB 6 invalid.

### C.    ELAM Proved A Discovery On RE 2.

In his South Fork Gold Zone, Mr. Gruber identified one large valuable mineral deposit, a portion of which lies on RE 2. AR 976, 1063, 1067, 1094, 2113-17. Although Mr. Gruber determined that this valuable mineral deposit contributed 456,048 tons to his reserve base, he somehow determined that it contained only 356,048 tons of reserves.[22] AR 913, 975.

As it did with respect to EB 6, the IBLA ruled that no discovery had been made on RE 2 because, although Mr. Gruber identified a valuable mineral deposit containing reserves thereon, ELAM purportedly failed to exposed minerals on RE 2 within the valuable mineral deposit identified by Mr. Gruber. AR 746-47. Again, ELAM submits that when the BLM's mineral examiner determines that a valuable mineral deposit containing reserves exists on a mining claim, discovery is proven. Thus, the IBLA erred, as a matter of law, when it declared RE 2 invalid.

Assuming, *arguendo*, that a claimant must expose minerals within a valuable mineral deposit identified by the mineral examiner, ELAM did expose minerals on RE 2 within Mr.

---

[21] The IBLA focused solely on the data from TCE-2 and ignored the data from TCE-1 when it concluded that ELAM had not exposed minerals within Mr. Gruber's valuable mineral deposit. AR 744. ELAM submits that data from TCE-2 also demonstrates an exposure of minerals within a valuable mineral deposit. AR 1456, 1463. In any event, the data from TCE-1 is sufficient because, presumably, the new test created by the IBLA requires only one exposure within the mineral examiner's valuable mineral deposit.

[22] The 100,000 ton discrepancy is due, in part, to Mr. Gruber placing his pit slope within the valuable mineral deposit. AR 2266-67. Mr. Gruber also made a mathematical error that reduced his reserves by 51,000 tons. AR 1500, 2267-75. Whatever the reason may be, the bottom line is, once again: a prudent man would not leave 100,000 tons of valuable ore in the ground!

Gruber's valuable mineral deposit.  Although Mr. Gruber never explained how he determined the aerial extent of this valuable mineral deposit, it appears he determined the boundary of the deposit where it crossed through RE 2 by drawing a curved line from outside of a rock sample that had a grade of 692 ppb in the southeast corner of section 19 to drill hole EBR-1.  AR 1063, 1067.  This rock sample is within Mr. Gruber's valuable mineral deposit (AR 1063) and is within that portion of RE 2 that does not overlap a senior claim.  AR 146, 1459; *compare* AR 1063, 1066 (both showing Mr. Gruber erroneously plotted this sample as being on P 20).  Thus, ELAM exposed minerals on RE 2 within Mr. Gruber's valuable mineral deposit and, therefore, satisfied the IBLA's new test for discovery.  Accordingly, this Court should hold unlawful and set aside the portion of the IBLA decision that declared RE 2 invalid.

In fact, this Court should do so for an additional reason.  Immediately north of Mr. Gruber's valuable mineral deposit on RE 2 are numerous rock samples taken by ELAM with the following grades (from south to north):  205 ppb,[23] 120 ppb, 238 ppb, 2,388 ppb, 204 ppb, 537 ppb, 3,389 ppb.  AR 146, 1459.  These samples are approximately 75 feet from Mr. Gruber's valuable mineral deposit (AR 2117-18) and some of them may have been mined under Mr. Gruber's model if he had not placed his pit slope within his valuable mineral deposit.  *See* AR 2266-67.  There is no geological or rational basis as to why Mr. Gruber did not draw his valuable mineral deposit to include these samples.[24]  *See* AR 2118-19.  Indeed, under Circular 831, these samples are, at a minimum, "indicated" resources, which are used to determine "reserve base."

[23] On Mr. Gruber's Plate 3, the 205 ppb sample is approximately 50 feet north of the 692 ppb sample.  AR 1063.  By contrast, Mr. Gruber's Plate 6 shows these samples within approximately 10 feet of each other.  AR 1067.  This 40-foot discrepancy raises serious concerns regarding the accuracy of Mr. Gruber's plotting skills.

[24] Mr. Gruber testified that he disregarded the 2,388 ppb and 3,389 ppb samples as being "high grade" samples and, thus, "unrepresentative."  AR 1836-37.  This was another error.  AR 2321

41

AR 1090, 1093.  Therefore, Mr. Gruber should have drawn his "reserve base" to include the area of RE 2 containing these samples.

In short, if a mining claimant must now expose minerals within a valuable mineral deposit later identified by the mineral examiner, the valuable mineral deposit must be accurately drawn by the mineral examiner.  Because Mr. Gruber failed to do this, this Court should hold unlawful and set aside the portion of the IBLA decision that declared RE 2 invalid.

IV.    **THE IBLA ERRED IN DECLARING THE SIX CONTESTED CLAIMS INVALID BECAUSE THE BLM PREVENTED ELAM FROM ACQUIRING FURTHER EVIDENCE OF ITS DISCOVERY.**

Because mining claims are a real property interests, the IBLA may not declare mining claims invalid for lack of discovery when the BLM has prevented the claimant from acquiring the evidence necessary to prove discovery.  *United States v. Mavros*, 122 IBLA 297, 310 (1992) Thus, following the withdrawal or segregation of land from mineral entry, a claimant must be allowed to test and sample his claims to gather evidence that a discovery existed on the date of withdrawal or segregation.  *Id.*; *United States v. Parker*, 82 IBLA 344, 384 (1984).

In the instant case, ELAM submitted the 1992 Plan of Operations to further delineate and develop the Tootsie Creek Deposit.  AR 1201-03, 1963-67.  Specifically, the 1992 Plan of Operations, as modified, contemplated road building and trenching on all of the Six Contested Claims and the drilling of three drill holes on the RE 1 claim, one drill hole of the EB 6 claim, and two drill holes on both P 15 and P 16.  AR 1454, 1964-65, 2123-24.  Undoubtedly, if this work had been allowed to occur, ELAM would have acquired further evidence of its pre-existing discovery on the Six Contested Claims.

---

("A valid sample is a valid sample regardless of its grade.").  In any event, at a minimum, Mr. Gruber should not have ignored the other five samples.

