## IN THE UNITED STATES DISTRICT COURT
## OF THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ERNEST K. LEHMANN & ASSOCIATES | ) | |
| OF MONTANA, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 07cv00762-HHK |
| | ) | Hon. Henry H. Kennedy |
| | ) | |
| DIRK KEMPTHORNE, | ) | |
| Secretary of the Interior, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

### FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Federal Defendants, by and through their undersigned counsel, hereby move, pursuant to Federal Rule of Civil Procedure 56, for summary judgment on all claims in the Plaintiffs' Complaint. In support thereof, Federal Defendants rely on the Complaint, Federal Defendants' Answer thereto, the Administrative Record lodged with the Court on September 18, 2007, and the Memorandum of Points and Authorities In Support of Federal Defendants' Cross-Motion for Summary Judgment, filed herewith.

For the reasons stated in the accompanying memorandum, Federal Defendants respectfully request that the Court grant their cross-motion for summary judgment on all the claims raised in Plaintiffs' Complaint.

January 22, 2008

Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General
Environment and Natural Resources Division

Of Counsel:                          /s/   *Mark T. Romley*
Karan A. Dunnigan                    MARK T. ROMLEY
Field Solicitor                            Trial Attorney
U.S. Department of the Interior      United States Department of Justice
                                     Environment and Natural Resources Division
                                     Natural Resources Section
                                     P.O. Box 663
                                     Washington, D.C. 20044-0663
                                     (ph)(202) 305-0458/(fax)(202) 305-0506

# IN THE UNITED STATES DISTRICT COURT
## OF THE DISTRICT OF COLUMBIA

ERNEST K. LEHMANN & ASSOCIATES )
OF MONTANA, INC., <u>et al.</u>,           )
                                          )
    Plaintiffs,                       )
                                          )
    v.                                )    Case No. 07cv00762-HHK
                                          )    Hon. Henry H. Kennedy
                                          )
DIRK KEMPTHORNE,                          )
Secretary of the Interior, <u>et al.</u>, )
                                          )
    Defendants.                       )
_____ )

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.     INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    LEGAL BACKGROUND  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

       A.     Relevant Mining Law  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

       B.     The Law Governing Contest Actions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.   FACTUAL BACKGROUND  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

       A.     Exploration of the Tootsie Creek Area  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

       B.     The Validity Determination and Contest Hearing  . . . . . . . . . . . . . . . . . . . 9

       C.     Judge Sweitzer's Decision  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

       D.     The IBLA Decision  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

IV.    STANDARD OF REVIEW  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

       A.     Standard of Review for Granting Summary Judgment  . . . . . . . . . . . . . . . . 21

       B.     Standard of Review Under The Administrative Procedure Act  . . . . . . . . . . . 22

V.     ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

       A.     IBLA CORRECTLY FOUND THAT BLM PRESENTED A PRIMA FACIE
              CASE THAT THE CONTESTED CLAIMS WERE INVALID  . . . . . . . . 24

              1.     Applicable Law and Substantial Facts of Record Support
                     the IBLA's Finding of A Prima Facie Case With Respect
                     to the P 14, P 15, P 16 and RE 1 Claims  . . . . . . . . . . . . . . . . . . . . . . . 25

              2.     Applicable Law and Substantial Facts of Record Support
                     the IBLA's Finding of A Prima Facie Case With Respect
                     to the EB 6 and RE 2 Claims  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

              3.     Plaintiffs Incorrectly Argue that A Prima Facie Case
                     Was Not Presented  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

        a.     Controlling precedent compels a holding that the mining claimant is the true proponent of an order in a mining claim contest action . . . . . . . . . . . . . . . . . . . . . . . . . 29

        b.     The IBLA correctly applied Mineral Law in its decision . . . . . . 29

        c.     The IBLA's decision was not flawed by Gruber's use of Circular 831 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        d.     Plaintiffs misapply the group claim rule . . . . . . . . . . . . . . . . . . 32

    B.    PLAINTIFFS FAIL TO DEMONSTRATE THAT IBLA'S FINDING THAT THEY DID NOT MEET THEIR BURDEN OF ESTABLISHING BY A PREPONDERANCE OF THE EVIDENCE THE VALIDITY OF THE CONTESTED CLAIMS WAS NOT ARBITRARY OR CAPRICIOUS . . . . . . 33

        1.     The IBLA's Conclusions Applicable to All of the Contested Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

            a.     Plaintiffs cannot use geological inference to prove a valuable mineral deposit on the contested claims . . . . . . . . . . . 35

        2.     The IBLA Correctly Determined That No Discovery Had Been Made On the EB 6 Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

        3.     The IBLA Correctly Determined That No Discovery Had Been Made On the RE 2 Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

        4.     The IBLA Correctly Determined That No Discovery Had Been Made On the P 14, P 15, P 16 or RE 1 Claims . . . . . . . . . . 42

        5.     Plaintiffs' Claims of Unfairness Are Unfounded . . . . . . . . . . . . . . . . . . 45

VI.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

# TABLE OF AUTHORITIES

## CASES

*Barton v. Morton,
    498 F.2d 288 (9th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 39, 43

Best v. Humboldt Placer Mining Co.,
    371 U.S. 334 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4

Camps v. Pitts,
    411 U.S. 138 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Citizens to Preserve Overton Park, Inc. v. Volpe,
    401 U.S. 402 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 33, 34

Exxon Mobil Corp. v. Norton,
    206 F. Supp. 2d 1085 (D. Colo. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Florida Fruit & Vegetable Ass'n v. Brock,
    771 F. 2d 1455 (11th Cir. 1985), cert. denied, 475 U.S. 1112 (1986) . . . . . . . . . . . . . . 21

Florida Power & Light Co. v. Lorion,
    470 U.S. 729 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Foster v. Seaton,
    271 F.2d 836 (D.C. Cir. 1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 28, 29

Gros Ventre Tribe v. United States,
    469 F.3d 801 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Hagelin v. FEC,
    411 F.3d 237 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 34

Hjelvik v. Babbitt,
    198 F.3d 1072 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4

Mineral Policy Center v. Norton,
    292 F.Supp.2d 30 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Motor Vehicle Mfrs. Assen v. State Farm Mut. Auto Ins. Co.,
    463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 34

Mount Royal Joint Venture v. Kempthorne,
    477 F.3d 745 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

National Ass'n of Home Builders v. U.S. Army Corps of Engineers,
    417 F.3d 1272 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Oregon Basin Oil and Gas Co. v. Work,
    6 F.2d 676 (DC.App. 1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Richards v. INS,
    554 F. 2d 1173 (D. C. Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

United States v. Coleman,
    390 U.S. 599 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

United States v. Springer,
    491 F.2d 239 (9th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 29

United States v. Zweifel,
    508 F.2d 1150 (10th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 24, 29

**ADMINISTRATIVE DECISIONS**

Allen C. Kroeze,
    153 IBLA 140 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Castle v. Womble,
    19 L.D. 455 (1894) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Marilyn Dutton Hansen,
    79 IBLA 214 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 27

Mount Royal Joint Venture,
    144 IBLA 277 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

In re Pacific Coast Molybdenum Co.,
    75 IBLA 16 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Red Thunder, Inc.,
    129 IBLA 219 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Schlosser v. Pierce,
    92 IBLA 109 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 32

Sigma M. Explorations, Inc.,
    145 IBLA 182-91 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

United States v. Boucher,
    147 IBLA 236 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 25, 27, 42

United States v. Bunkowski,
    5 IBLA 102 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

United States v. Clouser,
    144 IBLA 110 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 30, 32

*United States v. Collord,
    128 IBLA 266 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 32-34, 44

United States v. Feezor,
    74 IBLA 56 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 30

*United States v. Feezor,
    130 IBLA 146 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 26, 35-37, 40-43

United States v. Foresyth,
    15 IBLA 43 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

United States v. Gillette,
    104 IBLA 269 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

United States v. Knoblock,
    131 IBLA 48 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

United States v. Milan Martinek,
    166 IBLA 347 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

United States v. Miller,
    138 IBLA 246 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

United States v. Page,
    119 IBLA 12 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

United States v. Pass Minerals, Inc.,
    168 IBLA 115 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,3

United States v. Walls,
    30 IBLA 333 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

United States v. White,
    118 IBLA 266 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Winkley,
    160 IBLA at 145 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Vanderbilt Gold Corp.,
    126 IBLA 72 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 30

## STATUTES

30 U.S.C. §§ 21-47 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
30 U.S.C. §§ 22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 38, 39
5 U.S.C. § 556(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## RULES

Federal Rule of Civil Procedure 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## I.      INTRODUCTION

Federal Defendants respectfully submit the following memorandum of points and authorities in support of Defendants' cross-motion for summary judgment and in opposition to Plaintiffs' motion for summary judgment.  Plaintiffs, Ernest K. Lehmann of Montana, Inc. and Mount Royal Joint Venture, challenge a decision of the Interior Board of Land Appeals ("IBLA") that found invalid six of fourteen mining claims held by Plaintiffs in the Sweet Grass Hills of Montana.  *See United States v. E.K. Lehmann & Assocs. of Montana, Inc.*, 161 IBLA 40 (2004).  Plaintiffs' challenges misconceive or simply ignore the legal principles applicable to this Court's review of the IBLA's decision and ignore critical portions of the mining law.  The Court should therefore grant summary judgment to the Department of the Interior and dismiss Plaintiffs' challenge with prejudice.

## II.     LEGAL BACKGROUND
### A.      Relevant Mining Law.

The General Mining Law of 1872, 30 U.S.C. §§ 21-47 (the "Mining Law"), provides the framework of rights and privileges for mining on federal public land.  Under the Mining Law, "a miner who discovered a valuable mineral deposit on Government land received a grant of equitable ownership in the mineral interest directly from Congress."  *Exxon Mobil Corp. v. Norton*, 206 F. Supp. 2d 1085, 1087 (D. Colo. 2002).  Accordingly, the Mining Law permits location[1] of mining claims where a discovery of a valuable mineral deposit has been made on lands belonging to the

---

[1] The term "location" is a term of art in mining law that refers to a miner's identification of a particular mineral deposit and his claim to exclusive mineral rights over that deposit.  The location system provides that the first mineral claimant who identifies a valuable deposit of a locatable mineral, and who fulfills the Mining Law's administrative requirements, is entitled to produce all the minerals from the deposit without being required to purchase fee simple title from the United States.  *See* 1 Am. L. of Mining § 30.01 (2d ed.).

1

United States.  *See* 30 U.S.C. §§ 22, 26.

Courts have repeatedly affirmed that in order to be valid, a miner must show that a mining claim contains within its boundaries a discovery of a valuable mineral deposit.  *See, e.g.*, *Best v. Humboldt Placer Mining Co.*, 371 U.S. 334, 335 (1963); *Foster v. Seaton*, 271 F.2d 836, 837 (D.C. Cir. 1959); *Mineral Policy Center v. Norton*,  292 F.Supp.2d 30 (D.D.C. 2003); *United States v. Pass Minerals, Inc.*, 168 IBLA 115, 121 (2006).  A valuable mineral deposit is demonstrated where minerals of sufficient quality and quantity are uncovered such that a "prudent person," knowing all of the facts, "would be justified in the further expenditure of his labor and means, with a reasonable prospect of developing a paying mine."  *United States v. Coleman*, 390 U.S. 599 (1968); *Castle v. Womble*, 19 L.D. 455, 457 (1894)(announcing the "prudent person" rule).  "The standard applied in these cases is that of a prudent man, not necessarily an experienced miner."  *Schlosser v. Pierce*, 92 IBLA 109, 122 (1986)(citing *United States v. Jenkins*, 75 I.D. 312 (1968)).  As part of this test, the person asserting the validity of a claim must show, objectively and "as a present fact," that "considering historic prices and cost factors and assuming they will continue, there is a reasonable likelihood of success that a paying mine can be developed."  *In re Pacific Coast Molybdenum Co.*, 75 IBLA 16, 29 (1983).