As demonstrated above, in order "to prevent mineral activity in [the Sweet Grass Hills]" (AR 1143), the BLM avoided approving the 1992 Plan of Operations.  Finally, on December 27, 1996, ELAM demanded that the BLM issue a decision on the 1992 Plan of Operations.  AR 1137.  The BLM responded to ELAM's demand by declaring that the BLM would not approve a plan of operations for the Six Contested Claims, unless ELAM prevailed in the claim contest. AR 1137.  Although the BLM advised ELAM of four possible options ELAM could pursue, none of those options would have allowed drilling or trenching on the Six Contested Claims.  AR 1138-39.  As a result, ELAM sought State Director Review of this decision.  AR 1487.  The State Director denied ELAM's appeal, ruling, *inter alia*:  "the BLM can only analyze proposals on those eight mining claims with valid existing rights."  AR 1488.  ELAM then appealed to the IBLA.  Although the IBLA ruled that the BLM had no authority to suspend consideration of the 1992 Plan of Operations during the validity examination, the IBLA affirmed the State Director's decision.  *Mount Royal Joint Venture*, 153 IBLA at 96-98.

As the foregoing demonstrates, ELAM did everything possible to acquire additional evidence to confirm its pre-existing discovery.  The BLM, however, intentionally impeded those efforts.  Because of the BLM's actions, the IBLA erred as a matter of law when it declared ELAM claims invalid.  *Mavros*, 122 IBLA at 310; *United States v. Foresyth*, 15 IBLA 43, 61 (1974).

Although the IBLA recognized these legal principles, it paid them only lip-service.  *See* AR 753-56.  First, the IBLA stated:

> [The] BLM extended the opportunity to [ELAM] to amend its plan to conduct further exploration within the eight mining claims conceded to contain pre-existing discoveries; *this information necessarily would have assisted appellants in determining recoveries in a deposit both parties concede to have been exposed on those eight claims*.

AR 753-54 (emphasis added). This statement is nonsensical. Determining additional recoveries from the non-contested claims would have done ELAM absolutely no good in this proceeding. Indeed, with Mr. Gruber's misapplication of Circular 831, his inability to apply principals of geological inference, and his failure to apply the Group Claim Rule, it is hard to image how drilling and sampling on the non-contested claims would have helped ELAM. This is especially true considering the IBLA's new test for discovery, *i.e.*, an exposure within a mineral deposit later identified by the mineral examiner to be valuable.

Second, based upon snippets from a letter written by Manhattan Minerals, the IBLA ruled that the purpose of the 1992 Plan of Operations was for exploration – not to confirm a pre-existing discovery. AR 755-56. This ruling reveals the IBLA's long-standing failure to recognize that, under the Mining Law, exploration may occur after discovery. Mullen, R.W., *The "Prudent Man" Ain't What She Used To Be Many Years Ago*, 49 Rocky Mt. Min. L. Inst., at 10-9, 10-33. Indeed, the Mining Law, expressly recognizes that exploration may occur after discovery by declaring that "all valuable mineral deposits . . . shall be free and open to *exploration* and purchase, and the lands in which they are found to occupation and purchase. . . ." 30 U.S.C. § 22 (emphasis added). An interpretation that there may be no exploration after discovery would render the grant of the right to explore illusory.

Moreover, the Secretary recognized the statutory right to explore after discovery when he established the Prudent Man Rule:

> For, if as soon as minerals are shown to exist, *and at any time during exploration*, before the returns become remunerative, the lands are to be subject to other disposition, few would be found willing to risk time and capital in the attempt to bring to light and make available the mineral wealth, which lies concealed in the bowels of the earth, as Congress obviously must have intended the *explorers* should have proper opportunity to do.

*Castle*, 19 L.D. at 457 (both emphasis added). Thus, the Secretary recognized that the Mining

Law granted claimants the right hold their claims against the government and rival claimants "during exploration, before the returns become remunerative." *Id*. This necessarily means that exploration may occur after discovery and even during production. *Id*. In fact, without this protection, "few would be found willing to risk time and capital in the attempt to bring to light and make available the mineral wealth, which lies concealed in the bowels of the earth . . . . " *Id*.

As the foregoing demonstrates, both Congress and the Secretary intended for exploration to occur after discovery. Thus, the IBLA erred in ruling that the 1992 Plan of Operations was not to confirm a pre-existing discovery, but to make a discovery in the first instance. Therefore, because ELAM was prevented from acquiring additional evidence to confirm its pre-existing discovery, the IBLA's decision should be held unlawful and set aside.

## CONCLUSION

For the foregoing reasons, this Court should grant summary judgment in favor of ELAM and hold unlawful and set aside the IBLA's decision that declared ELAM's six mining claims invalid for lack of discovery.

Dated this 3rd day of December 2007.

Respectfully Submitted By:

MOUNTAIN STATES LEGAL FOUNDATION

/s/ Steven J. Lechner
Steven J. Lechner, D.C. Bar No. AZ 0001
William Perry Pendley, Esq.
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)
lechner@mountainstateslegal.com

Attorneys for Plaintiffs

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this 3rd day of December 2007, I filed the foregoing Plaintiffs' Motion for Summary Judgment, Memorandum Of Points And Authorities In Support Of Plaintiffs' Motion For Summary Judgment, and proposed Order Granting Plaintiffs' Motion for Summary Judgment electronically through the CM/ECF system, which caused the following to be served by electronic means:

Mark T. Romley, CA Bar #240655
U.S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
Natural Resources Section
Ben Franklin Station, P.O. Box 663
Washington, D.C. 20044-0663
Tel: (202) 305-0436
Fax: (202) 305-0506
mark.romley@usdoj.gov

<u>/s/ Steven J. Lechner</u>

46

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ERNEST K. LEHMANN & ASSOCIATES OF MONTANA, INC., and MOUNT ROYAL JOINT VENTURE, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) Civil Action 07cv00762 (HHK) |
| DIRK KEMPTHORNE, Secretary of the Interior, *et al.*, | ) ) ) |
| Defendants. | ) ) ) |

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

THIS MATTER having come before this Court on Plaintiffs' Motion for Summary Judgment, and this Court having reviewed the Motion and being otherwise fully advised in the premises:

IT IS HEREBY ORDERED that Plaintiffs' Motion for Summary Judgment is granted.

IT IS FURTHER ORDERED that the IBLA's decision in *United States v. E.K. Lehmann & Associates of Montana, Inc.*, 161 IBLA 40 (2004), is hereby held unlawful and set aside.

DATED this _____ day of _____ 2008.

_____
Henry H. Kennedy, Jr.
United States District Judge

EXHIBIT 1

| UNITED STATES<br>DEPARTMENT OF THE INTERIOR<br>BUREAU OF LAND MANAGEMENT<br><br>MANUAL TRANSMITTAL SHEET | Release<br>3 - 33 2 |
|---|---|
| | Date      SEP 1 1 2007 |

Subject: H-3890-1 - HANDBOOK FOR MINERAL EXAMINERS – (Internal)

1.  Explanation of Material Transmitted: This release updates and revises the text of the Handbook for Mineral Examiners, H-3890-1. The revised Appendices were previously issued as release 3-322 of 09/01/2004. The Handbook and its components are being issued in both an 8 ½ x 11 desktop edition and in a pocket edition for effective use in the field.