In *United States v. Coleman*, 390 U.S. 599 (1968), "the Supreme Court refined the prudent person test and held that 'profitability is an important consideration in applying the prudent-man test.'" *Hjelvik v. Babbitt*, 198 F.3d 1072, 1074 (1999)(quoting *Coleman*, 390 U.S. at 602).  This focus on profitability was enshrined in the marketability test which "requires a showing that the mineral deposit can be extracted, removed, and marketed at a profit."  *Id.*  Additionally, even where a mining claimant is actually mining a claim at a small profit, a finding of no discovery can still be

justified because "'a prudent man would not develop a mine which promised a profit below the return for a commercial venture.'"  *Pass Minerals*, 168 IBLA at 122 (quoting *United States v. Kottinger*, 14 IBLA 10, 16 (1973)).

When a mining claimant seeks to validate a group or block of mining claims, the Bureau of Land Management ("BLM"), the responsible agency in this case, applies additional considerations in determining whether the discovery of a valuable mineral deposit has been established.  In such a scenario, "[i]t is not enough for a claimant to offer evidence simply for claims as a unit [because] the existence of mineral on one claim cannot . . . support the existence of mineral on another contiguous or nearby claim."  *Schlosser*, 92 IBLA at 128 (citing *United States v. Dresselhaus*, 81 IBLA 252 (1984); *United States v. Feezor*, 74 IBLA 56, 90 (1983)).  Indeed, "such a theory of bulk validation" has been "expressly reject[ed]" by the IBLA.  *United States v. Foresyth*, 15 IBLA 43, 58 (1974).[2/]  Accordingly, a claimant seeking to validate a group of claims bears the burden of showing that "the recovery expected from each claim . . . not only exceed[s] the costs of mining, transporting, milling, and marketing the particular deposit on that claim but each claim must also bear a proportionate share of the development and capital costs attributable to the combined operations."  *United States v. Collord*, 128 IBLA 266, 287 (1994).

If a mining claim is located on public lands which are later withdrawn or segregated from mineral entry, the government has the authority to examine such a claim for validity.  *See  Allen C. Kroeze*, 153 IBLA 140, 144 (2000).  "Until the  United States surrenders the last vestiges of title by issuing a patent to the ground, 'it does have the power, after proper notice and upon adequate

---

[2/] This precedent should not be read to suggest that each claim must independently support the development of a mine.  The Board has expressly rejected such a theory.  *See Schlosser*, 92 IBLA at 132.

hearing, to determine whether the claim is valid, and if found to be invalid, to declare it null and void." *Sigma M. Explorations, Inc.*, 145 IBLA 182-91 (1999)(quoting *Best v. Humboldt Placer Mining Co.*, 371 U.S. at 337-38). When the government contests the validity of a mining claim on withdrawn or segregated lands, the evidence must show that a discovery existed within the boundaries of the claims at the time of withdrawal and at the time of a hearing. *See, e.g.*, *United States v. Boucher*, 147 IBLA 236, 242-43; *United States v. Feezor*, 130 IBLA 146, 190 (1994). Evidence indicating that further drilling may uncover a valuable deposit is not sufficient to demonstrate a discovery. *See Barton v. Morton*, 498 F.2d 288, 290-91 (9th Cir. 1974)(discussing *Henault Mining Co. v. Tysk*, 419 F.2d 766, 768-69 (9th Cir. 1969)). Finally, where a discovery is made on overlapping claims, that discovery belongs to the senior claim. *See Marilyn Dutton Hansen*, 79 IBLA 214, 216 (1984).

### B.    The Law Governing Contest Actions.

When, as here, the BLM contests the validity of a mining claim, it bears only the burden of going forward with sufficient evidence to establish a prima facie case. *Hjelvik v. Babbitt*, 198 F.3d at 1075. *See also United States v. Zweifel*, 508 F.2d 1150, 1157 (10th Cir. 1975); *United States v. Springer*, 491 F.2d 239, 242 (9th Cir. 1974); *Foster v. Seaton*, 271 F.2d 836, 838 (D.C. Cir 1959). Whether the BLM has presented a prima facie case is necessarily limited to the evidence presented by the bureau in its case-in-chief. *United States v. Pass Minerals, Inc.*, 168 IBLA 115, 123 (2006). Further, the BLM presents a prima facie case where a government mineral examiner offers expert testimony that the discovery of a valuable mineral deposit has not been made within the boundaries of a contested claim. *Id.* This expert testimony must be based on evidence probative of the character, quality and extent of the mineralization on a contested claim. *Id.* (citing *United States v.*

4

*Winkley*, 160 IBLA 126 (2003)).

The existence of contradictory evidence in a claimant's case-in-chief does not undermine the government's prima facie case. *See United States v. Bunkowski*, 5 IBLA 102, 119 (1972)("To meet its burden the government is not required to negate all the evidence required of the patent applicant."). Rather, it is "axiomatic that the determination of whether or not the Government has presented a prima facie case is necessarily limited to the evidence presented by the Government in its case-in-chief." *United States v. Knoblock*, 131 IBLA 48, 82 (1994). Accordingly, where the government has satisfied its burden and contradictory evidence is subsequently submitted by the claimant, "the effect of this evidence is not to vitiate the existence of the prima facie case but rather to overcome the prima facie case." *Id.*

Where the BLM has presented a prima facie showing that mining claims are invalid for lack of discovery of a valuable mineral deposit, the burden shifts to the mining contestee to overcome the BLM's showing by a preponderance of the evidence. *United States v. Pass Minerals, Inc.*, 168 IBLA at 123. Further, the contestee must preponderate on each issue for which the BLM has established its prima facie case. *See United States v. Miller*, 138 IBLA 246, 268-270 (1997). "[T]o prevail, a contestee must present sufficient proof of validity and cannot meet their burden of proof by asserting weakness in the Government's prima facie case." *United States v. Boucher,* 147 IBLA 236, 251 (1999)(citing *United States v. Rosenberger*, 71 IBLA 195, 201 (1983). Finally, "'any doubt on the issue of discovery raised by the evidence must be resolved against the mining claimant, who bears the risk of nonpersuasion.'" *United States v. Collord*, 128 IBLA at 268 (quoting *United States v. Taylor*, 19 IBLA 9, 22-23 (1975).

## III.    FACTUAL BACKGROUND

This action had its genesis in the segregation from mining certain public lands located in the Sweet Grass Hills of Montana. Administrative Record at 0692 [hereinafter AR]. Between 1983 and 1991, prior to this segregation, Plaintiffs located 14 mining claims in an area of the Sweet Grass hills called Tootie Creek. AR at 0002. Following the segregation, the BLM instituted a contest action seeking a declaration that six of Plaintiffs' fourteen Tootsie Creek mining claims were invalid for lack of a valuable discovery. *Id.* at 0002 (Contest Compl. ¶ 5). The challenged claims were designated as follows at the time of their location: East Butte No. 6 ("EB 6"), Patricia 14 ("P 14"), Patricia 15 ("P 15"), Patricia 16 ("P16"), Royal East No. 1 ("RE 1") and Royal East No. 2 ("RE 2"). *Id.* (Contest Compl. ¶ 3).[3] It is these six claims that are the subject of this action. A map of the claims is located in the Administrative Record at page 0757.

### A.    Exploration of the Tootsie Creek Area

Beginning in 1983, Plaintiffs conducted exploration of the Tootsie Creek area in search of valuable minerals. *See* AR at 1200 (Contestees' Ex G, "Report on the Geology and Mineral Development of the Tootsie Creek Gold Deposit, Sweet Grass Hills, Liberty County, Montana by Ernest K. Lehmann, CPG #583" [hereinafter "Lehmann Rep."]); AR at 0955-0967 (Contestant's Ex. 3, Tootsie Creek, Validity Report for Mining Claims by James R. Gruber, Jr." [hereinafter "Gruber Rep."] at 9-20). In 1984, Plaintiffs, along with Santa Fe Pacific Mining Company ("Santa Fe"), one of a number of partners Plaintiffs had in their exploration of these claims, carried out geological sampling of the general Tootsie Creek area. AR at 1218 (Lehmann Rep.); AR at 0956 (Gruber

---

[3] The BLM conceded the validity of Plaintiffs' remaining eight remaining claims. AR at 0692. The valid claims were designated Patricia 7, Patricia 8, Patricia 18, Patricia 20, Butte 47, East Butte No. 4, East Butte No. 5 and Butte 48. *Id.*

Rep.).

In, 1986, Plaintiffs submitted to BLM, and had approved, a plan of operations which allowed mining exploration in the Tootsie Creek area. AR at 1200 (Lehmann Rep.). In 1987, pursuant to this approved plan, Plaintiffs and Santa Fe conducted exploratory drilling. *Id.* While several holes were drilled, only three are of consequence to this proceeding, TCM-1, TCE-1 and TCE-2. The TCM-1 hole was drilled on the surface in the RE 1 claim and then laterally through the RE 2 claim. AR at 1461 (Lehmann Rep., Fig. 9.5). *See also* AR at 1078 (detailing the types of material found in the TCM-1). Additionally, the TCE-1 and TCE-2 drill holes both explored, at different angles, the subsurface of the EB 6 claim. AR at 1463 (Lehmann Rep., Fig. 9.7); AR at 1080 (detailing the types of material found in the TCE-1 and TCE-2 drill holes). The values of gold found in these holes were generally low. *See* AR at 1378-81, 1395-96 (Lehmann Rep., App. 9.2a).

In 1988-1989, Plaintiffs sought to amend the 1986 plan of operations to allow the exploratory drilling of eleven new holes on Plaintiffs' mining claims. AR at 0698. Plaintiffs did not propose exploration activities, in either the original or amended plan of operations, on the P14, P 15 or P 16 claims. *Id.* After the BLM approved the amended plan in 1992, Plaintiffs drilled only three holes. AR at 1201 (Lehmann Rep.). Of these three drill holes only one, labeled EBR 3, is of concern in this proceeding because it started in the EB 4 claim, and then cut laterally into the RE 2 claim uncovering generally low gold values. AR at 1497 (Lehmann Rep., App. 9.2a). The sampling done by Plaintiffs up to 1991 led to the identification of three main gold-bearing zones within the Tootsie Creek area. AR at 1063, 1459. (Gruber Rep., Plate 3; Lehmann Rep., Fig. 9.4). BLM described these zones as the "Main Gold Zone," the "East Gold Zone" and the "South Fork Gold Zone." AR at 1063 (Gruber Rep., Plate 3).

In February of 1992, Plaintiffs submitted another exploration proposal seeking to build 28,800 feet of road and drill 38 holes to uncover bedrock for sampling.  AR at 962 (Gruber Rep.); AR at 1454 (Lehmann Rep., Fig 8.2).  In response to this proposal, BLM informed Plaintiffs that preparation of an environmental assessment ("EA"), pursuant to the National Environmental Policy Act ("NEPA"), would be necessary prior to the bureau's approval of the plan.  AR at 1122.  Accordingly, the BLM sent Plaintiffs a letter containing a list of information required to prepare the EA.  *Id.*  As part of their response to the BLM's request, Plaintiffs submitted a document stating that they were "in an early stage of exploration" on the Tootsie Creek claims.  AR at 1129.  Plaintiffs also stated that their 1992 "program [was] designed to obtain the required surface data needed to assess the property as a whole, and to determine the best locations/suitability for further drilling." *Id.*

While preparing the EA for the 1992 drilling program, BLM determined that an environmental impact statement was required, which in turn was ultimately the catalyst for the challenge before the Court.  AR at 0699.  In the wake of the EIS process, which, inter alia, raised significant concerns about the use of "cyanide heap-leach" mining[4] in the Tootsie Creek area, the BLM decided to segregate from mining, subject to valid existing rights, 19,685 acres of public land in the Sweet Grass Hills.  *Proposed Withdrawal and Opportunity for Public Meeting; Montana*, 58 Fed. Reg. 41289, 41290 (Aug. 3, 1993).  The Tootsie Creek area was included within the segregated

---

[4] "Cyanide heap leaching is a process used to recover microscopic gold particles typically found in low-grade ore deposits.  The process includes drilling, blasting and crushing low-grade ore.  The ore is then transferred to a leach pad, a carefully constructed series of flat-topped heaps that is lined with plastic and/or clay to try and prevent loss of solution.  The leach pad is also constructed in lifts, which are sequentially sprayed with a cyanide solution.  Once processed, a "pregnant solution" containing the gold particles is collected . . . ."  *Gros Ventre Tribe v. United States*, 469 F.3d 801, 805 n. 1 (9th Cir. 2006).

lands. Subsequently, BLM informed Plaintiffs that processing of the 1992 plan of operations had been suspended and that all mining claims within the segregated lands would be subject to a validity examination. AR at 1024; AR at 1471(Gruber Rep., Att. 4).