2.  Reports Required: None.

3.  Material Superseded: The Material superseded by this release is listed under "REMOVE" below. No other directives are superseded.

4.  Filing Instructions: The field pocket edition is filed in the "red binder" Manual sets with Manual Section 3890. Use the existing special binders previously provided to house the pocket edition of the Handbook. The 8 ½ x 11 edition is to be filed behind Manual Section 3890.

REMOVE:

Title Page (rel. 3-322)
Table of Contents (rel. 3-322)
Text (All rel. 3-234)

(Total: 37 Sheets)

INSERT:

Title Page
Table of Contents
Text (All)
Appendix VI A

(Total: 64 Sheets)

Assistant Director
Minerals, Realty, and Resource Protection

PLAINTIFF'S
EXHIBIT
1

UNITED STATES DEPARTMENT OF THE INTERIOR
Bureau of Land Management

# H – 3890 -1 - HANDBOOK FOR MINERAL EXAMINERS

Policies, Procedures and Standards for Conducting Mineral
Examinations of Mining Claims and Sites on Federal Land

and

Appearing as an Expert Witness in an Administrative
Hearing before the Department of the Interior

Third Edition (Revised) 2006

by

The Mineral Examiner's Certification Panel [1]

1 Burrett Clay, Chairman; Matthew Shumaker, Executive Secretary; Roger Haskins, Member, BLM;
Roy Drew, Member, BLM; Victor Dunn, Member, BLM; Glenwood Kerestes, Member, BLM; John
Burghardt, Member, National Park Service.

Chapter V – Evaluating a Mineral Deposit

A.  General Requirements and Process.

The objective of evaluating a mineral deposit is to determine if the operator has a
reasonable prospect of success in developing a valuable mine.[1]

1.  Test for Discovery.

a.  Prudent person rule.  In patent, validity and related examinations, the standard
that you must apply is the prudent person rule, established in Castle v. Womble, supra:

". . .where minerals have been found and the evidence is of such a character that
a person of ordinary prudence would be justified in the further expenditure of his
labor and means, with a reasonable prospect of success, in developing a valuable
mine, the requirements of the statute have been met. To hold otherwise would tend to
make of little avail, if not entirely nugatory, that provision of the law whereby 'all
valuable mineral deposits in lands belonging to the United States . . . . are . . . .
declared to be free and open to exploration and purchase.' For, if as soon as minerals
are shown to exist, and at any time during exploration, before the returns become
remunerative, the lands are to be subject to other disposition, few would be found
willing to risk time and capital in the attempt to bring to light and make available the
mineral wealth, which lies concealed in the bowels of the earth, as Congress obviously
must have intended the explorers should have proper opportunity to do."

b.  A validity examination is not an appraisal.  An appraisal and a validity report
may rely on similar data. However, the purposes of and analyses in each document differ.
An appraisal is intended to determine the fair market value of a property right for sale,
trade, or taxation purposes. A validity examination is intended to determine whether a
claimant has discovered a valuable mineral deposit under the Mining Law. Appraisals
generally reflect risk assessments and the use of higher rates of return than does a validity
examination, among other distinctions.

c.  Factors to consider.  You must consider a number of factors to estimate a
deposit's probable economic viability, including:

•  The grade, tonnage, and estimated gross value of the mineral deposit.

•  All non-sunk capital costs, such as costs of equipment, buildings or other
infrastructure at the mine (sunk costs are described below)

•  All costs incidental to operating the mine, processing the ore, and reclaiming the
site.

•  Marketing costs.

1  Castle v. Womble, 19 Pub. Lands Dec. 455 (1894).

●    All applicable Federal and State taxes, including but not limited to income taxes, depletion allowance, depreciation allowance, property taxes, and severance taxes.

    d.    Grouping claims into logical mining units[2] is permitted for verifying discovery.

    (1)  Mining claims may be analyzed as a group for the purpose of ascertaining whether a marketable discovery exists, so long as each mining claim recommended for patent contains mineralization in sufficient quality and quantity that it can be reasonably expected to be developed profitably under an overall mining plan for the entire deposit. Schlosser v. Pierce, 92 IBLA 109, 130 (1986); see also United States v. Cactus Mines Ltd., 79 IBLA 20 (1984), In Re Pac. Coast Molybdenum Co., 75 IBLA 16 (1983).

    (2) For a group of mining claims covering the same mineral deposit, you may treat the mining claims as a single unit for purposes of cost estimation and economic analysis, and validity determination.[3] After you verify that the claimant can show a physical exposure of the valuable mineral deposit on each claim in the group, you may treat the claim group as a logical mining unit for the remainder of the mineral examination. Each claim need not stand alone economically, but each claim must contribute to the overall value of the deposit. In general terms, each claim must have sufficient tonnage at or above the cut off grade for the deposit as a whole to justify extraction. This means that when you are analyzing marketability for a group of claims, "the recovery expected from each claim must not only exceed the costs of mining, transporting, milling, and marketing the particular deposit on that claim but each claim must also bear a proportionate share of the development and capital costs attributable to the combined operation." United States v. Collord, 128 IBLA 266, 287 (1994) (citing Schlosser, 92 IBLA at 131-132 (citing Pac. Coast Molybdenum, 75 IBLA at 24, 24 n.7, 24-26, 32)).

    e.    Limited information available. In many instances, you will have to verify whether a valuable mineral deposit exists based on limited information. Information available for a mining claim validity examination will only rarely be comparable to a major feasibility study in reliability and scope of available data.

    2.    Test for Whether Lands are Mineral-in-Character.

Beginning from the earliest days of the public land system, Congress created two categories of public lands:  mineral land and agricultural land. Mineral lands were sold for $5 per acre. Agricultural lands were sold for $1.25 per acre. The criteria for determining whether lands were either mineral or agricultural was whether the lands were "chiefly valuable" for one or the other. With the enactment of FLPMA, this land classification distinction became less important. However, the question of whether lands are mineral-in-

---

2  Usage of the term "logical mining unit" in this context is similar to, but not identical to, the logical mining unit terminology used in solid leasable minerals. In Chapter II of this handbook, a logical mining unit is also referred to as a claim block.