In 1997, while the segregation and validity determinations were pending, BLM offered Plaintiffs four options for proceeding with the 1992 plan of operations. Apparently, none were satisfactory and Plaintiffs appealed the decision to the IBLA, but their appeal was rejected. *See Mount Royal Joint Venture*, 144 IBLA 277, 280-81 (1998).[5]

### B.    The Validity Determination and Contest Hearing

In September 1993, BLM contacted Plaintiffs to discuss the validity determination and asked Plaintiffs to provide information which could "confirm the existence of the discovery of a valuable mineral deposit" on the fourteen mining claims held by Plaintiffs within the Sweet Grass Hills. AR at 1025-26 (Gruber Rep., Att. 5). In response, Plaintiffs provided data from their explorations in the Tootsie Creek area. *See* AR at 0937. BLM conducted its own "reconnaissance work" during 1993 to 1994 to verify the data provided by Plaintiffs and to collect samples for analysis and comparison to Plaintiffs' data so that it could conduct its validity determination. AR at 0967, 0969, 1063 (Gruber Rep., Table 5, Plate 3).

On September 15, 1995, BLM concluded the validity examination and its findings were presented in the Gruber Report, which was prepared by certified mineral examiner James R. Gruber. AR at 0888, 11103(Gruber Rep, Addendum). The validity examination concluded that six claims,

---

[5] Plaintiffs unsuccessfully challenged the agency's segregation decision, which was upheld by the Court of Appeals for the D.C. Circuit. *See Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745 (D.C. Cir. 2007). The D.C. Circuit correctly deferred to agency's expert conclusions, also applied deference and upheld the IBLA's approval of the BLM's actions with regard to the segregation and ultimate withdrawal of the Sweet Grass Hills from mining. *Id.* at 755.

P 14, P 15, P 16, RE 1, RE 2 and EB 6 were invalid for lack of a valuable discovery and that a valuable discovery had been made on Plaintiffs' eight remaining claims. AR at 093-39 (Gruber Rep.).

On March 4, 1996, BLM submitted the contest complaint to Interior's Hearings Division of the Office of Hearings and Appeals, AR at 0002, and on April 6, 1996 Plaintiffs submitted their answer. AR at 0007. The contest complaint was premised on the findings of the Gruber Report. *See* AR at 0002. Plaintiffs ("contestees" in that action) moved for partial summary judgment arguing that the Gruber Report confirmed the existence of valuable minerals on the EB 6 and RE 2 claims and, as such, those claims were valid. AR at 0091. In opposition, BLM showed that although gold had been uncovered on the EB 6 and RE 2 claims, mineral values high enough to support a discovery were only found on the claims where they overlapped with senior claims also held by Plaintiffs. AR at 0136. BLM also argued that Plaintiffs' claims that gold existed on the claims were based on the impermissible use of geological inference. AR at 135. Ultimately, citing disputed issues of material fact, Administrative Law Judge Harvey J. Sweitzer denied the motion for partial summary judgment and held a five day hearing. AR at 0198.

At the contest hearing, BLM presented the testimony of certified mineral examiner James R. Gruber and the "Tootsie Creek Validity Report for Mining Claims." AR at 0888 (Gruber Rep.); AR at 1501-1847 (Tr. 1-347).[9] Meanwhile, Plaintiffs' rebuttal case relied chiefly on the mineral

---

[9]   James Gruber, who conducted the examination, has substantial experience and expertise in the field, and his conclusions are entitled to deference from the Court. *Citizens Inv. Svcs. Corp. v N.L.R.B.*, 430 F.3d 1195, 1200 (D.C. Cir. 2005)(saying that a situation involving an agency's "expertise in drawing reasonable inferences from the evidence to make a determination . . . merits the court's deference."). He had been working for nearly twenty-five years as a geologist, and he had been a mineral examiner for the BLM for over fifteen years. *See* AR at 0758.

report of Earnest K. Lehmann, an owner of the business entities that are the plaintiffs in this action;

Mr. Lehmann's testimony; the testimony of John Soma, a mining engineer hired by Plaintiffs, and

the testimony of David Abbott, a geologist hired by Plaintiffs to testify about geological inference.

IBLA Dec., 161 IBLA at 62; AR at 1167 (Lehmann Rep.).

The Gruber Report, prepared for the BLM's validity examination, identified gold deposits

within the three main zones discussed above: the Main Gold Zone, the East Gold Zone and the South

Fork Gold Zone. AR at 0958 (Gruber Rep.). The issue of oxidation of the claims' mineral deposits

was central to Gruber's analysis. AR at 1539 (Tr. 39). Gruber testified that his examination of the

drill hole data revealed that the gold in the Tootsie Creek area was not well oxidized, a fact which

would result in lower gold recovery from mined ore and correspondingly lower profits. AR at 1587,

(Tr. 87); AR at 0971(Gruber Rep.). Low recovery rates in the non-oxide areas, also known as

sulfide areas, were confirmed by the data from cyanide leach tests performed by BLM on the drill

hole samples provided by Plaintiffs.[7] See AR at 1078-81 (showing drill hole data in sulfide zones

with erratic returns of 7% to 48.5% of gold from the samples). Gruber's analysis was also supported

by similar experiences at the Zortman and Landusky heap leach mine, and the Kendall mine, both

of which served as model for the mine Plaintiffs proposed. AR at 1591-93 (Tr. 91-93). At both the

Kendall and Zortmand and Landusky mine, oxidized zones were mined, while sulfide zones were

not mined. AR at (Tr. 91-93). Based on this assessment, Gruber determined that a prudent miner

---

[7] As they did at the contest hearing, and in their appeal to the IBLA, Plaintiffs conveniently omit any mention of several cyanide tests that showed low recovery rates on the EB 6 and RE 2 claims. Pltfs' Mem. at 34 (noting recovery rates of 48.4%, 45.7% and 42.86%). Further, the recovery rates Plaintiffs rely upon are inapposite because the other recovery rates in Plaintiffs' drill holes from sulfide ores were 7%, 9%, 15%, 20%, 26% and 35%. Accordingly, even if this Court was considering Plaintiffs' mine model, it would have to reject the model as based on inaccurate, overly optimistic, recovery rates.

would only mine in the oxide zones – the Main Gold Zone, the East Gold Zone and the South Fork Gold Zone – where the associated recovery of valuable minerals would be greatest.  AR at 1591 (Tr. 91); AR at 1078-81.

Gruber's conclusion also considered other appropriate evidence, including Plaintiffs' samples from bedrock trenches and rock outcrops, AR at 1549 (Tr. 49), and samples collected by BLM during the validity determination.  AR at 0967 (Gruber Rep.).  In evaluating the samples he received, Gruber properly excluded "high-grade outcrop samples at suspected points of mineralization, composite grab samples in abandoned prospect pits, float samples, and subcrop samples . . ." because they are not legally appropriate evidence of a discovery.  AR at 0964 (Gruber Rep.). [8]

Next, Gruber calculated the types and amounts of reserves to be found on Plaintiffs' claims. Using United States Geological Survey Circular 831 ("Circular 831"),[9] Gruber calculated the "Identified Resource Subset Reserve Base," which defined the "geometry and extent of the mineral deposits . . ." within Plaintiffs' claims.  AR at 0973 (Gruber Rep.).  Circular 831 states that identified resources are "resources whose location, grade, quality, and quantity are known or estimated from

---

[8] *See United States v. White*, 118 IBLA 266, 315 (1991)( "This is a critical point since the *sine qua non* of a discovery is the exposure of a mineral deposit and, to the extent that the rocks and specimens which he sampled are considered to be detrital deposits, they cannot be considered supportive of a lode claim since a placer discovery (even assuming it exists) will not support a lode location.")  Accordingly, Plaintiffs' reliance on loose rock samples, or detrital deposits, is misplaced because they are seeking to validate lode claims, rather than a placer claim, and Gruber was correct to exclude such samples.

[9] Circular 831 is the successor of United States Geological Survey Bulletin 1450-A, which has a nearly identical classification system and has been cited by the IBLA in several cases.  *See, e.g.*, *United States v. Clouser*, 144 IBLA 110 (1998); *Vanderbilt Gold Corp.*, 126 IBLA 72, 78 (1993); *United States v. Feezor*, 74 IBLA 56, 84 (1983) aff'd in relevant part 81 IBLA 94 (1984).

specific geological evidence . . . and include economic, marginally economic and subeconomic components. To reflect varying degrees of geological certainty, these economic divisions can be subdivided into *measured, indicated* and *inferred* [reserves]." AR at 1089-90 (emphasis in original). Ultimately, Gruber calculated a reserve base by combining the measured and indicated reserves, the existence of which are based on a greater amount of reliable data than inferred reserves. *Id.*

Using this methodology, Gruber drew circles with a 200 foot radius around each drill hole and labeled the area within the circles as "indicated reserves." AR at 1094; AR at 1646-48 (Tr. 146-48). Notably, this practice coincided with Lehmann's approach of assuming a 200 foot area of influence on each side of sample points. AR at 1236 (Lehmann Rep.). Gruber then calculated the reserve base on Plaintiffs' claims and determined that 604,915 tons of reserve material could prudently be mined from the three gold zones. AR at 973-76 (Gruber Rep.); 1676 (Tr. 176). After determining the reserve base, Gruber determined the amount of gold and silver recoverable from the reserve base. This involved determining the "leachability" of the rock taken from within the reserve base. Gruber found that, on average, .042-.044 ounces of gold and .21-.22 ounces of silver could be leached from every ton of rock mined. AR at 0977, 1676 (Gruber Rep., Tr. 176).

With these calculations in hand, Gruber created a mine model to determine whether Plaintiffs' claims could be economically mined. AR at 1678 (Tr. 178). Gruber based his model on a document entitled "Gold Heap Leaching Plans and Costs for Mining and Heap Leaching A Small Gold Deposit," which he testified was authoritative in the profession. AR at 1095; AR at 1679-81 (Tr. 179-81). Gruber also interviewed vendors of mining equipment and services to gain estimates of operation costs. AR at 0979-89 (Gruber Rep., Tables 9-13). Ultimately, Gruber estimated the total cost of this theoretical operation at $4,302,600. AR at 0990 (Gruber Rep.).

13

Based on the above analysis, Gruber concluded that a prudent miner would extract only 387, 942 tons of oxide ore in one mining season. *Id.* Using the determined recovery rates, Gruber concluded that the theoretical mine could recover 12,973 ounces of gold and 42,672 ounces of silver. *Id.* Based on the then-applicable prices of gold and silver, Gruber calculated that this recovery would yield the project $5,250,980, resulting in a post-tax profit for Plaintiffs of $569,028. *Id.* at 0991.

Next, Gruber used his cost estimates to establish a "cutoff grade" that he defined as the "lowest grade that will meet project costs," of .034 oz./ton of gold, or 1163 parts per billion ("ppb"). Gruber concluded that a prudent miner would not mine below cutoff grade. In other words, Gruber concluded that a prudent miner would not mine a claim if the recovered gold and silver could not meet the cost of mining and processing the minerals extracted. *See* AR at 1697 (Tr. 197).