3  Schlosser v. Pierce, 92 IBLA 109, 129-34 (1986).

Chapter V – Evaluating a Mineral Deposit

character must still be addressed when determining the validity of placer mining claims and mill sites or when considering certain land transactions.[4/]

a.   Considerations for determining whether lands are mineral-in-character.   The test for determining whether lands are mineral-in-character, like that for discovery, has been established by case law. It may be viewed as discovery minus a physical exposure. It may be determined by geologic inference, but requires more than a simple determination that unexposed minerals probably exist; their quality and quantity are also an issue. Land is mineral-in-character when known conditions engender the belief that the land contains mineral of such quality and quantity as to render its extraction profitable and to justify expenditure to that end.[5/]

b.   When required.   Determining whether lands are mineral-in-character is most commonly necessary when evaluating the character of each ten-acre parcel of a placer mining claim or when evaluating mill sites under the Mining Law. Geologic inference may be used to estimate deposit size or establish mineral-in-character status.[6/]

c.   Evidence of Mineral-in-Character.   A mineral-in-character determination is based upon a combination of physical exposures and geologic inference. When using geologic inference, you are making projections from known or reasonably inferred formations from adjoining lands into the land in question to determine its mineral character.[7/] As such, reserves that may be inferred to reside within a geologic formation adjacent to the land in question may be used to establish the mineral character of the land being classified if available evidence shows that the formation likely projects into this land.

B.   Classification of Ore Reserves and Resources.

Problems with defining and properly using terms to describe ore, reserves and mineral resources are not new. As early as 1909, Herbert C. Hoover wrote:

"Some general term is required in daily practice to cover the whole field of visible ore, and if the phrase 'ore in sight' be defined, it will be easier to teach the laymen its proper use than to abolish it. In fact, the substitutes are becoming abused as much as the originals ever were. All convincing expressions will be misused by somebody."[8/]

1.   Resources, Reserves and Ore.

Over the past few decades there has been a trend to shorten the phrase "ore reserves" to just

4   Manual Section 3060 Mineral Reports Preparation and Review.
5   Diamond Coal & Coke Co. v. United States, 233 U.S. 236, 240 (1914); S. Pac. Co., 71 Interior Dec. 224, 223 (1964); United States v. McCall, 7 IBLA 21, 27, 79, Interior Dec. 457, 460 (1972); United States v. Bunkowski, 5 IBLA 102, 127, 79 Interior Dec. 43, 55 (1972).
6   United States v. Feezor, 74 IBLA 56, 78-79 (1983).
7   S. Pac. Co., 71 Interior Dec. 224, 223 (1964)
8   Hoover, H. C., 1909, Principles of Mining, McGraw-Hill, p 17.

"reserves," and to use the terms "ore" and "reserves" interchangeably. When using these terms, you must be mindful of their various economic and legal meanings. In general usage, an "ore"/"reserve" is that portion of a mineral deposit that can be profitably mined under current economic, technological, and legal conditions. It is generally not possible to determine if a mineral deposit is an ore/reserve or a resource until you have completed your economic evaluation.

2. Terminology.

The terms "resources," "reserves" and "ore" are often classified by adding the terms "measured," "indicated," "proven," and "probable," as well as other descriptive adjectives. You will also encounter a wide variety of other terms such as "possible ore," "ore in sight," and "measured ore." It is important that you understand how these terms are used and the system from which they are derived. Many such terms have little to no direct applicability to determining the validity of a mining claim.

3. Ore Reserve Definitions.

For validity and mineral-in-character purposes, it is recommended that you use the definitions from McKinstry[9] for describing ore reserves. They are well established in practice and match the common usage of the past century. Their focus is on the individual mining property in question rather than the mining district or region, and they can be readily established based on the data at hand. Those definitions are:

    a. **Positive ore or ore blocked out**. These terms are now referred to as "proven ore," which are not always "proven" in the classical sense. Ore exposed and sampled on four sides, i.e., by levels above and below and by raises or winzes at the ends of the block. This definition applies to veins; for wide ore bodies the workings must be supplemented by crosscuts.

    b. **Probable Ore**. Ore exposed and sampled either on two or on three sides.

    c. **Possible Ore**. Ore exposed on only one side, its other dimensions being a matter of reasonable projection. Some engineers use an arbitrary extension of 50 to 100 feet. Others assume extension for half the exposed dimension.

4. Mineral Resource Definitions.

"Mineral resources" can be defined as minerals which are uneconomic to mine under present technological or economic conditions, or for which there is insufficient information to place them into an ore/reserve category. With changes in economic or technological conditions, or after further exploration, resources may become ore/reserves. "Resources" will be defined differently, depending on the classification system and its intended use.

---

9  Mckinstry, H. E., 1948, Mining Geology, Prentice-Hall Inc.

Resources are usually classified as "measured, indicated, or inferred."

a.    Measured resource.  To be classified as "measured,"[10] the grade and tonnage are computed from dimensions revealed in outcrops, trenches, workings, or drill holes; grade and/or quality are computed from the results of detailed sampling, and measurements are spaced so closely and the geologic character is so well defined that size, shape, depth, and mineral content is well established.

b.    Indicated resource.  To be classified as "indicated,"[11] the quantity and grade and/or quality are computed from information similar to that used for measured resources, but the sites for inspection, sampling, and measurement are farther apart or otherwise less adequately spaced.  The degree of assurance, although lower than that for measured resources, is high enough to assume continuity between points of observation.

c.    Inferred resource.  An "inferred"[12] resource is estimated by assuming continuity beyond measured and/or indicated resources, for which there is geologic evidence.  An inferred resource may or may not be supported by samples or measurements.

d.    Grouping of defined classes.  The term "demonstrated" is often encountered in the quantification of resources or reserves for a mineral deposit.  "Demonstrated" is usually the sum of "measured" plus "indicated" for resources and "positive" plus "probable" for ore/reserves.

5.    Using "Reserves" and "Resources" Terminology in Validity Determinations.

a.    Reserves.  If a claimant establishes positive and/or probable reserves on a mining claim, it is likely that the claimant has discovered a valuable mineral deposit under the Mining Law.  This is because, if there are positive and/or probable reserves on a mining claim, it is likely that a prudent person would invest additional labor and means in the expectation of developing a valuable mine involving that claim.  "Possible ore," (from McKinstry's classification) may similarly qualify as the basis for a finding of a discovery of a valuable mineral deposit.[13]

b.    Resources.  If a claimant establishes the existence of resources on a mining claim, resources are normally an insufficient basis, no matter how accurate or certain, for concluding that the claimant has discovered a valuable mineral deposit.  Depending on the outcome of your economic evaluation, resources may or may not become reserves.