Accordingly, Gruber found the P 14, P 15 and P 16 claims invalid because the surface sample found on those claims yielded gold values lower (ranging from less than 34 ppb to one sample of 308 ppb) than either parties' cutoff grade, because there was no drill hole data that verified the grade of the gold contained within those claims and because there was no opportunity to extrapolate mineral values from known data points using geological inference. AR at 1654-59 (Tr. 154-59). This evidence established that a prudent miner would not mine the P 14, P 15 and P 16 claims.

Gruber also testified that no deposits valuable enough to cover mining costs were present on the RE 1 or RE 2 claims because the gold values on those claims were significantly low in both the surface samples and the drill hole data derived for the claims from hole TCE-1. AR at 1659-66 (Tr. 159-166). Gruber testified that although a gold bearing structure crossed through the claims, the gold in that structure was sulfide in nature and the gold recovery from it would accordingly be low.

14

AR at 1660 (Tr. 160). Overall, Gruber testified that he could not find a trend across the RE 1 or RE 2 claims with values above 172 ppb, well short of even Plaintiffs estimated profit point of 400 ppb. *Compare* AR at 1661 (Tr. 161) *with* AR at 1234 (Lehmann Rep.).

Finally, Gruber testified that he found an exposure above cutoff grade on the EB 6 claim, but that it was at an elevation well below any defined mineral deposit and surrounded by sulfide ore which a prudent miner would not extract. AR at 1696 (Tr. 196). Accordingly, this exposure was viewed as isolated and not indicative of a valuable mineral deposit sufficient to support the finding of a discovery. AR at 1695-96 (Tr. 195-96). Based on Gruber's substantial analysis and the sample data showing low, inconsistent gold values throughout the contested claims, the BLM established a prima facie case that the six claims were invalid.

In rebuttal, Plaintiffs relied chiefly on a mineral report and mine plan developed by Ernest K. Lehmann, part owner of the mining claims, and the testimony of their hired experts, mining engineer John Soma, and geologist, David Abbott. AR at 1167 (Lehmann Rep.); AR at 2253 (Tr. 754)(Soma); AR at 2306 (Tr. 832)(Abbott). Plaintiffs attempted to compensate for the low gold recovery rates on the invalid claims by proposing that Judge Sweitzer base his decision on a competing mine model they developed. *See* AR at 1231 (Lehmann Rep.). Plaintiffs' plan was to mine the higher value ore found on the claims and then to "crush and agglomerate" ("C&A") these ores to increase the efficiency of the gold leaching process. *Id.* Plaintiffs theorized that this would yield them a 78% recovery rate of gold from the C&A ore. *Id.* Plaintiffs also planned to place low-value, run of the mine ore ("ROM"), on the leaching heaps without further treatment in hopes of attaining the small amounts of gold that could be recovered from such material. *Id.* Despite a lack of supporting data, and in the face of outright contradictory data, AR at 1078 (showing gold

15

recovery in sulfide zone of 40%); AR at 1079 (showing gold recovery rates in sulfide zones ranging from 7% to 45%), Plaintiffs estimated that they would achieve gold recovery of 50% from ROM ores. *Id.* at 1231 (Lehmann Rep.).

To mine the ore, Plaintiffs' plan proposed an open pit, heap leaching method of mining that would operate for 10.89 years. AR at 1246 (Lehmann Rep. ). The plan theorized daily output of 9350 tons of C&A ore, 15,900 tons of ROM ore and 25,900 tons of waste. *Id.* Mine costs were estimated based on a supposedly analogous mine, the Florida Canyon Mine, and Lehmann made adjustments to "compensate[] for differences between Florida Canyon and Tootsie Creek by increasing capital and operating costs appropriately to reflect local conditions." AR at1245, 1248 (Lehmann Rep., Table 10.1.). Under this plan Lehmann postulated that Plaintiffs could recover 901,000 ounces of gold from C&A ore and 186,000 ounces from ROM ores for a total gold recovery of 1,087,000 ounces. AR at 1245. Lehmann then derived his own cutoff grades, which he defined as "the minimum mineralization of minimum grade . . . to cover costs, above which there would be a contribution to the cash flow of [an] operation." AR at 2097 (Tr. 598). Lehmann derived two cutoff grades for the ore on Plaintiffs' claims, one for the C&A ore, 400 ppb, and another for the ROM ore 114 ppb. AR at 1232 (Lehmann Rep.). In violation of the "group claim rule," which requires each claim to be capable of contributing a proportionate share to recovering capital costs, Lehmann's cutoff grades assigned to the C&A ore all of the operating costs for the venture including the mining of the ROM ores. AR at 2099 (Tr. 599). With the capital costs supposedly borne by the C&A ore, Lehmann theorized that the ROM ore only needed to return the minimal amount of 114 ppb to cover the cost of the cyanide solution and be profitably mined. AR at 2099-2100 (Tr. 599-600). However, the record shows that Lehmann's cutoff grades were too low because they were

based on a gold price of $400 per ounce, rather than the price of gold on the date of hearing, $387 per ounce. AR at 2136 (Tr. 637). Additionally, according to Lehmann's report, the price of gold in 1993, the year of the segregation and the year by which discovery had to have been made, was $378.52 per ounce. AR at 1224 (Lehmann Rep., Table 8.1). Overall, Lehmann estimated that the cost of his alternative proposed mine would be $70 million dollars and that his project would gross – based on higher than demonstrated gold prices and an unrealistically high expected gold recovery rate – $147.7 million over the 10 year life of the mine, netting a theoretical project a profit of $77.7 million. AR at 1246 (Lehmann Rep.).

Lehmann testified that no drill hole evidence existed for the P14, P 15 and P 16 claims and that the claimed "discoveries" thereon were based on geological inference. AR at 2195-96 (Tr. 696-697). Plaintiffs' other witnesses, Soma and Abbott, made similar concessions with respect to the lack of exposure confirming a valuable deposit on the P 14, P 15 and P 16 claims. AR at 2290-92 (Tr. 791-793)(Soma); AR at 2324 (Tr. 825)(Abbott). The testimony of Plaintiffs' witnesses also made clear that prior to the segregation of the Tootsie Creek area from mineral entry, Plaintiffs' project was still largely one aimed at exploration and, on some claims, Plaintiffs were not in a position to evaluate whether such claims could be economically mined or even whether such claims would be mined at all. Lehmann, for example, testified that Plaintiffs would not mine on the P 15 claim because it did not "make good mining sense." AR at 2129 (Tr. 630). Additionally, Soma testified that the Plaintiffs were only "[a]t the stage for delineation drilling . . ."[10] AR at 2265 (Tr. 766). Soma reaffirmed the nascent nature of Plaintiffs' proposal when he testified that he "would

---

[10] Delineation drilling is drilling aimed at defining the shape, extent and position of a valuable mineral deposit within a claim or group of claims. Delineation drilling also helps the miner to discern between areas of waste material and mineable material.

not worry about . . .," the economically critical oxide/sulfide issue, at "this stage of delineation drilling . . . ." AR at 2285 (Tr. 786). He also testified that with the data Plaintiffs possessed on the date of withdrawal and the date of hearing, a mine operator would not proceed to a mining operation but would instead conduct additional exploration. AR at 2292 (Tr. 793).

With respect to the presence of sulfide ores on the mining claims, Plaintiffs argued that BLM's focus on oxidation was irrelevant. AR at 1231 (Lehmann Rep.). Significantly, Lehmann testified that it was a "no-brainer that [oxidation] is not well developed" on Plaintiffs' claims, AR at 2067 (Tr. 568), and conceded that the portion of oxide ore mined in his model would be "relatively small." AR at 2207-09 (Tr. 708-10). Perhaps because Plaintiffs viewed the oxide issue as irrelevant, Soma testified that he did not make any adjustment to his mine model costs, even though he conceded that Lehmann proposed a mining plan that proposed to mine oxide ores,  AR at 2283-84 (Tr. 784-85), and that the presence of sulfides would affect costs in some manner. *Id.* Finally, Lehmann testified that he was aware that the sulfide ore mining program at the Zortman and Landusky mine, a mine that Plaintiffs claimed to be an analogue of their own, had been cancelled, but attributed the cancellation to other financial issues with the firm managing the Zortman and Landusky mine. AR at 2207-09 (Tr. 708-10). In sum, Plaintiffs proposed to the IBLA as an alternative to Gruber's analysis an oxide mine model, that would process mainly sulfide ores.

### C.    Judge Sweitzer's Decision.

On April 28, 1998, after hearing the above described evidence and reviewing the parties' post- hearing briefs, Judge Sweitzer rendered his decision finding the P 14, P 15, P 16, RE 1, RE 2 and EB 6 mining claims invalid. AR at 0396 (ALJ Dec. at 1). In rendering his decision, Judge Sweitzer stated, "[t]he law simply is not clear whether the requisite exposure of the valuable mineral

18

deposit on each claim must be at least cutoff grade . . . ." AR at 0427 (ALJ Dec. at 32). Ultimately, Judge Sweitzer determined that the "best course of action, given the uncertainty, [was] to follow the law of the case . . . requiring on each claim an exposure of at least cutoff grade mineralization within a mineral deposit found to be valuable." AR at 0428 (ALJ Dec. at 33). Because the BLM presented evidence that no exposures above cutoff grade existed on the RE 2 or EB 6 claims, Judge Sweitzer found those claims invalid. *Id.* Judge Sweitzer also found that the government made a *prima facie case* with respect to the P 14, P 15, P16 and RE 1 claims based solely on evaluating the values and locations of the sample data, irrespective of the analysis in the Gruber report. AR at 0424 (ALJ Dec. at 29).

Judge Sweitzer then evaluated whether Plaintiffs overcame the *prima facie* case by a preponderance of the evidence. AR at 0428 (ALJ Dec. at 33). For six main reasons, Judge Sweitzer ruled that Plaintiffs had not carried their burden. AR at 0429 (ALJ Dec. at 34). Chief among these were Plaintiffs' failure to show whether, or to what extent, the mainly sulfide Tootsie Creek Deposit would be amenable to heap leaching and the Plaintiffs' failure to provide cost estimates with sufficient detail, specificity or explanation. *Id.* Accordingly, Judge Sweitzer declared "null and void for failure to discover a valuable mineral deposit . . ." the six contested claims. AR at 0459 (ALJ Dec. at 64).

### D.    The IBLA Decision

Plaintiffs appealed Judge Sweitzer's decision to the IBLA. AR at 0461. The IBLA found that Plaintiffs' appeal was without merit and affirmed Judge Sweitzer's decision, finding the six claims invalid with one modification. IBLA Dec., 161 IBLA at 40. The IBLA held that Judge Sweitzer, "went too far in adopting cutoff grade as a rule of law," *id.* at 93, but indicated that the use

of cutoff grades is an important indicator of fact. *Id.* Exercising its power of *de novo* review, the IBLA analyzed the contested claims' validity "as the factual inquiry it should have been." *Id.*

IBLA found that the BLM presented sufficient evidence to establish a prima facie case as to the contested claims. *Id.* at 95-96. With respect to the Patricia claims (P 14, P15 and P 16) and RE 1 claim, the IBLA based its decision on the testimony of James Gruber that cited sparse sampling and low gold values throughout the claims and Gruber's conclusion that no valuable discovery had been made on the claims. *See id.* at 86, 96. The IBLA next found that the BLM presented a prima facie case for the EB 6 claim when it adduced evidence showing that the two exposures of gold on that claim were not sufficient to support a finding of discovery because the exposures were of low gold value and lacked a nexus to a mineral deposit. *Id.* at 95-96. Finally, the IBLA found that BLM presented a prima facie case that no discovery existed on the RE 2 claim when Gruber testified that the only two "high grade" samples on that claim were not within an identified mineral deposit, namely, the South Fork Gold Zone. *Id.* at 96.