---

10  Definition as given in Principles of a Resource/Reserve Classification for Minerals; USGS Circular 831 (1980).  See also Principles of the Mineral Resource Classification System of the U.S. Bureau of Mines and U.S. Geological Survey; USGS Bulletin 1450-A (1976).  The Bureau uses this term to describe the process for obtaining the resource classification, but the Bureau does not adopt the USGS classification system for mineral reserves.
11  Id.
12  Id.
13  United States v. Hooker, 48 IBLA 22, 30 (1980); United States v. Feezor, 74 IBLA 56, 79 (1983).

Chapter V – Evaluating a Mineral Deposit

c. Discovery under the Mining Law. In a validity examination, use extreme caution when using ore/reserves or resources terminology to confirm the discovery of a valuable mineral deposit. There is no direct correlation between these terms and the validity determination standards because they differ in purpose. Consider a hypothetical situation in which a mineral examiner delineates a large mass of ore grade material in an area where mining operations have historically occurred.

• Until professionally-completed feasibility studies with encouraging results have been completed, that mass of ore grade material probably would not meet Society for Mining, Metallurgy, and Exploration (SME) standards for reserves, and would probably be a resource if SME standards alone are applied.

• Under the U.S. Geological Survey (USGS) "McKelvey" diagram, the mass of ore grade material might be a reserve.

• Under the prudent person rule, the mass of ore grade material would probably constitute a discovery of a valuable mineral deposit.

6. Other Commonly Used Classification Systems.

For many years, the industry worldwide has grappled with establishing actual, legal and verifiable classifications for "resources and reserves." Two of the most commonly used of these systems are the USGS classification system (the "McKelvey diagram") and the SME Guidelines. Neither of these systems is an exact fit with the requirements of the prudent person rule.

a. SME Guidelines and the prudent person rule do not correlate. The prudent person rule, as established in Castle v. Womble, supra, is the basic standard for determining whether a mining claim contains a valuable mineral deposit. The SME guidelines were developed by an international working group as a means of consistently defining and stating mineral resources for publicly reporting companies. Consequently, the prudent person rule and the SME guidelines do not correlate to each other. As an example, if a mining claim contains "proven mineral reserves" as defined by SME there is a very high probability of there being a discovery under the Mining Law. However, discovery under the Mining Law may well be achieved without attaining the level of confidence or certainty required by the SME guidelines for "proven mineral reserves."

(1) You are expected to understand the SME definitions of "reserves" and "resources," and to remain informed as to any amendments to them. You must be conversant in how the terms are used by the mining industry, and how the industry's usage may or may not relate to the Bureau's work so that you may understand the relationship between documents provided by the industry using that terminology and the discovery test. The SME Guidelines are not quoted within this Handbook or included as an appendix because they are subject to change by parties that are not affiliated with the U.S. Department of the Interior.

H-3890-1 - HANDBOOK FOR MINERAL EXAMINERS – (Internal)

Chapter V – Evaluating a Mineral Deposit

b.    The McKelvey diagram differs from SME Guidelines and from the prudent person rule. The mineral resource classifications in the SME guidelines are not the same as the mineral resource categories in the "McKelvey diagram."[14] The USGS developed the basics of the "McKelvey diagram" during World War II. It was officially published in 1972 and has remained as the USGS standard since then.[15]

(1) USGS developed the McKelvey diagram for mineral resource inventories and land use planning and not for classifying resources and reserves on specific mineral properties. The McKelvey diagram lacks the precision necessary to properly classify resources and reserves for economic reporting purposes or determinations of validity using the prudent person rule.

(2) A noted authority on the use and classification of reserves for the evaluation of a mining property, in discussing the utility of the USGS classification system stated in 1948:

"This classification leaves room for considerable deduction from geological background. It is well suited to its intended purpose, the estimation of the reserves of a district or a nation. It is less satisfactory for valuing a single mine." (McKinstry[16]).

C.    Calculation of the Tonnage and Grade of a Mineral Deposit.

1.    Tonnage.

In order to calculate the tonnage of an ore reserve and waste rock in a mining operation you first need to calculate the volumes of each and calculate their respective densities.

a.    Volume. Calculate the volumes of the valuable mineral deposit and waste rock that must be removed using geometric methods. In most instances, you will have to subdivide the deposit into multiple geometric bodies to accomplish this task.[17]

b.    Weight. Determine the weight, in pounds per cubic foot, of each geometric body. Use measured weights and densities, as they will give you more accurate results than if you rely on a reference, such as in Appendix IV-B. The weights and volumes calculated for waste rocks are included in your estimate of total mining costs.

---

14  See Hansen, W. R., Suggestions to Authors of the Reports of the United States Geological Survey (7th ed.) (1991), Dept of the Interior, GPO, p. 96, Fig. 21.
15  McKelvey, V. E., 1972: Mineral Resource Estimates and Public Policy: American Scientist, vol. 60, no. 1, pp. 32–40. Hansen, W. R., 1991: Suggestions to Authors of the Reports of the United States Geological Survey, U. S. Dept. of the Interior, pp. 95-97.
16  Id. at 472
17  Popoff, C., 1966; Computing Reserves of Mineral Deposits: Principles and Conventional Methods; U. S. Bureau of Mines Information Circular 8283, U. S. Dept. of the Interior, pp. 113.

H-3890-1 - HANDBOOK FOR MINERAL EXAMINERS – (Internal)

Chapter V – Evaluating a Mineral Deposit

    c.   Total Tonnage. Using the resulting volumes and weights, calculate the tonnage of each geometric body. Determine the total tonnage by calculating a weighted average of the deposit's geometric bodies and adding them together. See Appendix VIII.

    2.   Grade.

Calculate the weighted average grade of the valuable mineral deposit. See Appendix VIII.

D.   Precision of Calculations.

Be sure to avoid the appearance of extreme precision where it does not exist.

    1.   Making Calculations Involving Measurements of Varying Precision.

**The precision of a calculation is limited to its least precise number.** For example, assume that a mineral deposit is about 3.5 feet thick by about 150 feet long by about 750 feet wide. In this example, two of the measurements are significant figures that are not as precise as the third measurement. The correct volume, accounting for the imprecise significant figures, will be about 15,000 cubic yards, not 14,583.33 cubic yards. If the original measurements had been made using a precise survey, measuring exactly 3.502 feet, 150.00 feet, and 750.00 feet, then 14,580 cubic yards would be correct.

    2.   Rounding of Numeric Values.

You must ensure that rounding is within the accuracy of all measurements. Virtually all calculators and spreadsheet programs will carry an extensive number of digits after the decimal point while making calculations. Rounding can take place with each calculation, at the end of a string of calculations, or with the last calculation. Whichever method you decide to use, be certain to consistently apply it and to explain it in the mineral report.