The IBLA then examined the evidence to determine whether Plaintiffs met their burden of proving, by a preponderance of the evidence, that they had exposed a valuable mineral deposit on each contested claim prior to the withdrawal of the Sweet Grass Hills from mining. *Id.* at 99-101. The IBLA noted that Plaintiffs' case was "speculative and lacking sufficient proof . . . ," as well as not "consistent with the facts of record . . . ." *Id.* at 103. The IBLA also stated that the evidence, taken as a whole, made clear that Plaintiffs had not yet made a discovery on the contested claims but "were still attempting to explore for more evidence of a mineral deposit" on those claims. *Id.*

With respect to the P 14, P 15, P 16 claims, which were analyzed as a group, the IBLA found Plaintiffs' own samples demonstrated gold values that were generally low (6 ppb to 425 ppb),

20

"erratic" and not well identified.  *Id.* at 101, 102.  With respect to the RE 1 claim, the IBLA found

that Plaintiffs failed to rebut the prima facie case because the samples taken on the claim revealed

nothing more than "'isolated bits of mineral on the surface of the claim'" upon which a "'discovery

cannot be predicated . . . .'" *Id.* at 102 (quoting 2 *American Mining Law* § 35.11(3)(b).  IBLA also

found the RE 2 claim invalid, stating that the generally low and random gold values found in the

surface samples and drill hole data for the claim prevented Plaintiffs from meeting their burden of

rebutting the prima facie case.  *Id.* at 102-03.  Finally, the IBLA analyzed the EB 6 claim and held

it to be invalid due to generally low gold values in the claim's sample data and Plaintiffs' failure to

account for the low gold recovery they would realize from sulfide ores on the claim.  *Id.* at 97.

Ultimately, the IBLA decided Plaintiffs' evidence was due little weight because of the low gold

values found in Plaintiffs' own samples on the claims and Plaintiffs' failure to adjust their mine

model to reflect the additional costs associated with mining sulfide ores.  *Id.* at 103.

     Accordingly, the IBLA affirmed Judge Sweitzer's findings that the contested claims were

invalid.

## IV.    STANDARD OF REVIEW

### A.    Standard of Review for Granting Summary Judgment

     Summary judgment is appropriate where there are no genuine issues of material fact.  Fed.

R. Civ. P. 56(c).  In Administrative Procedure Act (APA) actions, the Court reviews the agency's

administrative record, and may not "find" underlying facts. The only issues presented are issues of

law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also National Ass'n of Home Builders

v. U.S. Army Corps of Engineers*, 417 F.3d 1272, 1282 (D.C. Cir. 2005) ("'[C]laims that an agency's

action is arbitrary and capricious or contrary to law present purely legal issues.'") (quoting *Atlantic

*States Legal Foundation v. E.P.A.*, 325 F.3d 281, 284 (D.C. Cir. 2003)).  In reviewing final agency action under the APA, the relevant facts, with few exceptions, are limited to those presented in the administrative record of the agency.  *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985); *see also Camps v. Pitts*, 411 U.S. 138, 143 (1973) (validity of the agency's action should "stand or fall" on the administrative record presented).  Consequently, the issues presented in this matter are issues of law, and summary judgment is "particularly appropriate" to resolve Plaintiffs' claims.  *Richards v. INS*, 554 F. 2d 1173, 1177 n. 28 (D. C. Cir. 1977); *Florida Fruit & Vegetable Ass'n v. Brock*, 771 F. 2d 1455, 1459 (11th Cir. 1985), *cert. denied*, 475 U.S. 1112 (1986).

**B.      Standard of Review Under The Administrative Procedure Act**

The APA provides a highly deferential standard for review of a challenge to an formal agency action, such as the one at issue here.  In examining such a challenge, a reviewing court must determine whether the conclusions arrived at were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court."  *Camp v. Pitts*, 411 U.S. 138, 142 (1973).  In determining whether an agency's decision violates the deferential "arbitrary or capricious" standard set forth in the APA, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (citations omitted).  In APA review cases, the Court must give the agency action great deference. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985).  Additionally, this standard of review requires a presumption of validity of the agency action.  *Hagelin v. FEC*, 411 F.3d 237, 242 (D.C. Cir. 2005).

While the considerable deference provided to the agency does not shield the decision from a "thorough, probing, in-depth review," the question is not whether the Court itself would have made the same decision, because "the court is not empowered to substitute its judgment for that of the agency." *Overton Park*, 401 U.S. at 415-16. Accordingly, the question before the Court is not "whether [it] would have reached the same conclusion as did the Secretary . . . ." *Oregon Basin Oil and Gas Co. v. Work*, 6 F.2d 676 (DC.App. 1925). Rather, the Court must uphold the decision if the agency followed required procedures, evaluated relevant factors, and reached a reasoned decision which did not constitute a clear error of judgment or exceed the bounds of its statutory authority. *Overton Park*, 401 U.S. at 415-16. It is the Plaintiffs' burden to prove that these criteria are not met and that the agency's decision was arbitrary and capricious. *Motor Vehicle Mfrs. Assen v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

## V.    ARGUMENT

The record shows that the IBLA's decision is supported by substantial evidence and that its conclusions – that the six claims at issue in this case are invalid – should be upheld. In their motion for summary judgment, Plaintiffs attempt to re-argue the evidence to assert that these six claims are valid, but the validity of the claims is not at issue, and the Court may not reach a decision on that point. The only issues before this Court are: (i) whether Plaintiffs have met their substantial burden of showing that IBLA's decision that the BLM presented a prima facie case on the six contested claims was arbitrary, capricious, otherwise not in accordance with the law, or not supported by substantial evidence; and (ii) whether Plaintiffs have met their substantial burden of showing that the IBLA's decision that Plaintiffs failed to prove by a preponderance of the evidence that discoveries of valuable mineral deposits had been made on the contested claims, rendering the

23

claims void, was arbitrary, capricious, otherwise not in accordance with the law, or not supported by substantial evidence.  As explained in detail in the Factual Background and below, the record shows that, applying substantial agency expertise, BLM made a prima facie showing that a prudent person would not develop the contested claims because the gold values were low and erratic and because the presence of sulfide materials would render mining the claims unprofitable.  Plaintiffs' arguments to the contrary request that this Court ignore controlling precedent that compels a decision in favor of Defendants.  Pltfs' Mem. at 14-18.  The remainder of Plaintiffs' arguments are misguided attacks on the evidence BLM offered to demonstrate that the contested claims are invalid.

The record also demonstrates that Plaintiffs did not rebut BLM's prima facie case by a preponderance of the evidence.  Plaintiffs' evidence did not overcome the evidence of invalidity because it ignored significant costs and low gold recovery rates associated with mining sulfide materials, used too high a gold price in generating a mine model, focused on samples with high gold values while ignoring evidence of low value samples, applied geological inference in a legally incorrect manner and generally failed to show that valuable amounts of gold were associated with a mineral deposit anywhere on the contested claims.

### A.    IBLA CORRECTLY FOUND THAT BLM PRESENTED A PRIMA FACIE CASE THAT THE CONTESTED CLAIMS WERE INVALID

"In an action to contest mining claims the government bears the burden of establishing prima facie the invalidity of the claims, the burden then shifting to the claimant to prove that his claims are valid."  *United States v. Zweifel*, 508 F.2d at 1157.  "When a Government examiner, who has had sufficient training and experience to qualify as an expert witness, testifies that he has physically examined a claim and found mineral values insufficient to indicate the discovery of a valuable

mineral deposit, the United States has established a prima facie case." *United States v. Gillette*, 104 IBLA 269, 274 (1988). Accordingly, the IBLA correctly held that BLM established a prima facie case when "Gruber 'testifie[d] that he has examined a claim and found the mineral values insufficient to support a finding of discovery.'" IBLA Dec., 161 IBLA at 94 (quoting *United States v. Boucher*, 147 IBLA at 248)(citations omitted)).[1]  The determination that the BLM established its prima facie case at the hearing is entitled to substantial deference from this Court and should be upheld.

The below analysis of the BLM's prima facie case tracks the IBLA decision which analyzed the Patricia claims (P 14, P 15 and P 16) and the RE 1 claim together and the EB 6 and RE 2 claims together.

> 1.    IBLA's Finding of A Prima Facie Case With Respect to the P 14, P 15, P 16 and RE 1 Claims Is Correct.

The IBLA determined that the BLM presented a prima facie case of invalidity with respect to the P 14, P 15, P 16 and RE 1 claims "for the reasons stated [in its opinion] and in Judge Sweitzer's decision . . . ."  IBLA Dec., 161 IBLA at 101 (citing ALJ Dec. at 29 (AR at 424)). Plaintiffs failed to meet their substantial burden of showing that IBLA's decision was arbitrary or capricious.

The IBLA's decision with respect to the Patricia claims was based in part on BLM's showing that Plaintiffs failed to conduct exploration activities on the P 14, P 15 and P 16 claims. *See, e.g.*,

---

[1] The determination of whether the government established its prima facie case is based exclusively on the evidence the BLM presented in its case-in-chief. *United States v. Knoblock*, 131 IBLA at 82. Accordingly, to the extent Plaintiffs assert factual deficiencies in the prima facie case, the United States addresses the arguments below. *See infra* Sec. V.B.

*id.* at 51 (noting that the facts in the record showed that Plaintiffs' drilling plans did not include the P 14, P15 or P 16 claims); *id. at 53* (noting that facts in the record showed that Plaintiffs' final drilling plan did not include the P 14 claim). IBLA also relied on Gruber's testimony "that he included no 'identified reserves' [on the claims]. . . because he had no verification at depth of mineral values, and no ability to extrapolate [such values] from known data points." *Id.* at 73 (citing AR at 1654-59 (Tr. 154-59)). In other words, the IBLA found that the evidence failed to support a finding that there was a deposit of gold on the claims, which is a prerequisite for inferring a discovery. *See id.* at 51, 73, 101; *United States v. Feezor*, 130 IBLA 146, 190 (1994). Therefore, the IBLA correctly determined that no valuable mineral deposit was present on the Patricia claims because no such deposit was uncovered and there was not sufficient evidence to infer a deposit on the claims.

With regard to the RE 1 claim, the IBLA found credible Gruber's testimony that the surface and drill hole data on the claim indicated "that gold values were significantly low throughout the area . . ." and insufficient to support a finding of discovery. IBLA Dec., 161 IBLA at 73 (citing AR 1659-66 (Tr. 159-66). As discussed above, this satisfied the BLM's prima facie burden.

Finally, it is important to note that the IBLA agreed with Judge Sweitzer, that even if the Gruber report, which Plaintiffs wrongly attack, was excluded from consideration, a prima facie case still would have been made as to these claims because:

> the sample data, and other facts presented in the Government's case-in-chief independently show[ed] that no basic equivalency exist[ed] between the surface samples and drill hole samples, that each of the contested claims lack[ed] an exposure of at least cutoff grade mineralization within a valuable mineral deposit, and that each . . . lack[ed] an exposure of any grade of mineralization within a valuable mineral deposit.

AR at 0424 (ALJ Dec. at 29). Taken together, these facts supply substantial evidence to support the

26

IBLA's decision that the BLM presented a prima facie case of invalidity with respect to the P 14, P 15, P 16 and RE 1 claims.

> 2.    Applicable Law and Substantial Facts of Record Support the IBLA's Finding of A Prima Facie Case With Respect to the EB 6 and RE 2 Claims.

Exercising *de novo* review, the IBLA properly found that the BLM established its prima facie case at the contest hearing. *See* IBLA Dec., 161 IBLA at 96. First, the IBLA pointed out that Gruber testified that one of the two physical exposures of mineral found on the EB 6 claim was in an area that was overlapped by the senior Butte 48 claim and that the portion of the deposit on the EB 6 claim was too small to be economically mined. IBLA Dec., 161 IBLA at 96 (citing AR 1695-96 (Tr. 195-196)). Because the large part of this exposed deposit belonged to the senior claim, the IBLA was correct to determine that it could not be tallied as the requisite identification of a valuable mineral deposit on the EB 6 claim. *See Marilyn Dutton Hansen*, 79 IBLA 214, 216 (1984).

Second, with respect to the other exposure on the EB 6 claim, the IBLA relied on Gruber's testimony that:

> Q.    The only other exposure on the East Butte 6 claim, then[,] that's above cutoff grade, is it your professional opinion that it is not an exposure of a valuable mineral deposit?
>
> A.    That's my professional opinion.