    3.   Estimating Resource Values.

Methods of estimating resource values are found in Peele (1947), Peters (1987), Parks (1957), Popoff (1966), and McKinstry (1948). See Appendix VIII for brief examples of calculations. Your choice of method should be appropriate to the situation, recognize geologic boundaries, and be thoroughly explained in the mineral report.

E.   Establishing a Market Price for a Commodity.

The Department has ruled that it is both proper and necessary to consider historic price and cost fluctuations in the consideration of marketability.[18]

---

18  In Re Pac. Coast Molybdenum Co., 75 IBLA 16, 90 Interior Dec. 352, (1983).

H-3890-1 - HANDBOOK FOR MINERAL EXAMINERS – (Internal)

Chapter V – Evaluating a Mineral Deposit

1.    Pricing Mineral Commodities.

a.    Commodities traded on public exchanges. With certain commodities, especially precious metals and some base metals, prices can fluctuate considerably. You must take this fluctuation into account when evaluating the viability of an operation. You must take into account both current market trends and historic price fluctuations.

(1)  BLM has established a policy for how to estimate a market price for mineral commodities.[19] In brief, the methodology uses a six-year average, which is centered on the critical date for which the economic evaluation is being performed. Some examinations will require that the calculation be made for more than one critical date.

(2)  To begin, calculate the average market price for the three year period before the appropriate critical date. Next, calculate the average commodity futures price for the three years after the critical date, based on the published prices for futures contracts. By including the market price for the month of the critical date, this method gives you 73 months of pricing that is averaged to give an expected commodity price for your economic analysis. Please refer to the policy statement given in Appendix VI-A for more detailed information.

b.    Commodities not traded on public exchanges. The pricing policy does not work in all cases. For example, many industrial minerals are utilized in vertically integrated markets and there may not be published prices for them. In such cases, you must review all relevant information to develop a thoroughly documented reference price. For additional information regarding industrial minerals, consult BLM Handbook H-3890-5, *Industrial Minerals*.

F.    Mine and Mill Modeling.

Before you can estimate the costs or potential returns, you must first determine what mining and processing methods are being used or are expected to be used.

1.    Data Supplied by Claimants.

In many cases, the claimant will provide you with a detailed mine and mill plan that includes economic data. In this situation, you should verify whether that plan is operationally viable. You may evaluate the proposal and adjust or modify any component to improve efficiency, recovery of valuable minerals, savings on reclamation, and so forth. A number of other documents may provide useful information, including:

- Documents filed under the surface management regulations, such as notices or plans of operations

---

19  65 Fed. Reg. 41,724 (July 6, 2000); Appendix VI-A.

Chapter V – Evaluating a Mineral Deposit

- Documents filed with the United States Securities and Exchange Commission (SEC) or foreign equivalents

- Documents filed with State securities agencies.

- Articles of incorporation, as well as periodic reports. These are normally filed with an agency in the state of incorporation.

- Information posted at a company website or an affiliated website on the internet.

- Company press releases.

- Articles in newspapers and trade journals.

2.    Data Not Supplied By Claimants.

When the claimant does not provide a mine and/or mill plan, or where the claimant provides an unrealistic or inappropriate plan, you must develop a hypothetical operation suitable for the deposit being examined. Whether verifying mine and mill information provided by the claimant or developing a hypothetical operation, you must ensure that the mine and mill operations are properly sized and otherwise appropriate for the site and deposit being examined.

G.    Preparing a Cost Estimate.

1.    Sources of Operating Cost Data.

In many cases, you can get operating cost data for a planned or existing mine from the mine operator. However, you must verify any cost information you get from the mine operator. In other instances, you may have to calculate the costs of a proposed mine operation. Multiple sources of operational and cost information are available for this purpose.[20] In addition, several computer programs are available to assist you in estimating costs. However, if you do not fully understand how the computer program handles the data that it manipulates, you could produce an impressive-looking result that may not be defensible.

2.    Estimation Methods.

You may choose to use one of several methods of estimating costs. These include cost indexing, comparable costs in the same mining district, cost models, and grass roots estimating. In essence, you will build a mine on paper. Cost estimation is usually an iterative process, which requires information generated in the previous iterations to refine

---

20    Western Mine Engineering, equipment handbooks, trade journals.

H-3890-1 - HANDBOOK FOR MINERAL EXAMINERS – (Internal)

Chapter V – Evaluating a Mineral Deposit

the results as work progresses. Normally, several full iterations of a cost estimate will be required to provide a sufficient level of confidence. In cases where the resource values are very low or very high, only a few iterations are necessary. For example, there is little need to expend a large amount of effort to estimate the cost of a purported mine that actually contains only average crustal abundance concentrations of mineral commodities.[21/]

    a.   Cost estimating. You can use cost indexing to update or backdate the cost of equipment or services from one point in time to another point in time. The U. S. Department of Labor and Commerce publish monthly and annual cost indices for a large range of commodities and services including mining and milling. Indices are regularly compiled by Western Mine Engineering. Cost indexing does not work well as the sole cost estimation method for an overall mining operation. The resulting numbers become less reliable beyond five years.

    (1)   Sample index calculation. A D-8 Caterpillar bulldozer cost $150,000 in 1979. You need to know its cost in 1982. Its estimated cost would be:

$$1979 \text{ cost } \times \frac{1982 \text{ cost Index}}{1979 \text{ cost Index}}$$

$$\$150,000 \times \frac{343.8}{256.2} = \$150,000 \times 1.34 = \$201,000$$

    b.   Comparable operations in the same mining district. Neighboring mining operations within a particular mining district often use similar mining methods. The removal cost per ton of rock or cubic yard of gravel will usually vary by only a few percent between properties. If operating cost data is available for two or three properties in the district, you can use that data to estimate the average operating cost for removing a ton of rock or gravel per day for an operation of equivalent size. Comparative cost analyses do not work well if you are evaluating very small operations using site-built equipment, unless the operations are substantially identical. Comparing operations is often useful in spot checking costs provided by the claimant.

    c.   Grass roots estimating. This method independently estimates the project costs, or costs of parts of a project, based on unit operations and other discrete costs, all of which together represent the cost of a complete operation. The references cited in cost indexing above, especially Western Mine Engineering, contain up-to-date purchase costs of equipment and services. A number of publications advertise new and used equipment for sale. You may be able to get current and past sales prices at the local library, if the library's collections include these types of publications.[22/] Other cost information sources include equipment manufacturers, vendors, and service companies. Many equipment manufacturers publish operating or estimating guides, which can assist you in equipment

---

21  See generally, United States v. Pass Minerals, 168 IBLA 115, 121 (2006).
22  Past and present sale prices for metallic minerals are also found at www.kitco.com, www.cbot.com>, www.lme.co.uk.

sizing and selection, as well as determining cycle times for unit operations.

        d.      Sunk costs. Sunk costs are the unrecoverable past capital costs of certain types of equipment that the claimant already owned or the costs of improvements already made before the marketability date.[23]/ Do not include as expenses in the operation's cash flow those capital costs that were sunk **before** the date of marketability.