IBLA Dec., 161 IBLA at 96 (citing AR 1695-96 (Tr. 195-196)). As explained herein, the testimony of a mineral examiner that a claim has been examined and no valuable discovery has been found is sufficient to establish a prima facie case. *United States v. Boucher*, 147 IBLA at 248. Therefore, the IBLA properly relied on this testimony and Gruber's testimony that the only other deposit on the claim belonged to a senior claim in determining that the BLM presented a prima facie case with respect to the EB 6 claim.

The IBLA also correctly determined that the BLM presented a prima facie case that the RE 2 claim was invalid. Plaintiffs contend that two "high grade" samples, samples containing encouraging quantities and quality of gold, on the RE 2 claim support a finding that a discovery was found on the RE 2 claim. Pltfs' Mem. at 42. In reaching a contrary conclusion, the IBLA credited Gruber's testimony that the two high grade samples found on the RE 2 claim were demonstrably anomalous and outside the valuable mineral deposit in the South Fork Gold Zone. IBLA Dec., 161 IBLA at 96 (citing AR at 1836-37 (Tr. 336-37)). The IBLA based this conclusion on the fact that Gruber testified none of the samples taken on the claim showed a correlation between Plaintiffs' high grade surface samples and any similarly high grade samples at depth in the nearest drill hole, EBR-3. AR at 1836 (Tr. 336:14); AR at 1837 (Tr. 337:24)(testifying that the drill hole data held "nothing to indicate sample values in the range of those two high-grade samples . . ."). *See also* AR at 1840 (Tr. 340:17-23). Accordingly, because the values in the surface samples and drill holes were not consistent, Gruber concluded that the South Fork Gold Zone deposit, which the BLM determined was a valuable deposit, did not extend into the RE 2 claim. *Id.* at 1838 (Tr. 338). Based on these findings, Gruber opined that Plaintiffs had not discovered a valuable mineral deposit on the RE 2 claim. The IBLA correctly relied on this testimony, supported in the record by the BLM's and Plaintiffs' evidence, in making its determination that the BLM presented a prima facie case as to the RE 2 claim, IBLA Dec., 161 IBLA at 96, and this Court should uphold that decision.

3.    Plaintiffs Incorrectly Argue that A Prima Facie Case Was Not Presented.

Plaintiffs' attacks on the IBLA's decision are founded on misstatements of controlling precedent and on mischaracterization of the administrative record. First, Plaintiffs argue that the Court should ignore *Foster v. Seaton*, 271 F.2d 836 (D.C. Cir 1959), controlling precedent from the

Court of Appeals for the District of Columbia Circuit, establishing that a mining claimant bears the burden of demonstrating the validity of a mining claim because the appellate court supposedly had a "jaundiced view" and "lack of knowledge regarding the mining law." Pltfs' Mem. at 16. Plaintiffs also assert that the IBLA erred in relying on Gruber because he allegedly misapplied the Mining Law, Pltfs' Mem. at 18-21, should not have utilized Circular 831, *id.* at 21-26, failed to conduct an objective analysis, *id.* at 27, and failed to apply the group claim rule. *Id.* 27-28. As demonstrated below, none of these assertions threaten the IBLA's well-supported conclusion that the BLM established a prima facie case as to each of the contested claims.

        a.     Controlling precedent compels a holding that the mining claimant is the true proponent of an order in a mining claim contest action.

Plaintiffs' first argument, that the burden apportionment in contest claims violates the APA, is entirely devoid of merit. Plaintiffs contend that the law placing the burden on a claimant to prove a valuable discovery on each contested claim by a preponderance of the evidence violates the APA, 5 U.S.C. § 556(d), which provides that "except as otherwise provided by statute, the proponent of a[n] . . . order had the burden of proof." Pltfs' Mem. at 14. *Foster v. Seaton*, 271 F.2d 836 (D.C. Cir 1959), precedent binding upon this Court, directly forecloses this argument. In *Foster*, the Circuit evaluated an identical argument and held that the claimant in a contest action is "the true proponent of a rule or order; namely that they have complied with the applicable mining laws." 271 F.2d at 255. Plaintiffs bear the burden of demonstrating that their claim is valid.[17]

---

[17] In addition to the D.C. Circuit, both the 9th Circuit and 10th Circuit courts of appeals have rejected arguments identical to the one advanced here by Plaintiffs. *See United States v. Springer*, 491 F.2d 239 (9th Cir. 1974)(citing *Foster v. Seaton*, 271 F.2d at 242); *United States v. Zweifel*, 508 F.2d 1150, 1157 (10th Cir. 1974)("the claimant rather than the government is the proponent of a ruling that he has complied with the mining laws.").

b.    The IBLA correctly applied Mineral Law in its decision.

Plaintiffs' second argument is that Gruber's use of cutoff grades to evaluate the contested claims fatally flawed the BLM's prima facie case. This argument simply ignores the IBLA's decision. As it was evaluated by the IBLA, the issue of whether the BLM presented a prima facie case was not dependant on whether an exposure of above cutoff grade was present on each claim. See IBLA Dec., 161 IBLA at 93. Rather, the IBLA held that the prima facie case was presented when Gruber testified that he evaluated each claim and found them not to contain an exposure within a valuable mineral deposit and, as discussed above, the IBLA's decisions as to each claim were based on more than findings of cutoff grade. *See supra* Sec. V.A.1. In fact, where available, the IBLA analyzed the available samples and the gold values found in such samples for each contested claim prior to concluding that the claims were invalid *irrespective* of the cutoff grades established by both parties. *See, e.g.*, IBLA Dec., 161 IBLA at 73, 93, 96, 101-02. Accordingly, this Court should reject Plaintiffs' inaccurate assertion that the IBLA "blindly" ruled that a prima facie case was established for each contested claim.

c.    The IBLA's decision was not flawed by Gruber's use of Circular 831.

Plaintiffs' arguments regarding Circular 831 are also baseless. As an initial matter, Circular 831 is merely a "revision of the publication system published as U.S. Geological Survey Bulletin 1450-A" ("Bulletin 1450-A"). AR at 1086. Identifying this kinship between Circular 831 and Bulletin 1450-A is significant because the IBLA has repeatedly recognized the appropriateness of relying on Bulletin 1450-A in identifying mineral reserves. *See, e.g.*, *United States v. Clouser*, 144 IBLA 110 (1998); *Vanderbilt Gold Corp.*, 126 IBLA 72, 78 (1993); *United States v. Feezor*, 74 IBLA 56, 84 (1983) aff'd in relevant part 81 IBLA 94 (1984). In fact, in *United States v. Feezor*,

the IBLA expressly upheld the "measured," "indicated" and "inferred" classification system found in Circular 831 and applied by Gruber. *Id.* Notably, in direct contravention to Plaintiffs' arguments, the IBLA stated in *United States v. Feezor* that "an 'inferred' reserve whose existence is dependent solely on geological inference cannot serve as a predicate for finding quantity and quality sufficient to support a discovery" of a valuable mineral deposit. *Id.* at 85. Accordingly, after noting that the 200 foot area of influence proscribed in Circular 831 coincided with the area of influence used by Plaintiffs, IBLA Dec., 161 IBLA at 103, *see also* AR at 1236 (Lehmann Rep.), the IBLA correctly rejected Plaintiffs' argument that "errors that allegedly may have resulted from use of the Circular [831] are material." 161 IBLA at 103. This Court should apply deference to the agency's expertise in this area and uphold the IBLA's rejection of Plaintiffs' arguments.

The Court should also reject Plaintiffs' arguments alleging that Gruber misapplied Circular 831. First, as the IBLA noted in its decision, the alleged errors resulting from the use of Circular 831 were not material to its decision. *Id.* Second, Plaintiffs' argument relies on an inaccurate portrayal of the law of discovery. Plaintiffs charge that each of the contested claims "contained gold" or "evidence of resources . . ." and, as such, each should have been found to have a valuable mineral deposit. Pltfs' Mem. at 24-26. However, the mere presence of gold on a claim is not sufficient to support a finding of discovery. Rather,

> A discovery cannot be predicated upon (1) the exposure of . . . isolated bits of mineral on the surface of the claim, not connected with ore leading to substantial values, (2) the finding of mere surface indications of mineral within the limits of the claim, (3) the discovery of valuable mineral deposits outside [the] claim, or (4) inferences from established geological facts relating to the claim. The mere hope or expectation that values will increase at depth is not sufficient to constitute a discovery.

*United States v. Winkley*, 160 IBLA at 145 (quoting 2 Am. L. of Mining § 35-40 to 35-41 (footnotes

and citations omitted)).  Because the IBLA addressed the drill hole and surface sample data on the

contested claims and still concluded that the samples demonstrated only "isolated bits of mineral .

. . not connected with ore leading to substantial values . . ." on the contested claims, IBLA Dec., 161

IBLA at 95-103, this Court should uphold the IBLA's decision that Plaintiffs' arguments are without

merit.  *See United States v. Clouser*, 144 IBLA 110, 114 (1998)(holding "testimony was sufficient

to establish a prima facie case of the lack of discovery on each claim" where the evidence  showed

that disputed claims "exhibited isolated high values.")(internal quotation omitted).

<u>d.</u>    <u>Plaintiffs misapply the group claim rule.</u>

Plaintiffs must also fail because they misapply, or simply ignore a critical aspect of, the

group claim rule.  The group claim rule allows a claimant to group mining claims containing low

quality or quantities of minerals together for determining whether the requisite discovery has been

made.  *See, e.g.*, *Schlosser v. Pierce*, 92 IBLA at 128.  However, this rule is not without limits.

Instead, the rule must be applied such that "the recovery expected from each claim must not only

exceed the costs of mining, transporting, milling and marketing the particular *deposit* on that claim

but each claim must also bear a proportionate share of the development and capital costs attributable

to the combined operations."  *United States v. Collord*, 128 IBLA at 287 (emphasis added).  That

Plaintiffs ignore this requirement is clear from their explication of the  rule.  Plaintiffs state that to

apply the group claim rule "a claimant must demonstrate that locatable minerals are present on each

claim and then the minerals from those claims . . . may be aggregated for purposes of determining

whether there is a reasonable prospect of success in developing one valuable mine."  Pltfs' Mem.

at 29 (citing *United States v. Collord*, 128 IBLA at 348 (Mullen, J. dissenting).  This misstatement

of the law ignores two aspects of the group claim rule as properly described in *United States v.*

32

*Collord*. First, Plaintiffs ignore that the rule requires the demonstration of a "deposit" on each claim that is to be grouped for mining. *United States v. Collord*, 128 IBLA at 287. Second, application of the rule requires a demonstration that each claim will bear its "proportionate share" of the costs of the mining operation exploiting the group of claims. *Id.* It follows that the IBLA was correct to reject this identical group claim argument when presented by Plaintiffs on appeal because Gruber testified to gold values on the contested claims that would have been insufficient to bear a proportionate share of capital costs, *see supra* Sec. V.A.2 - 3, because Gruber testified to the absence of a deposit of valuable mineral on the contested claims, *id.*, and because Plaintiffs "analysis of the group claim rule is too simplistic." IBLA Dec., 161 IBLA at 101. Therefore, that Plaintiffs' arguments that Gruber failed to apply the group claim rule are without merit.

The balance of Plaintiffs' arguments on this point improperly attempt to reargue the facts. Because "the court is not empowered to substitute its judgment for that of the agency" in this matter, *Overton Park*, 401 U.S. at 415-16, these factual arguments are inappropriate and need not be considered.

**B.    PLAINTIFFS FAIL TO DEMONSTRATE THAT IBLA'S FINDING THAT THEY DID NOT MEET THEIR BURDEN OF ESTABLISHING BY A PREPONDERANCE OF THE EVIDENCE THE VALIDITY OF THE CONTESTED CLAIMS WAS NOT ARBITRARY OR CAPRICIOUS**

The only question before this Court is whether the Plaintiffs have sustained their substantial burden of proving that the IBLA's decision holding the contested claims invalid for Plaintiffs' failure to make a discovery prior to the date Tootsie Creek was withdrawn from mineral entry was arbitrary, capricious, not in accord with applicable law or not supported by substantial evidence. That Plaintiffs, or even this Court reviewing this record, might have reached different conclusions than the IBLA is irrelevant so long as the IBLA demonstrated a rational connection between the

evidence it considered and the conclusions it reached.  *Overton Park*, 401 U.S. at 415-416.