        (1)  Excavations, structures, and equipment affixed to the land and that cannot be removed, even for salvage value, may qualify as sunk costs.  Examples include pits, underground workings, dumps, tailings ponds, monitor wells and some buildings.

        (2)  Sunk costs do not include ongoing equipment, improvement or maintenance expenses.[24]/  Purchase of new equipment or planned replacement of equipment or facilities after the date of marketability, consumable stores, repairs, and daily operating expenses are not sunk costs.

        e.      Equipment costs and accounting. The acquisition costs of equipment owned by a claimant before the marketability or withdrawal date need not be considered in calculation of costs.[25]/  Replacement costs of equipment after the marketability date are to be taken into account.

        f.      Labor costs. To establish the labor costs for a mining operation, use the local or regional wage rate for the job classification that was prevailing for the time period you are evaluating. The wage cost must normally account for burden, including Workers' Compensation, FICA, Medicare, and other required personnel costs that may be required by a state or local government. Burden is also applicable to persons who are self-employed. When you are evaluating a small "mom and pop" operation, do not calculate the burden as though the "mom and pop" operators are hiring outside employees. Use only the labor overhead costs that might apply to the "mom and pop" operation, e.g., self-employment taxes and insurance. The minimum wage should only be used for unskilled labor when the local job market is actually paying minimum wage for that kind of work, or if there is no other data.[26]/  When there is evidence that a prudent mine operator would expect to pay a higher wage for a certain type of labor, use the higher wage.

        g.      Environmental Compliance Costs. Include all costs associated with obtaining federal and State permits, reclamation, and monitoring and maintenance of post mining facilities in your estimate.

---

23   United States v. Clouser, 144 IBLA 110, 131 (1998); United States v. Mannix, 50 IBLA 110, 119 (1980).
24   United States v. Garner, 30 IBLA 42, 67 (1977).
25   United States v. Clouser, 144 IBLA 110, 132 (1998); United States v. Mannix, 50 IBLA 110, 119 (1980)
26   United States v. Clouser, 144 IBLA 110, 129-130 (1998).

Chapter V – Evaluating a Mineral Deposit

### 3. Milling Costs.

a. Information sources. Ask the operator for the costs of processing, but be certain to confirm those costs independently. If the operator cannot or will not give you processing costs, calculate the costs of proposed mill operations independently. Use Western Mine Engineering or a similar reference as a source for many milling costs.

b. Cost of compliance. All mill operations must meet current environmental and safety standards, including applicable regulatory requirements imposed by the surface managing agency and any applicable State regulatory requirements. You must consider all appropriate costs, including costs of acquiring water, water treatment, and disposal of tailings and waste. Report the final cost output in dollars per ton of rated capacity of the mill. Then calculate these costs back to the cost per ton of ore in the same manner as for other milling costs.

### 4. Smelter and Refining Costs.

A mining operator may plan to produce, process, and sell a finished product from the mineral property under evaluation. In such cases, determine the costs of the processing and refining needed to produce the marketable product. Determine the marketing costs to the first point of sale. In other words, determine whether the commodity will be sold on an FOB mine site basis, from a processing plant, or if transportation to market is normally required.

a. Custom smelters. If a mining operator sells the mine's output through a custom smelter, consider the cost of smelting or ore reduction, as well as the costs of transportation to the smelter, in the economic evaluation. Confirm that the smelter was operational and actually accepting and processing custom concentrates during the critical dates. In addition, confirm that the smelter would accept the form of concentrates proposed for production. Obtain smelter schedules from the mine or smelter operator. Western Mine Engineering has several sample smelter schedules for various commodities in the western United States and Canada. Smelter schedules typically have the following components:

● **Charges:** The basic cost of smelting and handling of the ore.

● **Deductions:** That portion of the received minerals that is not paid for, mainly for losses during smelting.

● **Penalties:** The additional cost to the smelter for treating undesirable constituents in the ore. Arsenic, bismuth, and antimony, for example carry a stiff penalty, as does high moisture content.

- **Premiums:** Credits given for specific constituents contained in the ore that are needed in the smelting process. For example, silica is a premium constituent in the smelting of copper ores because it is a necessary flux.

## H. The Marketing of a Mine's Products.

Typical end products may include dore', concentrates, precious and semiprecious gemstones, or chemical feed-stocks. When a mine is proposed, but not in operation, you need to determine whether there is a market and whether market entry is feasible.

1. Metallic Mineral Deposits.

Products for which there is an established market, such as gold, silver, copper, lead, zinc, molybdenum and other metallic minerals, are inherently marketable. That does not mean that all deposits containing these metals are valuable. It only means that there is a market for the metals. Information sources include Engineering and Mining Journal and The Northern Miner. Internet sources include <www.kitco.com> and <www.cbot.com>.

2. Industrial Minerals.

You must determine whether industrial minerals and materials with local, regional or used in vertically integrated industries, are marketable. Mineral deposits may be of a very high grade, but if there is no market for them, they are not valuable.[27]/ There are five factors to consider in determining whether industrial minerals are marketable.[28]/ The five factors, with some additional considerations outlined in the subparagraphs, are as follows:

 a. Accessibility.

  (1) Is the deposit accessible?

  (2) Is a market area accessible?

 b. Bona fides in development.

  (1) Are there any existing plants and equipment on the claim?

  (2) Is there present or past usage evident on the claim?

  (3) What is the status of mine (undeveloped, developed, or on standby)?

---

27 United States v. Coleman, 390 U.S. 599 (1968); Layman v. Ellis (On Recon.), 54 Interior Dec. 294 (1933); Layman v. Ellis, 52 Pub. Lands Dec. 714 (1929).
28 Foster v. Seaton, 271 F. 2d 836, 838 (D.C. Cir. 1959) (citing Layman v. Ellis, 54 Interior Dec. 294, 296 (1933)); 43 CFR 3830.12(b) (2006).

Chapter V – Evaluating a Mineral Deposit

    c.   Proximity to market.

        (1)  What are the transport and haulage costs?

        (2)  How many users or buyers are available in the market area?