Additionally, this standard of review requires a presumption of validity of the agency action.

*Hagelin v. FEC*, 411 F.3d 237, 242 (D.C.Cir. 2005).  Finally, within the realm of a contest action

"'any doubt on the issue of discovery raised by the evidence must be resolved against the mining

claimant, who bears the risk of nonpersuasion.'"  *United States v. Collord*, 128 IBLA at 268

(quoting *United States v. Taylor*, 19 IBLA 9, 22-23 (1975).

Plaintiffs ignore the applicable law, and simply reargue the facts, hoping that this Court will

find their testimony more persuasive and therefore reach a different conclusion than did the IBLA.

*See* Pltfs' Mem. at 30-34 (discussing the facts of the Lehmann mine model rejected by the IBLA and

the facts of the oxide/sulfide issue); *id.* at 37-42 (sections titled "ELAM  Proved a Discovery on EB

6" and "ELAM Proved A Discovery On RE 2").  But, as explained above, the Court cannot engage

in this battles of the parties' evidence and substitute its judgment for that of the agency.  Because

the IBLA's opinion demonstrates that it reviewed the entire evidentiary record carefully, because

its reasoning is well-grounded in applicable law, and because its ultimate conclusion is not "so

implausible that it could not be ascribed to a difference in view or the product of agency expertise,"

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43, the Court

should affirm the IBLA's opinion.

Once the BLM satisfied its burden and presented a prima facie case, the burden shifted to

Plaintiffs to overcome the BLM's case by a preponderance of the evidence.  See IBLA Dec., 161

IBLA at 97 (citing *United States v. Willsie*, 152 IBLA 241, 265 (2000)).  Undertaking this analysis,

the IBLA reviewed the record *de novo*, and properly concluded that Plaintiffs did not meet their

burden because Plaintiffs had not demonstrated that they made the requisite discovery of a valuable

mineral deposit on the contested claims prior to the date of withdrawal. After a discussion of concepts applicable to all of the claims, the IBLA's analysis of the EB 6 claim and RE 2 claims will be discussed individually and its analysis of the P 14, P 15, P 16 and RE 1 claims discussed together.

1.     The IBLA's Conclusions Applicable to All of the Contested Claims.

a.     Plaintiffs cannot use geological inference to prove a valuable mineral deposit on the contested claims.

Plaintiffs' arguments are based, in part, on the incorrect use of geological inference to assume deposits on the contested claims. *See* Pltfs' Mem. at 37-42. In fact, case law establishes that in order to rely on geological inference, a claimant must first demonstrate the *exposure* of a deposit and continuity of values , Plaintiffs did not make that showing. *United States v. Feezor*, 130 IBLA 146, 190 (1994). In *United States v. Feezor*, the IBLA reiterated the acceptable approach and circumstances for using geological inference to assume a valuable mineral deposit on a claim:

> Once an *exposure* of a mineral deposit within the limits of a claim *has been shown to exist*, and *demonstrated values have been high and relatively consistent*, geological inference may be used to show continuity of values throughout the area of the *physical exposure* and establish that the exposed mineral is "valuable" within the meaning of the mining laws

*Id.* (emphasis added). This quote demonstrates the two chief problems with Plaintiffs' use of geological inference on the contested claims. First, prior to using geological inference to infer "mineralization beyond the actual exposed areas . . .," a claimant must have made an "exposure of a mineral deposit within the limits of a claim." *Id.* Because the evidence indicates that no reliable exposures of a deposit were made on the P 14, P 15, P 16 and RE 1 claims, *see, e.g.*, AR at 1063(Gruber Rep., Plate 3); AR at 1325, 1354-59, 1459 (Lehmann Rep., App. 9.1a, Fig 9.4), the use of geological inference to infer a valuable mineral deposit on those claims is simply not appropriate.

35

Plaintiffs' arguments with respect to the use of geological inference on these claims conveniently ignores this threshold requirement.

Second, as to the RE 2 and EB 6 claims, and assuming *arguendo* that a deposit was disclosed on those claims, a claimant must show that "demonstrated values have been high and relatively consistent . . ." prior to inferring that a valuable mineral deposit extends onto a claim. *United States v. Feezor*, 130 IBLA at 190. Plaintiffs also fall short on this requirement because where their "demonstrated values have been high," they have been, as noted by the IBLA, anything but consistent. *See* IBLA Dec., 161 IBLA at 97 (discussing AR at 1395 (Lehmann Rep., App. 9.2 a)(showing drill hole data for the EB 6 claim with two high grade samples at the 230 and 235 foot depths bracketed by markedly lower grade samples within five to fifteen feet up or down the drill hole)); IBLA Dec., 161 IBLA at 99 (citing AR at 1061 (Gruber Rep., Plate 1) ("evidence submitted by contestees regarding that mining claim shows anomalous values in a circular fashion through the tiny southeast corner of the RE 2 mining claim . . .")). Further, if Plaintiffs' values have been "relatively consistent," they have been notably low. *See, e.g.*, IBLA Dec., 161 IBLA at 99 (citing AR at 1379-80 (Lehmann Rep., App. 9.1)(showing consistently low values in drill holes TCM-1 and EBR-3, which correspond to the RE 2 claim)). IBLA's finding that the use of geological inference was inappropriate focused on the lack of consistency. *See id.*; IBLA Dec., 161 IBLA at 97 (noting that high value samples on the EB 6 claim were "anomalous"). Thus, the IBLA's rejection of Plaintiffs' use of geological inference to postulate the presence of valuable mineral deposits on the contested claims was correct.

This analysis also rebuts Plaintiffs' arguments regarding the "validity" of the EB 6 and RE 2 claims which rely on a covert attempt to incorrectly use geological inference. *See* Pltfs' Mem. at

37-42.  Although they attempt to hide it, after expending considerable effort complaining about Gruber's application of geological inference, Plaintiffs attempts to prove discovery of a valuable mineral deposit on these claims are based on Gruber's inferences of deposits thereon.  *See* Pltfs' Mem. at 37 (relying on Gruber's inference of a 276 ton deposit); Pltfs' Mem. at 40 ("ELAM submits that when the BLM's mineral examiner determines that a valuable mineral deposit containing reserves exists on a mining claim, discovery is proven.").  However, as just discussed, the low and demonstrably inconsistent values found both on the surface and in the drill hole data for the EB 6 and RE 2 claims prevents the use of "geological inference [to] . . . establish that the exposed mineral is "valuable" within the meaning of the mining laws."  *United States v. Feezor*, 130 IBLA at 190. The IBLA recognized that Plaintiffs could not rely on Gruber's inference of deposits on the contested claims to meet their burden,  IBLA Dec., 161 IBLA at 99 ("two anomalous data points . . . are isolated samples that do not reflect a valuable mineral deposit."); *id.* at 100 (noting that Plaintiffs could "only argue unconvincingly that a prudent miner would extend the line of the South Fork Gold Zone to "catch" an anomalous rock chip sample some distance away [that is] interspersed with low value samples."), and this Court should uphold that decision.

In an argument related to the discussion of geological inference, Plaintiffs claim that the IBLA fashioned a new test in determining the invalidity of their claims when it required Plaintiffs to demonstrate that a sample bearing valuable amounts of gold be identified within a deposit in order for such a deposit to be considered valuable.  *See* Pltfs' Mem. at 37-38.  Plaintiffs accusation that this is a "new test" is simply untrue as the IBLA's requirement is a mere reflection of the Mining Law which only provides for the location of claims containing  "valuable mineral deposits."  30 U.S.C. §§ 22, 26.  The standard applied by the IBLA  in this case only recognizes the obvious – that

a high grade sample surface sample found on top of a mineral deposit, cannot be used to demonstrate that such a deposit, not physically connected to the surface samples, is "valuable" despite drill hole samples *within* the deposit that demonstrate low gold values. *Compare* Pltfs' Mem. at 39 (discussing surface samples on EB 6 with gold values of 2530 ppb, 960 ppb and 960 ppb) *with* Pltfs' Mem. at 39 (discussing drill hole values within the "deposit" on EB 6 of 360 ppb, 222 ppb, 220 ppb and 210 ppb. It is worth noting that the drill hole values are all below even Plaintiffs' cutoff grade). Accordingly, because the IBLA correctly applied the Mining Law, Plaintiffs' argument should be rejected.

   2.   The IBLA Correctly Determined That No Discovery Had Been Made On the EB 6 Claim.

Turning to the specific claims, the IBLA first analyzed the EB 6 claim to determine if Plaintiffs preponderated against the prima facie case established by the BLM. IBLA Dec., 161 IBLA at 97. The IBLA started its analysis of the claim by discussing Plaintiffs' data for drill hole TCE-2. *Id.* IBLA noted that TCE-2 hole contained two anomalously high values at a depth of approximately 5260 feet above sea level. *Id.* Even taking these anomalies into account, the drill hole data conclusively established that the readily mineable oxide ore in this area existed at elevations between 5340 feet above sea level to 5500 feet above sea level. AR at 1080. This placed the anomalous high-grade samples 80 feet deep within a sulfide zone demonstrated to have recovery rates lower than the 50% recovery postulated by Plaintiffs *Id.* (showing 26% and 45% recovery in sulfide zones). Given this reality, Gruber testified that a prudent miner would not attempt to mine below the oxide zone in the vicinity of drill hole TCE-2 because the only high values in the hole were located well within a sulfide zone and the values of the samples bracketing the anomalies were extremely low. IBLA Dec., 161 IBLA at 97 (citing AR at 1591 (Tr. 91)(Gruber)). The IBLA found

38

Gruber's testimony credible, particularly given that had Gruber adjusted his model to mine in the sulfide zone where the anomalous values were found, as Plaintiffs would have had him do, the costs associated with mining the EB 6 claim would have increased such that the value of the anomalously high samples would have been diluted. *Id.* at 97.

IBLA concluded that Plaintiffs "failed to refute th[e] evidence" regarding the higher cost of mining in sulfide zones, even though they "agreed wholeheartedly that the Tootsie Creek region contained primarily sulfide material," *id.* (citing AR at 2212 (Tr. 713)(Lehmann)), and conceded that oxidation, or lack thereof, would be a metallurgical issue requiring adjustment to their costs at some point. *Id.* at 97, 98 (citing AR at 2283-84 (Tr 784-85)(Soma)). Additionally, the IBLA concluded that Plaintiffs' argument, which they repeat here, Pltfs' Mem. at 32-34, that oxidation would not matter to a miner in the planning stages, was shortsighted. *Id.*; *see* AR at 2283-84 (Tr. 784-85)(Soma). Indeed, Plaintiffs admitted that they could not proceed to mine planning, but were only prepared to proceed to delineation drilling. IBLA Dec., 1616 at 98 (citing AR 2290-92) (Tr. 791-93)(Soma)). Given that Plaintiffs had to demonstrate a discovery on the date of withdrawal and that discovery of minerals sufficient to drive a prudent person to conduct more exploration is not equivalent to the requisite exposure of a valuable mineral deposit, *see Barton v. Morton*, 498 F.2d 288, 291 (9th Cir. 1974)(citing *Converse v. Udall*, 399 F.2d 616, 619, 622 (9th Cir. 1968)), this admission supports the IBLA's conclusion that the EB 6 claim was invalid.