        (3)  How many competitors are there in the market area?

        (4)  How much material is being consumed by the available users?

        (5)  How much of the same type of mineral is being produced by competitors?

        (6)  Is it possible to enter the market?

    d.   Existence of present demand.

        (1)  Are there any sales contracts or verifiable, legitimate letters of intent to purchase?

        (2)  Is there present, legitimate use of the commodity in the market area?

        (3)  Does the quality of the product compare favorably with a competitor's product?

    e.   Other factors.

        (1)  Are there any other factors not covered above that would have a bearing on the sale of the product?

    3.   Common Variety Determination.

Not all mineral commodities are locatable. The Surface Resources Act, 30 U.S.C. § 611, provides that:

> No deposit of common varieties of sand, stone, gravel, pumice, pumicite, or cinders and no deposit of petrified wood shall be deemed a valuable mineral deposit within the meaning of the mining laws of the United States so as to give effective validity to any mining claim hereafter located under such mining laws.
>
>   *   *   * *  *   *   *   *   *   *
>
> Common varieties" as used in sections 601 and 603 of this title does not include deposits of such materials which are valuable because the deposit has some property giving it distinct and special value and does not include so-called "block pumice" which occurs in nature in pieces having

one dimension of two inches or more.

      a.    McClarty test. To determine whether an otherwise common variety mineral has distinct and special value, follow the standards set forth in United States v. McClarty: [29]

      (1)  There must be a comparison of the mineral deposit in question with other deposits of such minerals generally;

      (2)  The mineral deposit in question must have a unique property;

      (3)  The unique property must give the deposit a distinct and special value;

      (4)  If the special value is for uses to which ordinary varieties of the mineral are put, the deposit must have some distinct and special value for such use;

      (5)  The distinct and special value must be reflected by the higher price which the material commands in the marketplace or by reduced costs or overhead so that the profit to the producer would be substantially more while the retail market price would remain competitive.

      b.    Some factors not relevant. Differences in the chemical composition or physical properties are immaterial if they do not result in a distinct economic advantage of one material over another.[30]

    4.    Unmarketable Resources (formerly known as "Excess Reserves").

      a.    Industrial minerals. If you are determining the validity of a mining claim or a group of mining claims located for industrial minerals, you must determine whether any ten-acre parcel of a placer claim or any mining claim in the group contains unmarketable resources. Unmarketable resources are mineral resources that cannot be presently marketed or marketed in the reasonably foreseeable future. Industrial minerals include, but are not limited, to sand, gravel, perlite, gypsum, limestone, cinders, and building stone. Industrial minerals may be of widespread occurrence and have a low unit value. They may exist on a particular mining claim or mining claim group in far greater abundance than can be reasonably marketed at present or in the reasonably foreseeable future.[31]

29   17 IBLA 20, 24-26 (1974); 43 CFR 3830.12(c) (2006); see also United States v Multiple Use Inc., 120 IBLA 63 (1991).

30   United States v. Thomas, 1 IBLA 209, 217 (1971) (citing United States v. U. S. Minerals Dev. Corp., 75 Interior Dec. 127 (1968)).

31   McCall v. Andrus, 628 F. 2d 1185 (9th Cir. 1980), cert. denied, 449 U. S. 932 (1981); Solicitor's Opinion M-36984, Excess Reserves Under the Mining Law (1996); United States v. Oneida Perlite Corp., 57 IBLA 167, 204, 88 Interior Dec. 772, 793 (1981); United States v. Williamson, 45 IBLA 264, 293, 87 Interior Dec. 34, 53 n.8 (1980).

Chapter V – Evaluating a Mineral Deposit

     b.    Market entry. To determine whether there are unmarketable resources, the appropriate test is to determine whether the deposits found in each ten-acre parcel of a placer claim or each mining claim in a claim group can enter the market presently or within the reasonably foreseeable future. Consider the total amount of the mineral resource held by a mining claimant, on private land to the extent possible, as well as the total amount of the mineral resource available in the general market area. The mining claimant's holdings must be treated in the same manner as other competitive sources of the same material.

     c.    Time line for calculation of unmarketable resources. The Department's policy is to treat any industrial mineral resource that can be marketed within 40 years of the marketability date as presently marketable or marketable within the reasonably foreseeable future. The Department's policy is to treat any industrial mineral resource that cannot be marketed within 40 years as an unmarketable resource.

     d.    Application. Apply the 40-year policy by first determining a reasonable annual production rate for the mineral. To arrive at a reasonable annual production rate, take into consideration the claimant's past production rates for an operating mine or the claimant's proposed production rate for a proposed mine plan. If there is no operating mine and the claimant has not provided you with a proposed mine plan, you must develop your own mine plan with a logical mining sequence to calculate a production rate. Next, consider the available market for the mineral. You may only consider what reasonably can be marketed, even if the mine could produce at a level that exceeds the available market. Any minerals that cannot be thus produced and marketed within 40 years cannot be marketed in the foreseeable future and may not serve as the basis for validating a mining claim in a claim group or a ten-acre parcel of a placer claim.

I.  Economic Analysis of a Mineral Property.

    1.   Pre-tax Income.

The pre-tax income, in dollars per ton, is determined by deducting necessary capital and operating costs from the gross value of the sales or projected sales. These costs will normally include mining, milling, reclamation, environmental compliance, transportation, marketing, and all costs internal (itemized line items on your cost analysis sheet) to these categories. Compute the costs up to the point of delivery either Free on Board (FOB) at the mine site or at the first point of sale.

     a.    Results. If the pre-tax value is negative, you can conclude that there is no discovery of a valuable mineral deposit and recommend the mining claim or ten-acre parcel of a placer claim for contest. If the pre-tax value is positive, you can conclude that the claimant has demonstrated a discovery of a valuable mineral deposit.

### 2. Net Income.

To obtain the net income from the operation, account for taxes, amortization, depletion, depreciation, and other costs generally accounted for in financial reports on mineral properties.

### 3. Net Present Value Calculations.

Occasionally, it is necessary to estimate the net present value of a property containing proven or probable reserves. For example, a mine may have been developed but not yet placed into production. To do so, the property's future net earnings are converted to present day value by a discount process. The Discounted Cash Flow (DCF) method estimates either the project's net present value (NPV) or the Internal Rate of Return (IRR). The IRR is a projection of the percent payback to the investors in the project. The NPV is a projection of the present value of the property, based on a fixed rate of return, and is not to be confused with an appraisal of the value of the property. An appraisal takes into account other factors not considered in NPV calculations. For example, the rate of return is usually very different and an appraisal will take into account risk analyses.