Discussing *Red Thunder, Inc.*, 129 IBLA 219 (1994) and *United States v. Page*, 119 IBLA 12, 19 n.10 (1991), the IBLA also concluded that Plaintiffs' failure to consider the costs of recovering gold from a sulfide zone meant that Plaintiffs' mine model was deficient because it failed to take into account, at a minimum, the additional reclamation costs associated with mining sulfide

materials.  IBLA Dec., 161 IBLA at 98.  *See also United States v. Milan Martinek*, 166 IBLA 347, 368-69 (2005)(discussing the inclusion of reclamation costs into a mine model aimed at mining sulfide ores and noting that mining sulfide ores in that case was not profitable, in part, due to reclamation costs.).  The IBLA concluded that it could not "turn a blind eye to this information" and accept Plaintiffs' lack of arguments and adjustments to account for the realities of mining sulfide materials.  *Id.*  This Court should reach the same conclusion.

Finally, the IBLA summarized its reasons for finding the EB 6 claim invalid for lack of discovery of a valuable mineral deposit.  The board reiterated that the BLM had accepted and analyzed Plaintiffs' two high grade samples on the claim, but found the evidence showed the samples to be anomalous and located within a sulfide zone that a prudent miner would not attempt to mine given the concomitant complications.  *Id.* at 99.  The IBLA also rejected Plaintiffs' attempt to use Gruber's inference of the shallow oxide zone from 5340 feet above sea level to 5500 feet above sea level as proof that a valuable deposit had been discovered on the claim because the drill hole data revealed low values within deposit even though the mineral in that zone was oxide in nature.  *Id.*; AR at 1395 (Lehmann Rep., App. 9.2a).  As discussed, geological inference may be used to demonstrate discovery only where values are demonstrated to be high and relatively consistent.  *United States v. Feezor*, 130 IBLA at 190.  Accordingly, because the anomalous high-grade samples did not intersect with the inferred deposit, which, at any rate, bore otherwise low values, the IBLA correctly found that it could not serve as Plaintiffs' evidence of a valuable mineral deposit on claim EB 6.  As Plaintiffs have failed to demonstrate that IBLA's findings were not supported by substantial evidence, this Court should find in favor of Defendants.

3.    The IBLA Correctly Determined That No Discovery Had Been Made On the <u>RE 2 Claim.</u>

40

Turning to the RE 2 claim, the IBLA found that the evidence "leads to the same result." IBLA Dec., 161 IBLA at 99. Specifically, IBLA noted that the "mining claim shows anomalous values in a circular fashion through the tiny southeast corner of the RE 2 mining claim, which does not overlap with another [senior] claim, some distance from the South Fork Gold Zone and from BLM's inference of that zone." *Id.* (citing AR at 1061(Gruber Rep., Plate 1)). In other words, IBLA examined whether there was a link between the sparse evidence of high values on the RE 2 claim and the only identified valuable mineral deposit near that claim. *See United States v. Feezor*, 130 IBLA at 190. Examining the evidence, the IBLA also found that the "data from drill holes EBR 3 and TCM 4 show notably low values." IBLA Dec., 161 IBLA at 99 (discussing AR 1379-81 (Lehmann Rep., App. 9.2(a) and noting, with one exception, values from 30 ppb to 485 ppb in the EBR 3 drill hole)). The IBLA therefore held that the values in the drill holes were insufficient to support a finding of discovery. *Id.*

The IBLA also addressed the evidence of two high grade samples presented by Plaintiffs for the RE 2 claim. Sample 260110 had a value of 2388 ppb, while sample 260114 had a value of 3389 ppb. *Id.* at 100. The IBLA found that Gruber correctly rejected these samples because Plaintiffs simply could not show them to be representative of the nearby geology. *Id.* at 100 (citing AR 1459-60 (Lehmann Rep., Figs. 9.4, 9.4a)) . This conclusion flowed from comparison of the samples' data to samples derived from the nearby drill hole EBR 3, which had a high sample value of 665 and a significantly lower average sample value, and from nearby outcrop and trench samples, which had values in the 100 ppb - 200 ppb range. *Id.* Based on these facts and the lack of equivalency, the IBLA rejected Plaintiffs' suggestion that the South Fork Gold Zone should have been inferred to run across the RE 2 claim to "catch" these two high-grade samples. *Id*. Again, geological inference is

41

of no avail to Plaintiffs because, as discussed above, they did not demonstrate a continuity of high values on the RE 2 claim. *See United States v. Feezor*, 130 IBLA at 190.

> 4.     The IBLA Correctly Determined That No Discovery Had Been Made On the P 14, P 15, P 16 or RE 1 Claims.

In evaluating the Patricia claims, the IBLA observed that no valuable discovery had been made on the P 14, P 15 or P 16 claims. IBLA Dec., 161 IBLA at 102. Plaintiffs attempted to counter this lack of evidence with Lehmann's explanation that assumptions regarding lateral and vertical extent of mineralization on those claims were based on geological inference from drill holes in other areas, *id.* (discussing AR 2194-96 (Tr. 695-97)(Lehmann)), but as discussed above the application of geological inference to infer a discovery on these claims is inappropriate.  The IBLA also noted that another of Plaintiffs' wtinesses, Mr. Abbott, conceded in his testimony that his conclusions with respect to the presence of a valuable mineral deposit on the P 14, P 15 and P16 claims were based solely on geological inference and not samples taken within the claims.  IBLA Dec., 161 IBLA at 102 (citing AR at 2324 (Tr. 825)).  Of course, geological inference, standing alone, is not sufficient, to support the finding of a valuable discovery.  *United States v. Walls*, 30 IBLA 333, 338 (1977).

On this basis alone the IBLA would have been correct in finding the P 14, P 15 and P 16 claims invalid, but it nevertheless continued its analysis of the invalid Patricia claims.  It is axiomatic that where a mining claim is contested, the contestee must show that it made a discovery of a valuable mineral deposit prior to the date of withdrawal.  *See, e.g.*, *United States v. Boucher*, 147 IBLA 236, 242-43; United States v. Feezor, 130 IBLA 146, 190 (1994).  It is equally axiomatic that the discovery of minerals sufficient to provide incentive for a prudent person to conduct more exploration is not equivalent to the requisite exposure of a valuable mineral deposit.  *See Barton v.*

42

*Morton*, 498 F.2d 288, 291 (9th Cir. 1974)(citing *Converse v. Udall*, 399 F.2d 616, 619, 622 (9th Cir. 1968)).[13] Accordingly, properly concluded that the admissions of Mr. Soma and Mr. Lehmann that further drilling was necessary before the viability of these claims for mining could be ascertained also supported its findings.  IBLA Dec., 161 IBLA at 102 (citing AR at 2290-92, 2324 (Tr. 791-93, Tr. 825)).  This Court should uphold this well supported conclusion.

With respect to the RE 1 claim, the IBLA noted that in their appeal to the board, Plaintiffs focused their efforts to support the validity of that claim with generalized attacks on Judge Sweitzer's recognition of the oxide/sulfide issue and use of cutoff grade.  IBLA Dec., 161 IBLA at 102.  But, as we have previously explained, Plaintiffs' arguments ignore that the Court must evaluate IBLA's decision, not Judge Sweitzer's, and that the IBLA's *de novo* review is supported by substantial evidence.

The IBLA noted that while the Lehmann report "identified dozens of outcrop and trench samples of low value" on the RE 1 claim, of the 190 samples available for the claim, only 20 contained gold values above Lehmann's own cutoff grade for C&A ore (400 ppb), only 9 exceeded 500 ppb and only 1 exceeded 1000 ppb.  *Id.* (discussing AR at 1306-14, 1459 ( Lehmann Rep., Appendix 9.1a, Fig. 9.4)).  The IBLA also found that the values in these samples conformed to "no apparent pattern . . .," or, in other words, were not consistent, and that the high-grade samples bore no nexus to any of the three identified gold zone deposits.  *Id.*  Finally with respect to the surface samples on the claim, the IBLA noted that values above 500 ppb on the claim "appear to be surrounded by samples of markedly lower value."  *Id.* (discussing AR at 1459 (Lehmann Rep.,

---

[13] In fact, this analysis could be applied to all of Plaintiffs' claims because  Plaintiffs stated that their 1992 "program [was] designed to obtain the required surface data needed to assess the property as a whole, and to determine the best locations/suitability for further drilling."  AR at 1129.

Figure 9.4)).  The IBLA properly found that this evidence, which was not consistent and did not demonstrate high value, was insufficient to satisfy Plaintiffs' proof of a discovery on the RE 1 claim.

The IBLA next evaluated the drill hole data available for the RE 1 claim, which was dependent on a single drill hole, the TCM 1 drill hole.  AR at 1378-79 (Lehmann Rep., App. 9.2a). With one exception, the demonstrated values in the hole were below 240 ppb with twelve samples bearing quantities of mineral too low to be detected by the assay.  IBLA Dec., 161 IBLA at 102 (discussing  AR at 1378-79 (Lehmann Rep., App. 9.2a)).  Taking all of this evidence into consideration, and noting that a "'discovery cannot be predicated upon . . . the exposure of . . . isolated bits of mineral on the surface of the claim, not connected with or leading to substantial values,'" *id.* (quoting 2 *American Law of Mining* § 35.11(3)(b)), the IBLA found that Plaintiffs failed to present evidence sufficient to rebut the  BLM's prima facie case with respect to the RE 1 claim.

As explained above, the mining claimant has the burden of demonstrating that a claim is valid, and "'any doubt on the issue of discovery raised by the evidence must be resolved against the mining claimant, who bears the risk of nonpersuasion.'"  *United States v. Collord*, 128 IBLA at 268 (quoting *United States v. Taylor*, 19 IBLA 9, 22-23 (1975)).  Therefore, the IBLA correctly found that Plaintiffs failed to rebut the BLM's prima facie case on each contested claim.  As demonstrated, the IBLA supported these findings with ample facts of record – Plaintiffs' admission that they did not consider the costs of mining sulfide ores, Plaintiffs admissions that they had not yet determined the nature of the deposits on the contested claims and the results of assay tests on Plaintiffs' and BLM's sample data – and made its decisions in accordance with applicable law.  Accordingly, this Court should defer to the IBLA's expert conclusions.

5.    Plaintiffs' Claims of Unfairness Are Unfounded

As stated in *United States v. Mavros*, "[f]ollowing the withdrawal of land from mineral entry, a claimant may enter claims to gather evidence that a discovery existed on the date of withdrawal . . . [but] the claimant may not drive an adit on . . . a promising structure in hopes of finding valuable minerals, as that activity would be considered further exploration to disclose a deposit not exposed prior to withdrawal."  Plaintiffs admit that they were only at the stage of "delineation drilling" on the contested claims.  *See* AR at 2265(Tr. 766)(Soma)).  Plaintiffs also stated that their 1992 "program [was] designed to obtain the required surface data needed to assess the property as a whole, and to determine the best locations/suitability for further drilling."  AR at 1129. Additionally, the evidence discussed above demonstrates that Plaintiffs had not *exposed* on the contested claims a valuable discovery prior to the withdrawal.  *See supra* Sec. V.B.1-4.  It follows that the Plaintiffs' 1992 plan actually sought "to expose . . . deposits not exposed prior to withdrawal."  These facts support the IBLA's rejection of Plaintiffs' claims of unfairness, and this Court should similarly reject Plaintiffs' arguments.[14]

VI.    CONCLUSION

For the foregoing reasons, the Court should grant summary judgment for the Federal Defendants and deny Plaintiffs motion for summary judgment.

---

[14] This is doubly true in the instant case because Plaintiffs litigated the propriety of the segregation and eventual withdrawal of the Sweet Grass Hills all the way to an unsuccessful result in the D.C. Circuit.  Accordingly, any arguments that Plaintiffs have about the unfairness of the process have clearly been addressed.

45

January 22, 2008                          Respectfully submitted,

                                          RONALD J. TENPAS
                                          Assistant Attorney General
                                          Environment and Natural Resources Division

Of Counsel:                               /s/ *Mark T. Romley*
Karan A. Dunnigan                         MARK T. ROMLEY
Field Solicitor                                  Trial Attorney
U.S. Department of the Interior           United States Department of Justice
                                          Environment and Natural Resources Division
                                          Natural Resources Section
                                          P.O. Box 663
                                          Washington, D.C. 20044-0663
                                          (ph)(202) 305-0458/(fax)(202) 305-0506