# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ERNEST K. LEHMANN & ASSOCIATES OF )
MONTANA, INC., and MOUNT ROYAL )
JOINT VENTURE, )
  )
            Plaintiffs, )
  )
     v. )       Civil Action 07cv00762 (HHK)
  )
DIRK KEMPTHORNE, Secretary of the Interior, )
*et al.*, )
  )
           Defendants. )
  )

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY
JUDGMENT AND IN REPLY TO DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Steven J. Lechner, Esq.
William Perry Pendley, Esq.
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)
lechner@mountainstateslegal.com

Attorneys for Plaintiffs

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................... 1

ARGUMENT ......................................................................................... 1

I.  SCOPE OF REVIEW ................................................................. 1

II.  THE IBLA VIOLATED THE APA WHEN IT HELD THAT
ELAM HAD THE BURDEN OF PERSUASION............................ 2

III.  THE IBLA's RULING THAT THE BLM PRESENTED A
*PRIMA FACIE* CASE WAS ARBITRARY, CAPRICIOUS,
NOT IN ACCORDANCE WITH LAW, AND UNSUPPORTED
BY SUBSTANTIAL EVIDENCE........................................................ 5

A.  Gruber's Opinions Are Not Entitled To Any Deference ....... 5

B.  Gruber's Opinions Did Not Establish A *Prima Facie*
Case.................................................................................... 7

1.  Gruber's opinions were based on an erroneous
interpretation of the Mining Law ............................... 7

2.  Gruber's opinions regarding EB 6 and RE 2 were
"fatally defective" ....................................................... 8

a.  Gruber's opinion regarding EB 6 was not
based on all the evidence .............................. 9

b.  Gruber's opinion regarding RE 2 was not
based on all the evidence .............................. 12

3.  Contrary to Defendants' argument, the BLM
would not have presented a *prima facie* case with
respect to RE 1 and P 14-15 without Gruber's
Report.................................................................... 14

C.  Gruber Erroneously Utilized And Improperly Applied
Circular 831 .......................................................... 16

1.  Gruber erroneously utilized Circular 831 ................. 16

2.  Gruber erroneously applied Circular 831 ................. 17

**Page**

      a.        Gruber's misclassification of "identified resources" skewed his entire analysis ........... 18

      b.        Gruber erroneously equated "reserves" with "valuable mineral deposits" .................. 19

      c.        Gruber ignored "inferred reserves" ................ 20

      d.        Gruber misclassified the majority of RE 1 and the entirety of P 14-16 as "undiscovered resources" ............................... 22

D.      Gruber's Opinions Were Not Based Upon A Prudent Mine Model ........................................................................ 23

E.      Gruber Failed To Apply The Group Claim Rule ................... 25

IV.     THE IBLA'S RULING THAT ELAM DID NOT PROVE A DISCOVERY ON EB 6 WAS ARBITRARY, CAPRICIOUS, NOT IN ACCORDANCE WITH LAW, AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE ....................................................... 29

V.      THE IBLA'S RULING THAT ELAM DID NOT PROVE A DISCOVERY ON RE 2 WAS ARBITRARY, CAPRICIOUS, NOT IN ACCORDANCE WITH LAW, AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE ....................................................... 34

VI.    THE IBLA'S RULING THAT ELAM DID NOT PROVE A DISCOVERY ON THE SIX CONTESTED CLAIMS WAS ARBITRARY, CAPRICIOUS, NOT IN ACCORDANCE WITH LAW, AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE ................................................................................... 35

A.      The Prudent Man Rule Does Not Require Proof That Success Is Guaranteed ............................................................ 37

B.      The "Marketability Test" Cannot Be Used To Impose A "Present Profitability" Requirement ...................................... 38

C.      Defendants Fail To Understand Principles Of Geological Inference ............................................................................. 39

**Page**

VII.    THE IBLA ERRED IN DECLARING THE SIX CONTESTED
CLAIMS INVALID BECAUSE THE BLM PREVENTED
ELAM FROM ACQUIRING FURTHER EVIDENCE TO
CONFIRM DISCOVERY ................................................................    42

CONCLUSION.................................................................................................    45

CERTIFICATE OF SERVICE ..........................................................................    46

# TABLE OF AUTHORITIES

**Page**

**Case Law**

*AT & T Corp. v FCC*, 86 F.3d 242 (D.C. Cir. 1996) ................................... 2

*Barton v. Morton*, 498 F.2d 288 (9th Cir. 1974) ............................................ 8

*Book v. Justice Mining Co.*, 58 F. 106 (C.C. Nev. 1893) ............................. 7

*Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156 (1962) ............. 1

*Citizens Investment Services Corp. v. NLRB.*, 430 F.3d 1195
(D.C. Cir. 2005) ........................................................................................ 6

*Coleman v. United States*, 363 F.2d 190 (1966) ........................................... 4

*Converse v. Udall*, 399 F.2d 616 (9th Cir. 1968) ........................................ 44

*Director, Office of Workers' Compensation Programs v.
Greenwich Colliers*, 512 U.S. 267 (1994) ...................................... 2, 5

*Foster v. Seaton*, 271 F.2d 836 (D.C. Cir. 1959) ....................................... 2-5

*Lara v. Secretary of the Interior*, 820 F.2d 1535 (9th Cir. 1987) ................. 39

*Motor Vehicle Manufactures Ass'n of U.S. v. State Farm Mutual
Automobile Ins. Co.*, 463 U.S. 29 (1983) .................................... 1, 27

*NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292 (1939) ....... 2

*Payne v. Tennessee*, 501 U.S. 808 (1991) ..................................................... 3

*Rodgers v. Watt*, 726 F.2d 1376 (9th Cir. 1984) ........................................... 6

*United States v. Artero*, 121 F.3d 1256 (9th Cir. 1997) ................................ 8

*United States v. Coleman*, 390 U.S. 599 (1968) ................................ 4, 38, 39

*United States v. Springer*, 491 F.2d 239 (9th Cir. 1974) ............................ 2, 3

*United States v. Zweifel*, 508 F.2d 1150 (10th Cir. 1975) ........................... 2, 3

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) .............................. 2

**Page**

**Administrative Case Law**

*Castle v. Womble*, 19 L.D. 455 (1894) .......................................................... 20, 23, 37, 44, 45

*East Tintic Consol. Min. Co.*, 43 L.D. 79 (1914)........................................... 7

*John S. Wold*, 48 IBLA 106 (1980) ................................................................ 17

*Keith O'Leary*, 63 I.D. 341 (1956) ................................................................ 3, 6

*Norman Whittaker*, 95 IBLA 271 (1987)....................................................... 41

*Schlosser v. Pierce*, 93 I.D. 211 (1986) ........................................................ 25, 27

*United States v. Boucher*, 147 IBLA 236 (1999)........................................... 10, 13

*United States v. Cactus Mines Limited*, 79 IBLA 20 (1982) ........................ 4, 25, 29

*United States v. Cannon*, 70 IBLA 328 (1983)............................................. 4

*United States v. Collord*, 128 IBLA 266 (1994)........................................... 20, 24-28, 31, 37, 38

*United States v. Dresselhaus*, 81 IBLA 252 (1984)...................................... 4

*United States v Feezor,* 74 IBLA 56 (1983) (*Feezor I*) ................................ 18-19, 21, 27, 40

*United States v Feezor,* 130 IBLA 146 (1994) (*Feezor III*) ......................... 15, 39-41

*United States v. Foresyth*, 15 IBLA 43 (1974) (*Foresyth I*).......................... 44

*United States v. Foresyth*, 100 IBLA 185 (1987) (*Foresyth* II)..................... 6, 42

*United States v. Foster*, 65 I.D. 1 (1958)...................................................... 3

*United States v. Hooker*, 48 IBLA 22 (1980) ............................................... 5, 8-10, 30, 43

*United States v. Kinsley Ranch Resort, Inc.*, 20 IBLA 14 (1975)................. 13

*United States v. Larsen*, 9 IBLA 247 (1973) ................................................. 19, 31

*United States v. Mavros*, 122 IBLA 297 (1992) ........................................... 42, 43

*United States v. Strauss*, 59 I.D. 129 (1945)................................................. 3

**Page**

*United States v. Wells*, 11 IBLA 253 (1973) ................................................ 6

*United States v. Winters*, 78 I.D. 193 (1971) ................................................ 5, 6, 11, 15, 44

**Statutes**
5 U.S.C. § 551 *et seq*. (Administrative Procedure Act) ................................ 1-3, 5, 6

5 U.S.C. § 556(d) ........................................................................... 2

5 U.S.C. § 706(2) ........................................................................... 1

30 U.S.C. § 22 .............................................................................. 38

**Other Authorities**
*American Law of Mining* (2nd ed. 1984) .................................................... 4-5

BLM Handbook for Mineral Examiners (1989) ........................................... 16, 17

J. Haggard and J.S. Curry, *Recent Developments In The Law of Discovery*,
30 Rocky Mt. Min. L. Inst., 8-1 (1984) ...................................................... 17

T. Maley, *Mineral Law* (6th ed. 1996) ...................................................... 6

H.E. McKinstry, *Mining Geology* (Prentice Hall 1948) ............................... 41

R.W. Mullen, *The "Prudent Man" Ain't What She Used To Be Many
Years Ago*, 49 Rocky Mt. Min. L. Inst., 10-1 (2003) .................................... 41, 44

G. Reeves, *The Origin and Development of the Rules of Discovery*,
VIII Land and Water L. 1 (1973) .............................................................. 38

D. Sherwood, *Mineral Discovery: Is The Prudent Man Dead?*,
44 Rocky Mt. Min. L. Inst., 10-1 (1998) ...................................................... 38

*Webster's II New College Dictionary* (1999) ............................................... 22

## INTRODUCTION

Plaintiffs, Ernest K. Lehmann and Associates of Montana, Inc., and Mount Royal Joint Venture (collectively "ELAM"), respectfully submit this Memorandum of Points and Authorities in Opposition to Defendants' Cross-Motion for Summary Judgment and in Reply to Defendants' Opposition to Plaintiffs' Motion for Summary Judgment.

## ARGUMENT

**I.    SCOPE OF REVIEW.**

The scope of review in this case is governed by the Administrative Procedure Act, ("APA"), 5 U.S.C. § 551 *et seq*., which mandates that this Court "shall hold unlawful and set aside agency action, findings, and conclusions" that are, *inter alia*: (1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" and/or (2) "unsupported by substantial evidence." 5 U.S.C. § 706(2). Under the "arbitrary or capricious" test, this Court must ascertain whether the IBLA "examine[d] the relevant data and articulated a rational connection between the facts found and the choice made." *Motor Vehicle Manufactures Ass'n of U.S. v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 (1962)). Agency action is arbitrary and capricious if, *inter alia*:

> [T]he agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id*.

Under the "substantial evidence" test, this Court must carefully review the "whole record," and determine whether it "contains such evidence as a reasonable mind might accept as

adequate to support" the IBLA's decision. *AT & T Corp. v FCC*, 86 F.3d 242, 247 (D.C. Cir. 1996) (quoting *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939)). In reviewing this evidence, this Court must also "take into account whatever in the record fairly detracts from" the evidence relied on by the IBLA. *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

## II.    THE IBLA VIOLATED THE APA WHEN IT HELD THAT ELAM HAD THE BURDEN OF PERSUASION.

The IBLA ruled that the BLM needed to present only a *prima facie* case that no discovery existed on the Six Contested Claims and then the burden shifted to ELAM to overcome the BLM's case by a preponderance of evidence. AR 691-92. In short, the IBLA placed the burden of persuasion on ELAM. As previously demonstrated, the IBLA's placement of the burden of persuasion on ELAM was in violation of the APA, 5 U.S.C. § 556(d), as interpreted by the Supreme Court in *Director, Office of Workers' Compensation Programs v. Greenwich Colliers*, 512 U.S. 267, 276 (1994). Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment ("ELAM's Memo.") at 14-18.

As anticipated, Defendants rely almost exclusively on the *per curiam* decision in *Foster v. Seaton*, 271 F.2d 836 (D.C. Cir. 1959) for the proposition that the IBLA properly assigned the burden of persuasion to ELAM. Memorandum of Points and Authorities in Support of Defendants' Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment ("Defs' Memo.") at 29. In fact, Defendants argue that *Foster* "forecloses" ELAM's argument that the IBLA misallocated the burden of persuasion.[1] Defs' Memo. at 29.

---

[1] Defendants cite *United States v. Springer*, 491 F.2d 239, 242 (9th Cir. 1974), and *United States v. Zweifel*, 508 F.2d 1150, 1157 (10th Cir. 1975), for the proposition that two other circuits are in agreement with the D.C. Circuit. Defs' Memo. at 29 n.12. The panels in those cases, however, did not independently analyze the issue; instead, they simply followed the *Foster* and its illegitimate progeny. *Springer*, 491 F.2d at 242; *Zweifel*, 508 F.2d at 1157.

Although *stare decisis* dictates that lower courts should generally follow decisions of higher courts, *stare decisis* is not an "inexorable command." *Cf. Payne v. Tennessee*, 501 U.S. 808, 828 (1991) (noting that the Supreme Court has refused to apply *stare decisis* when controlling decisions are "unworkable or badly reasoned.").

In *Foster*, the mining claimant had located numerous mining claims outside of Las Vegas, Nevada, based on a purported discovery of sand and gravel. 271 F.2d at 837. The Department challenged the claims for lack of discovery. *United States v. Foster*, 65 I.D. 1 (1958). In holding the claims invalid, the Secretary ruled, *inter alia*, that the mining claimant had the ultimate burden of proving discovery. *Id*. at 11. On appeal before the D.C. Circuit, the claimant argued that, under the APA, the government, as the "proponent of an order," should have had the "burden of proof." *Foster*, 271 F.2d at 837-38. The D.C. Circuit rejected this argument for two reasons, neither of which have merit.

First, the D.C. Circuit thought it instructive that the Secretary had allocated the burden of proof in this manner "for a number of years." *Id*. at 838 n.2 (citing *United States v. Strauss*, 59 I.D. 129, 136 (1945)). *Strauss,* however, was decided one year before the APA was enacted and eleven years before the Secretary held that the Department had to afford a claimant notice and an opportunity for hearing in accordance with the APA before a mining claim may be declared invalid. *Keith O'Leary*, 63 I.D. 341, 344 (1956). Thus, contrary to the *per curiam* decision of the D.C. Circuit, the procedures used in *Strauss* provide no guidance as to how the APA allocates the burden of proof in claim contests.

Second, the D.C. Circuit ruled: "[The mining claimants], and not the Government, are the true proponents of a rule or order; namely, a ruling that *they have complied with the applicable mining laws*." *Foster*, 271 F.2d at 838 (emphasis added). If the mining claimant in

3

*Foster* had filed a patent application, this could arguably be a correct statement of the law.[2]
ELAM's Memo. at 16-18 (explaining the difference between "patent contest" and a "claim contest" and why the burden of persuasion should be allocated differently in each situation).

In a claim contest, however, a mining claimant need not prove his claim is valid. Instead, he must only preponderate on the issues, if any, raised by the federal government as to why a mining claim should be declared invalid.[3] *United States v. Dresselhaus*, 81 IBLA 252, 257 (1984) ("[M]atters not placed in issue by the Government case need not be disproved by the claimant.") (citing *United States v. Cactus Mines Limited*, 79 IBLA 20, 27 (1982)).

In fact this was made abundantly clear in *United States v. Cannon*, 70 IBLA 328 (1983). In ruling in favor of the BLM in a claim contest, the ALJ stated: "[w]hen the Government contests the validity of a mining claim, the ultimate burden proof as to the validity of the claim is on the mining claimant." *Id*. at 329. On appeal, the IBLA explained:

> This is an incorrect statement of the law. *Absent a patent application*, in a mining claim contest hearing, there is no requirement that a mining claimant show that a contested claim is valid; rather, the claimant's burden is to preponderate on the issues raised by the evidence.

*Id*. (emphasis added) (citations omitted). Thus, even if a mining claimant succeeds in "destroying all the evidence adduced" by the federal government, he is not entitled to an order or declaration that his claim was valid. *United States v. Winters*, 78 I.D. 193, 197 (1971). Therefore, contrary to the ruling of the D.C. Circuit, a mining claimant in a claim contest is not the "proponent" of anything, much less a proponent of an "order" of validity. *See* 2 *American*

---

[2] Although the published decisions in *Foster* do not expressly state that a patent application had been filed, the Ninth Circuit seemed to believe that to be the case. *Coleman v. United States*, 363 F.2d 190, 200 (1966) (stating that the discussion of the merits in *Foster* was a "judicial recognition of the requirement of the good faith of the *applicant for a mineral patent*.") (emphasis added), *rev'd on other grounds*, *United States v. Coleman*, 390 U.S. 599 (1968).
[3] Defendants fail to recognize this principle. Defs' Memo. at 29 ("Plaintiffs bear the burden of demonstrating that their claim is valid.").

*Law of Mining*, § 35.04[3][c] (2nd ed. 1984) ("[I]t seems unrealistic to say that an unwilling

defendant in a government [claim] contest is the proponent of a rule or order.").

Accordingly, both reasons for the ruling in *Foster* are wrong. Therefore, this Court

should hold unlawful and set aside the IBLA's decision because the IBLA erroneously placed the

burden of persuasion on ELAM in violation of the APA and *Greenwich Colliers*.

## III.    THE IBLA'S RULING THAT THE BLM PRESENTED A *PRIMA FACIE* CASE WAS ARBITRARY, CAPRICIOUS, NOT IN ACCORDANCE WITH LAW, AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE.

Assuming, *arguendo,* that the BLM had the burden of presenting only a *prima facie* case

regarding lack of discovery, the BLM failed to meet this burden. ELAM's Memo. at 18-30. It is

well established that the mineral examiner's opinion must be based upon the proper legal

standards. *United States v. Hooker*, 48 IBLA 22, 31 (1980) (The use of "improper standards"

renders a "mineral examiner's ultimate conclusion of invalidity" "fatally defective[.]"). It is also

well established that his opinion must be based upon "probative evidence [regarding] the

character, quality and extent of the mineralization allegedly discovery by the claimant." *Winters*,

78 I.D. at 195. In the instant case, Gruber made so many mistakes in conducting validity

examination that his subsequent opinions were essentially worthless.

### A.    Gruber's Opinions Are Not Entitled To Any Deference.

As an initial matter, Defendants argue that this Court should accord deference to Gruber's

opinions.[4] Defs' Memo. at 10 n.6. In support of that argument, Defendants cite Gruber's

experience, that he is a BLM employee, and *Citizens Investment Services Corp. v. NLRB.*, 430

F.3d 1195 (D.C. Cir. 2005). Defs' Memo. at 10 n.6. Defendants' argument is baseless.

---

[4] In addition to advocating deference to Gruber's opinions, Defendants criticize ELAM's use of experts. Defs' Memo. at 11, 15. Apparently unbeknownst to Defendants: "[t]o have an expert in the field examine the property and render a decision is, itself, an exercise of prudence." *United States v. Foresyth*, 100 IBLA 185, 210 (1987) ("*Foresyth II*").

First, if Defendants' argument were accepted, it would turn claim contests on their heads. The primary purpose of the hearing in a claim contest is to afford the claimant due process. *Keith O'Leary*, 63 I.D. at 344. Another purpose is the search for the truth. T. Maley, *Mineral Law* 907 (6th ed. 1996). Due process, however, would not be provided, nor would the search for the truth be achieved, if deference were accorded to opinions of government employees, even those with some relevant experience. Instead, the federal government would win every claim contest once it was able to qualify one of its employees as an "expert."

Second, it is well established that expert testimony, even that provided by a government employee, is not even admissible, unless determined admissible by the ALJ. *Winters*, 78 I.D. at 195 (An ALJ has "a wide latitude of discretion" in admitting expert testimony of a government employee); *see also Rodgers v. Watt*, 726 F.2d 1376, 1380-81 (9th Cir. 1984) (rejecting the testimonies of a government mining engineer and geologist as to the validity of mining claims because they had not proven that they possessed the relevant expertise). Thus, expert testimony by a government employee is not entitled to deference but may be admissible "when consistent with probability and reason[.]" *United States v. Wells*, 11 IBLA 253, 259 (1973).

Finally, the case relied upon by Defendants is inapposite. *Citizens Investment* involved judicial review of a decision by the National Labor Relations Board, which had held that a company had wrongfully discharged an employee for engaging in protected conduct. 430 F.3d at 1197-98. Although an administrative hearing was held in that case, there is no evidence that any federal employees testified at the hearing. Thus, it is a mystery as to why Defendants would suggest that this case stands for the proposition that a federal court should accord deference to the purported expert testimony of a federal bureaucrat.

**B.    Gruber's Opinions Did Not Establish A *Prima Facie* Case.**

**1.    Gruber's opinions were based on an erroneous interpretation of the Mining Law.**

Gruber conducted his validity examination under the belief that the Mining Law requires "a physical exposure of *ore grade* mineralization [on] each mining claim" to satisfy the test for discovery.  AR 1025 (emphasis added); AR 972 ("[T]here is an absolute requirement for an in-place, physical exposure of above-*cutoff-grade* mineralized rock on each claim in order for individual claims to meet the test of discovery.) (emphasis added).  A physical exposure of ore grade mineralization, however, has never been a prerequisite for discovery.  ELAM's Memo. at 19; *see also East Tintic Consol. Min. Co*., 43 L.D. 79, 81-82 (1914); (a valid discovery does not require the exposure of locatable minerals in commercial quantities).  Indeed, such a requirement would:  "[lead to absurd, injurious results, destructive of the rights of prospectors and miners, in their honest, patient, and industrious efforts to explore, discover, and develop the veins and lodes that exist in the public mineral lands of the United States." *Book v. Justice Mining Co*., 58 F. 106, 123-124 (C.C. Nev. 1893).

To make matters worse, Gruber was still operating under this mistaken belief when he testified that, in his opinion, there was a lack of discovery on the Six Contested Claims.  AR 1693-1696.  Because his analysis and opinions were based on an erroneous interpretation of the Mining Law, they could not have established a *prima facie* case.  ELAM's Memo. at 18-21.

Indeed, this conclusion is inescapable when one considers the IBLA's decision in *Hooker*.  In that case, the BLM initiated a claim contest asserting lack of discovery.  *Hooker*, 48 IBLA at 23-25.  During the BLM's case-in-chief, the mineral examiner opined that there was no discovery on the contested claims because:  (1) the mineral deposit had not been "blocked out," *i.e*., all three dimensions of the deposit were not known; and (2) the deposit was not being

7

currently mined.  *Id.* at 29-30.  The IBLA, however, noted that the law of discovery has never

required a mining claimant to either "block out" a deposit, or have a mine in production.  *Id.* at

31; *see also Barton v. Morton*, 498 F.2d 288, 289, 291-92 (9th Cir. 1974) (profitable mining of a

deposit need not be occurring, nor the future profitability of mining the deposit be guaranteed, in

order for there to be a discovery).  Thus, because the mineral examiner's opinion regarding lack

of discovery was based upon two erroneous interpretations of the Mining Law, the IBLA ruled

that the opinion was "fatally defective" and, therefore, failed to establish a *prima facie* case.

*Hooker*, 48 IBLA at 31.

Similarly, Gruber's entire analysis and all his opinions were "fatally defective" because

they were based on an erroneous interpretation of the Mining Law.  As a result, this Court should

hold unlawful and set aside the IBLA's ruling that the BLM presented a *prima facie* case as

being arbitrary, capricious, and abuse of discretion and unsupported by substantial evidence.  *Cf.*

*United States v. Artero*, 121 F.3d 1256, 1260-1262 (9th Cir. 1997) (defense expert failed to

present a *prima facie* case because he used the wrong criteria in his statistical analysis).

### 2.    Gruber's opinions regarding EB 6 and RE 2 were "fatally defective."

The significance of the interplay between Gruber's use of cutoff grade and *Hooker* was

not lost on ALJ Sweitzer.  AR 423 ("It is true that when the mineral examiner utilizes an

erroneous standard of discovery, his ultimate conclusion that there has been no discovery is

insufficient, of itself, to establish a prima facie case.") (citing *Hooker*, 28 IBLA at 31).  In ALJ

Sweitzer's mind, this was especially true *vis-à-vis* whether the BLM presented a *prima facie* case

as to EB 6 and RE 2:

> With respect to RE2 and EB6 claims, it is important to note that the Government
> would have failed to establish a prima facie case if an exposure of at least cutoff
> grade mineralization is not required.  This follows from the following facts
> applicable to each of those claims: (1) that Mr. Gruber identified a valuable

> mineral deposit which passed through a small portion of the claim, (2) that he
> nevertheless concluded that no discovery was made because of the lack of an
> exposure of at least cutoff grade mineralization within the area of intersection
> between the valuable mineral deposit and the claim, and (3) that the
> Government's case-in-chief did not address whether an exposure of below cutoff
> mineralization exists within that area of intersection.

AR 424-25. ALJ Sweitzer, however, avoided any difficulty when he incorrectly adopted

Gruber's erroneous interpretation of the Mining Law regarding cutoff grade. AR 428 ("The best

course of action, given the uncertainty, is to follow the law of the case . . . [and] require[] on

each claim an exposure of at least cutoff grade mineralization within a mineral deposit found to

be valuable."). ALJ Sweitzer did note that, without the use of cutoff grade, the BLM "would

have failed to establish a prima facie case with respect to those two claims." *Id*.

On appeal, the IBLA reversed ALJ Sweitzer's ruling that an exposure of cutoff grade

mineralization within a valuable mineral deposit was necessary to establish discovery. AR 740

("Judge Sweitzer went too far in adopting cutoff grade as if it were a rule of law."). This ruling

should have resulted in the IBLA holding that the BLM did not present a *prima facie* case with

respect to EB 6 and RE 2 because the BLM did not prove the absence of an exposure of below

cutoff grade mineralization within Gruber's valuable mineral deposits. *See* AR 428. This is

especially true considering the evidence shows that there were below cutoff grade exposures on

both EB 6 and RE 2 within Gruber's valuable mineral deposits.

> a.    **Gruber's opinion regarding EB 6 was not based on all
> the evidence.**

With respect to EB 6, the IBLA quoted a portion of Gruber's direct examination:

> Q.    Other than the exposure shared by the Butte 48 Claim on East Butte
> 6, is there another physical exposure *above cutoff grade*?
>
>                              * * *
>
> A.    Yes, there is * * * in the drill hole there is [an] exposure *above
> cutoff grade* at a, at a depth below the deposit that I have defined.

* * *

Q.    The only other exposure on the East Butte 6 claim, then[,] that's *above cutoff grade*, is it your professional opinion that it is not an exposure of valuable mineral deposit?

A.    That's my professional opinion.

AR 743 (quoting Tr. 195-96. (AR 1695-96)) (all emphasis added).  The IBLA then summarily concluded that the BLM presented a *prima facie* case as to EB 6 when Gruber "'testifie[d] that he has examined a claim and found the mineral values insufficient to support a finding of discovery.'"  AR 747 (quoting *United States v. Boucher*, 147 IBLA 236, 248 (1999)).

The IBLA's conclusion is flawed for two reasons.  First, the purported opinion contained within the quoted portion of Gruber's testimony was based on Gruber's erroneous interpretation that the Mining Law required an exposure of cutoff grade mineralization.  Opinion testimony based upon an erroneous interpretation of the Mining Law, is, by definition, "fatally defective" and, does not establish a *prima facie* case.  *Hooker*, 28 IBLA at 31.  Thus, the IBLA's ruling that the BLM presented a *prima facie* case as to EB 6 is not supported by substantial evidence.

Second, Gruber ignored relevant evidence when he opined about EB 6.  Drill hole TCE-1 was collared on EB 5 and was drilled diagonally to the southwest at 45 degrees (AR 1066) and crossed through EB 5, EB 6, B 48, and bottomed on the Malvina Claim.  *Id*.  At 40 feet, TCE-1 entered EB 6 and then exited EB 6 at 60 feet.  AR 1430, 1456, 1463.  This 20-foot interval was sampled in 5-foot segments and the four samples assayed at 220, 360, 210, and 222 ppb.  AR 1395, 1430, 2102.  The true depth of this interval was approximately 28-42 feet and corresponds to the valuable mineral deposit identified by Gruber as "Block 3" in his East Gold Zone.  AR 1006, 1066; ELAM's Memo. at 39-40.  Although TCE-1 proves that minerals were exposed within Gruber's valuable deposit on EB 6, Gruber simply ignored this evidence when he opined

10

about EB 6.  A mineral examiner's opinion may establish a *prima facie* case only if it is based

upon "probative evidence of the character, quality and extent of the mineralization."  *Winters*, 78

I.D. at 195.  "Probative evidence" necessarily includes all the evidence in the possession,

custody, or control of the mineral examiner, even that which may be contrary to the BLM's

position.  Thus, because Gruber's opinion was not based upon all the evidence, it was not based

upon "probative evidence."  More importantly, the IBLA's ruling that his testimony established a

*prima facie* case was arbitrary, capricious, not in accordance with law, and unsupported by

substantial evidence.

Defendants try to defend the IBLA's ruling that the BLM presented a *prima facie* case

with respect to EB 6 on three grounds, none of which has merit.  Defs' Memo. at 27.  First,

Defendants argue that the IBLA relied upon Gruber's testimony that one of the two "physical

exposures of mineral found on . . . EB 6" was located on the senior B 48 claim.  *Id*.  Defendants

then note that this exposure must be credited to B 48 as the senior claim.  Defs' Memo. at 27

No one disputes that a discovery point within overlapping claims is generally credited to

the senior claim.  The defect with Defendants' argument is that Gruber's testimony only

concerned exposures of cutoff grade mineralization.  As demonstrated above, Gruber ignored the

minerals exposed by TCE-1 within the valuable mineral deposit he identified on EB 6.

Second, Defendants argue that the IBLA relied upon Gruber's testimony that the portion

of Block 3 that was on EB 6 "was too small to be economically mined."  Defs' Memo at 27

(citing page 96 of the IBLA's decision (AR 743)).  No place in the IBLA's decision or Gruber's

testimony, however, is there a suggestion that the portion of Block 3 that lies within EB 6 "[is]

too small to be economically mined."  In fact, Gruber's Report proves that this portion of Block

3 could be mined profitably.

Gruber's Block 3 lies within the north part of B 48 and extends northwest across an approximately 10-foot-wide sliver of EB 6 and continues on into EB 5.  AR 1066.  Gruber determined that Block 3 contained 4,723 tons of reserves.  AR 909.  Of those 4,723 tons, Gruber determined that 4,327 tons and 120 tons would be mined from EB 5 and B 48, respectively.  AR 978.  The remaining reserves (*i.e.*, 276 tons) are necessarily within EB 6.  Importantly, by classifying the 276 tons on EB 6 as "reserves," Gruber necessarily determined that they could be mined at a profit.  AR 977 ("In developing the mine scenario for this report, that portion of the Reserve Base *which could be economically extracted at the present time* is termed demonstrated reserves and hereafter referred to as ore reserves.") (emphasis added).

Finally, Defendants quote the portion of Gruber's testimony where he testified that the cutoff grade mineralization found on EB 6 was not an exposure of a valuable mineral deposit and then they repeat the IBLA's ruling that *prima face* case is established when a mineral examiner testifies that there has been no discovery.  Defs' Memo. at 27.  As demonstrated above, that portion of Gruber's testimony was based upon an erroneous interpretation of the Mining Law regarding cutoff grade and, thus, was "fatally defective" and could not establish a *prima facie* case.

### b.    Gruber's opinion regarding RE 2 was not based on all the evidence.

With respect to RE 2, the IBLA stated:

> Gruber testified that there were two "high grade" samples, but that they were outside the South Fork Gold Zone. (Tr. at 336-37.)  Gruber concluded that they were nonrepresentative high grade samples that did not indicate the presence of a valuable mineral deposit.  *Id.*

AR 743.  The IBLA then summarily concluded that the BLM presented a *prima facie* case as to RE 2 when Gruber "'testifie[d] that he has examined a claim and found the mineral values

insufficient to support a finding of discovery.'"  AR 747(quoting *United States v. Boucher*, 147

IBLA at 248).  The flaw with the IBLA's conclusion is that Gruber's opinion was not based upon

all the evidence.

First, contrary to the opinion of Gruber and the IBLA, purported "high grade" samples do

have evidentiary value.  *See* AR 232-22 (David Abbott testifying that "Gruber's rejection of

high-grade samples because they were high grade is unprofessional and not warranted.").  In

fact, although unrepresentative samples alone may not be used to determine the existence of a

valuable mineral deposit, they may be used to determine the extent and value of a valuable

mineral deposit.  *United States v. Kinsley Ranch Resort, Inc*., 20 IBLA 14, 17-18 (1975).

Therefore, both Gruber and the IBLA erred when they summarily rejected these two samples.

Second, both Gruber and the IBLA ignored the five other samples taken near these two

purported "high grade" samples and immediately north of Gruber's valuable mineral deposit on

RE 2.  These samples are approximately 75 feet from Gruber's valuable mineral deposit on RE 2

(AR 2117-18) and have the following grades (from south to north):  205 ppb, 120 ppb, 238 ppb,

204 ppb, 537 ppb.  AR 146, 1459.  Gruber did not extend his valuable mineral deposit to include

these samples because he was either blindly focused on cutoff grade, or he was purposefully

trying not to find a discovery on RE 2.  *See* ELAM's Memo. at 41-42.  By ignoring these five

samples, Gruber failed to present a *prima facie* case.

Finally, and more importantly, Gruber determined the boundary of his valuable mineral

deposit in his South Fork Gold Zone by drawing a curved line that ran in a general northeast

direction from outside of a rock sample (692 ppb) in the southeast corner of section 19, past the

inside of the most southern of the five samples mentioned above (205 ppb), and on toward drill

hole EBR-1.  AR 1063, 1067.  Significantly, the rock sample with a grade of 692 ppb is within

both Gruber's valuable mineral deposit (AR 1063) and the portion of RE 2 that does not overlap a senior claim.  AR 146, 1459; *compare* AR 1063, 1066 (both showing Gruber erroneously plotted this sample as being on P 20).  This sample satisfies the IBLA's requirement that ELAM expose minerals within the portion of Gruber's valuable mineral deposit that exists on RE 2.  If Gruber had not been so blindly focused on cutoff grade, he would have recognized this sample for what it is – an exposure of his valuable mineral deposit on RE 2.  Therefore, the IBLA's ruling that the BLM presented a *prima face* case that RE 2 was invalid for lack of discovery should be held unlawful and set aside.

In an attempt to avoid this result, Defendants make a weak argument that the valuable mineral deposit in Gruber's South Fork Gold Zone did not extend into RE 2.  Defs' Memo. at 28 ("Gruber concluded that the South Fork Gold Zone deposit, which the BLM determined was a valuable deposit, did not extend into the RE 2 claim.").  In support of this argument, Defendant cite one page of Gruber's testimony.  *Id.* (citing AR 1838).  A reading of the cited page and the preceding page, however, reveals that what Gruber said is that, although the valuable mineral deposit in his South Fork Gold Zone exists on RE 2, he chose not to extend the boundaries thereof further onto RE 2 to include the mineralized rock samples taken by ELAM.  AR 1837-38.

Thus, Defendants' argument is patently wrong.

> **3.     Contrary to Defendants' argument, the BLM would not have presented a *prima facie* case with respect to RE 1 and P 14-15 without Gruber's Report.**

Defendants attempt to gloss over Gruber's erroneous interpretation of the Mining Law and his defective opinions based thereon, by arguing that, even if the Gruber's Report were "excluded from consideration[,"] a *prima facie* case was established with respect RE 1 and

P 14-16, Defs' Memo. at 26. In support of this argument, Defendants selectively quote from ALJ Sweitzer's decision:

> [T]he sample data, and other facts presented in the Government's case-in-chief independently show[ed] that no basic equivalency exist[ed] between the surface samples and drill hole samples, that each of the contested claims lack[ed] an exposure of at least cutoff grade mineralization within a valuable mineral deposit, and that each . . . lack[ed] an exposure of any grade of mineralization within a valuable mineral deposit.

Defs' Memo. at 26 (quoting AR at 0424 (ALJ Dec. at 29)). How this quote establishes that the BLM would have presented a *prima facie* case without Gruber's Report is unknown.

First, Defendants have taken this quote out of context. ALJ Sweitzer was not responding to ELAM's argument regarding Gruber's erroneous interpretation of the Mining Law. Instead, ALJ Sweitzer was responding to ELAM's criticism of Gruber's use of both Circular 831 and "basic equivalency."[5] AR 424; *see also* AR 443 (ALJ Sweitzer explaining the flaws with Gruber's interpretation of "basic equivalency").

Second, a review of the BLM's case-in-chief reveals that all the facts presented therein, except for some purported evidence regarding the price of gold and silver, were based upon Gruber's Report. ELAM submits that, if Gruber's Report were excluded for consideration, the BLM's case-in-chief would consist of unsupported speculation and conjecture by Gruber and Mr. Haskins and some testimony regarding the purported price of gold and silver. It is well established, however, that "unfounded surmise or conjecture will not" establish a *prima facie* case, "regardless of the expert qualification of the [mineral examiner]." *Winters*, 78 I.D. at 195.

---

[5] "Basic equivalency" is not an established geological principle but, instead, appears to have been invented in *United States v. Feezor*, 130 IBLA 149 (1994) ("*Feezor III*"). *See* AR 497-99.

**C.    Gruber Erroneously Utilized And Improperly Applied Circular 831.**

**1.    Gruber erroneously utilized Circular 831.**

Although 1989 BLM Handbook for Mineral Examiners ("1989 Handbook") sets forth the procedures and criteria for conducting mineral examinations (*see* AR 761), Gruber failed to use it in conducting his examination.  Instead, Gruber chose to use Circular 831.  As previously demonstrated, Circular 831 was not designed to be used by mineral examiners in conducting validity examinations.  ELAM Memo. at 21-23.  Indeed, this is evident from the 1989 Handbook itself, which does not even mention Circular 831.[6]  *See* AR 760-887.  Moreover, the 2007 version of the Handbook expressly advises against using the classification scheme in Circular 831 because the "McKelvey" diagram, upon which Circular 831 is based, "lacks the precision necessary to properly classify resources and reserves for economic reporting purposes or *determinations of validity using the prudent person rule*."  2007 Handbook at V-7 (emphasis added).[7]

Defendants argue that Gruber's use of Circular 831 was proper because the IBLA has, in the past, allowed the use of Circular 831 and its precursor, USGS Bulletin 1450-A, in "identifying mineral reserves."  Defs' Memo. at 30.  This statement reveals Defendants' misunderstanding of the Mining Law and proves why Gruber should not have used Circular 831 in evaluating the Tootsie Creek Deposit.  First, "reserves" means "profitability" (AR 1086-1093), *i.e.*, guaranteed success.  AR 795 (1989 Handbook defining "reserves" as "the amount of

---

[6] Although the 1989 Handbook does not mention Circular 831, Roger Haskins, "Senior Author" of that Handbook, had the audacity to testify that Gruber's Report "conform[ed]" to the Handbook.  AR 1852-1853.

[7] Interestingly, Mr. Haskins also assisted in writing the 2007 Handbook.  ELAM Memo. Ex. 1, p. 1.  Thus, in writing both the 1989 and 2007 Handbooks, Mr. Haskins recognized that Circular 831 should not be used to conduct validity examinations.  It is puzzling why his testimony in this case would contradict what he wrote in the Handbooks.

valuable mineral that is economically exploitable from a mineral deposit").  The Prudent Man

Rule, however:

> [D]oes not require that an economic ore body has been found . . . it requires only that minerals have been found.  It does not require proving that a valuable mine can be developed; only that there is a reasonable prospect of such a development. . . .  And it does not require a showing that a mine would be successful; only that there is a reasonable prospect that a mine would be successful.  In sum, the prudent man test is a prospective test of reasonable possibility, not a test of present certainty.

J. Haggard and J.S. Curry, *Recent Developments In The Law of Discovery*, 30 Rocky Mt. Min. L.

Inst., 8-1, 8-3 to 8-4 (1984).

Second, Circular 831 was not designed to "identify" anything, much less "mineral

reserves."  Instead, it is a self-admitted "arbitrary" scheme designed to "classify" resources.  AR

1089; *see John S. Wold*, 48 IBLA 106, 113 (1980) (IBLA describing Bulletin 1450-A as a simple

"glossary of resource terms [.]").  Moreover, Circular 831 does not even mention the Mining

Law, "discovery," "valuable mineral deposit," or the Prudent Man Rule.  *See* AR 1089-1094.

The use of such an irrelevant and inapposite scheme is necessarily arbitrary and capricious.

**2.       Gruber erroneously applied Circular 831.**

Defendants try to defend Gruber's use of Circular 831 based upon the IBLA's "finding"

that any errors that may have been made by Gruber's use of Circular 831 were not "material."

Defs' Memo. at 31 (citing AR 750).  This "finding" by the IBLA, however, was not supported by

any evidence, much less substantial evidence.  *See* ELAM Memo. at 21-27.  In fact, Gruber's

errors in using Circular 831 are almost too numerous to count and prove that he did not present a

*prima facie* case.

a.    Gruber's misclassification of "identified resources"
skewed his entire analysis.

Gruber purportedly began his application of Circular 831 by drawing 200-foot-radius

circles around all the drill holes and calling the inside of where these circles connected

"identified resources."[8]  AR 1649-51; AR 1094 (depicting "identified resources" as connecting

green arcs).  The drawing of these circles conveniently allowed Gruber to ignore the majority of

ELAM's data.  See AR 1094 (depicting numerous trench and rock samples outside of Gruber's

green arcs).  The drawing of these circles also conveniently allowed Gruber to avoid using

principles of geological inference.  ELAM's Memo. at 23-27.  It is well established, however,

that once minerals are exposed (as demonstrated by the hundreds of samples outside of Gruber's

green arcs (AR 1094)), geological inference may be used to evaluate the deposit to determine

whether a valuable mineral deposit exists:

> While geologic inference may not be relied upon to establish the existence of a
> mineral deposit, it may be accepted as evidence of the extent of a deposit.  That is,
> where ore has been found, the opinions of experts, based upon knowledge of the
> geology of the area, the successful development of similar deposits on adjacent
> mining claims, deductions from established facts–in short, all of the factors which
> the Department has refused to accept singly or in combination as constituting the
> equivalent of a discovery–may properly be considered in determining whether ore
> of the quality found, or of any mineable quality, exists in sufficient quantity to
> justify a prudent man in the expenditure of his means with a reasonable
> anticipation of developing a valuable mine.

United States v. Larsen, 9 IBLA 247, 262 (1973).  Gruber's refusal to apply principles of

geological inference and the IBLA's acceptance thereof were clear error.  See United States v.

---

[8] ELAM was unaware of Gruber's 200-foot-radius circles until it received a copy of Gruber's
"modified Plate 3" immediately prior to the hearing.  Compare AR 1063 (Gruber's original Plate
3, which depicts only "reserve base" and "reserves") with AR 1094 (Gruber's "modified plate 3,"
which depicts "identified resources" and "undiscovered resources," as well as "reserve base" and
reserves"); see also AR 293-297 (Gruber testifying that he created this exhibit just a couple of
months before the hearing).  The disclosure of the "identified resources" at such a late date
suggests that Gruber's whole analysis was reverse-engineered, i.e., he determined his reserves
before he determined his identified resources.

18

*Feezor*, 74 IBLA 56, 80 (1983 ) ("*Feezor I*") (reversing *United States v. Edeline*, 39 IBLA 239

(1979) because the majority opinion therein refused to consider what might be geologically

inferred from the exposed minerals).

Defendants try to defend Gruber's use of the 200-foot-radius circles by noting the IBLA

found that Gruber's 200-foot area of influence "coincided" with the "area of influence" used by

ELAM.[9]  Defs' Memo. at 31 (citing AR 750).  This statement shows that both Defendants and

the IBLA have ignored the analysis performed by ELAM on the Tootsie Creek Deposit.  To

determine the recovery from ELAM's Six Contested Claims, eight valid claims, and other

property interests, Mr. Lehmann divided his proposed pit into 400-foot-wide cross sections.  AR

1236, 1243, 1423, 1465-70.  To calculate the "volume" of each 400-foot-wide cross section, Mr.

Lehmann "assum[ed] an area of influence of half the distance to the next [cross] section (in this

case 200 feet) on either side."  AR 1236; *see also* AR 722.  Thus, Mr. Lehmann was using "area

of influence" to perform "volumetric" calculations; whereas, Gruber was using "area of

influence" in an ill-conceived attempt to classify resources.  That both happened to use a 200-

foot "area of influence" was mere happenstance.  For Defendants and the IBLA to suggest that

the two "areas of influence "coincided," is as ridiculous as comparing apples to oranges.

> **b.    Gruber erroneously equated "reserves" with "valuable
> mineral deposits."**

From inside his green arcs, Gruber purportedly determined his "demonstrated resources,"

which he equated with "reserve base."  AR 1094 (depicting "reserve base" in pink).  Gruber's

"reserve base" consists of eight deposits in three zones:  the Main Gold Zone, the East Gold

---

[9] Defendants also try to defend Gruber's use of the 200-foot-radius circles by suggesting that a
200-foot "area of influence" is "proscribed" by Circular 831.  This is not true.  Circular 831 does
even not mention "area of influence."  *See* AR 1086-1093.  In any event, Gruber testified that he
derived the 200-foot "area of influence" from the Enders/Rodgers Report.  AR 1645-1647.  Not
surprisingly, "area of influence" is also not mentioned in that report.  *See* AR 1068-1076.

Zone, and the South Fork Gold Zone.  AR 977.  From this "reserve base," Gruber somehow

determined that only six deposits constituted "reserves," *i.e.*, "valuable mineral deposits."  AR

973.

By equating "reserves" with "valuable mineral deposits," Gruber demonstrated another

flaw in his analysis.  The term "reserves," as used in Circular 831, means "profitability", *i.e.*,

guaranteed success.  AR 1090 (defining "reserves" as that part of the "reserve base" that could

be economically produced).  The Mining Law has never been interpreted as requiring a

guaranteed success.  *Castle v. Womble*, 19 L.D. 455, 457 (1894) ("reasonable prospect of

success").  Indeed, as explained by Administrative Judge Byrnes:

> The "prudent man" is not a man who would not take any risk unless he is
> guaranteed an enormous profit, otherwise he should not be in the business of
> mining.  In my view the "prudent man" as defined by the courts and this Board is
> one who would take reasonable risks once it is established that a valuable mineral
> deposit is located. . . .  Whether this mine will, in fact, bring any profit . . . will
> have to await the mining itself.  Mining by its nature is no more predictable than
> the stock market and we should not require the certainty of a municipal bond
> return before we patent.  The "prudent man" can and will take reasonable
> economic risks.

*United States v. Collord*, 128 IBLA 266, 320-21 (1994) (Byrnes, C.J., concurring in part and

dissenting in part).  Thus, Gruber's entire analysis was materially flawed.

### c.    Gruber ignored "inferred reserves."

In his Report, Gruber expressed his view that:  "[t]he [IBLA] has also held the Inferred

Reserves (also a subset of Identified Reserves) may not be used to satisfy the test of discovery."

AR 973 (citation omitted).  In so doing, Gruber demonstrated another fundamental

misunderstanding of the Mining Law.  *See* AR 424 (ALJ Sweitzer noting that "Gruber

inaccurately characterized the [IBLA's] standard regarding the use of inferred reserves as an

absolute prohibition against their use in proving a discovery.").  Indeed, as explained in *Feezor I*:

20

> [D]emonstrated reserves (*i.e.*, measured and indicated) can clearly be used to show the quantity necessary to establish a discovery. We do not, however, believe that any such broad ruling can be made insofar as inferred reserves are concerned. To the extent that such an estimate is based on assumed continuity or repetition <u>for which there is geologic evidence</u>, we feel such a reserve base can properly be considered. Where, however, a body is completely concealed, so that its actual existence must be predicated on geologic inference, use of geologic inference would, in effect, substitute for the exposure of the mineral. Such an exposure, however, is a necessary precondition to a discovery. Therefore, an "inferred" reserve whose existence is dependent solely on geologic inference cannot serve as a predicate for finding quantity and quality sufficient to support a discovery

74 IBLA at 85 (emphasis in original).

Defendants try to justify Gruber's failure to consider "inferred reserves" by implying that such reserves on ELAM's claims would be based solely on geological inference. Defs' Memo. at 31 (quoting *Feezor I*, 74 IBLA at 85). This is not true. Gruber had actual "geologic evidence" from which to determine "inferred reserves," he simply chose not to use it.

Under Circular 831, the large area between Gruber's green arcs and his pink lines is, by definition, "inferred resources." AR 1093. Within these "inferred resources" there are "inferred reserves" or "inferred reserve base," depending on whether Figure 1 or Figure 2 of Circular 831 is used. AR 1093. Despite the huge amount of "inferred resources" depicted on his map, Gruber found only 47,271 tons of "inferred reserves" in his Main Gold Zone (AR 1094).[10] That Gruber concluded that there were only 42,721 tons of "inferred reserves" is neither reasonable nor logical, considering the huge amount of "inferred resources" depicted on his map. *See* AR 1094.

The materiality of Gruber's mistake is particularly evident with respect to RE 1 and RE 2. On his map, Gruber indicated a large area of "identified resources" located around TCM-1,

---

[10] For some unknown reason, Gruber simply excluded these "inferred reserves" from any further analysis. AR 933.

which was drilled from the east side of RE 1 diagonally east into RE 2.  AR 1094.  Because the

drill hole samples and surface samples proved that this area was mineralized (AR 1094, AR

1456, 1459, 1461), under Circular 831, this area contains, at a minimum, "measured" and/or

"indicated" resources.  AR 1090.  As a result, using Figure 2 of Circular 831, this area of

necessarily includes "reserve base" and "inferred reserve base," both of which may used to prove

discovery.  Gruber, however, simply ignored this entire area in his analysis.  As a result, the

BLM failed to present a *prima facie* case that RE 1 and RE 2 were invalid.

> **d.    Gruber misclassified the majority of RE 1 and the entirety of P 14-16 as "undiscovered resources."**

Finally, Gruber misclassified the majority of RE 1 and the entirety of P 14-16 as

"undiscovered resources."  *See* AR 1094.  Circular 831 defines "undiscovered resources" as

"[r]esources, the existence of which are only postulated . . . . ."  AR 1090.  "Postulate" means "to

assume without proof."  *Webster's II New College Dictionary* (1999).  It is undisputed that

minerals were exposed on these claims in the areas Gruber classified as "undiscovered

resources."  AR 1094 (depicting approximately 1,400 feet of mineralized trench samples on that

portion of RE 1); *see also* AR 1063, 1459.  Indeed, Gruber admitted this in his Report.  AR 971

("Gold and silver mineralization on [ELAM's claims] is present and undeniably widespread.

Each unpatented mining claim contains a physical exposure of in place mineralized rock – a

prerequisite for satisfying the 'test of discovery[.]'").  Accordingly, under Circular 831, these

areas should have been classified as "indicated" and/or "measured" resources.  AR 1086-1093.

More importantly, if these areas had been properly classified as either "indicated" or

"measured," or even "inferred," then these resources necessarily would have included "reserve

base" or "inferred reserve base" (AR 1093), both of which may be used to prove discovery.

Defendants try to sweep Gruber's errors under the rug by arguing:

> Plaintiffs' argument relies on an inaccurate portrayal of the law of discovery. Plaintiffs charge that each of the contested claims "contained gold" or "evidence of resources . . ." and, as such, each should have been found to have a valuable mineral deposit. Pltfs' Mem. at 24-26. However, the mere presence of gold on a claim is not sufficient to support a finding of discovery.

Defs' Memo. at 31. Although ELAM agrees that each of the Six Contested Claims contains gold and evidence of resources, ELAM has never argued that the "mere presence of gold" is "sufficient to support a discovery[,]" and certainly did not argue such on the cited pages. Instead, all ELAM was demonstrating on those pages was that, because there was evidence of gold on the claims outside of Gruber's green arcs, Gruber's classification of those areas was materially flawed. ELAM's Memo. at 24-26. For Defendants to twist ELAM's argument in such a manner reveals that they know that Gruber's application of Circular 831 was materially flawed and skewed his entire analysis.

### D.    Gruber's Opinions Were Not Based Upon A Prudent Mine Model.

The Prudent Man Rule is expressed in objective terms. *Castle*, 19 L.D. at 457 ("a person of ordinary prudence"). Mr. Lehmann repeatedly advised Gruber that the Tootsie Creek Deposit was a low-grade, large-tonnage, disseminated gold deposit and asked that Gruber analyze it as such. AR 1472-80, 1980-81.[11] Despite these requests, Gruber ignored the bulk of ELAM's data

---

[11] The U.S. Bureau of Mines made a similar recommendation. AR 1157-60. The Bureau of Mines also criticized Gruber for placing his heaps within the Tootsie Creek drainage. AR 1157-58 (Bureau of Mines' criticism); AR 1061 (depicting Gruber's heaps within the Tootsie Creek drainage). By contrast, ELAM planned to acquire land, up to five miles away, so that the heaps would not be located in the Tootsie Creek drainage. AR 1240, 2086-87. Gruber's placement of his heaps in the drainage was either extremely imprudent or calculated to instill unfounded fear in the public to garner support for the withdrawal.

and subjectively focused on some isolated, high-grade zones and proceeded to develop a model to mine only those little zones.[12]  AR 2265-66

Gruber concluded that his "reserve base" consisted of eight deposits containing 604,915 tons.  AR 973-76, 1094.  Inexplicitly, Gruber chose to mine only six of those deposits and, thus, his "reserves" came from only six deposits totaling only 387,942 tons.  AR 977.  As a result, Gruber left 216,973 tons of valuable ore in the ground.  To say that a "person of ordinary prudence" would never leave 216,973 tons of valuable ore in the ground would be stating the obvious.  *See* Defs' Memo. at 13 (noting that Gruber determined that the entire reserve base, *i.e.*, 604,915 tons, "could prudently be mined").

Gruber tried to justify not mining those 216,973 tons on the grounds that:  (1) he was trying to use the "least costly" mine model; and (2) he wanted to complete mining within one year.  AR 1692-93; *see also* AR 1761 (Gruber agreeing that his model was a "one-year operation" that consisted of "dig[ging] three separate, relatively small pits" in order "to take" the "relatively high-grade material" there from).  A prudent miner does not design the "least costly" model that can be completed in one year.  Instead, she designs a mine model that maximizes profits.  *See Collord*, 128 IBLA at 347 n.24 (Mullen, J., concurring in part and dissenting in part) ("A prudent miner will mine all of the mineral that can profitably be mined, regardless of where the internal claim boundaries might lie.").  Because those 216,973 tons were "reserves," by definition, the mining thereof would have been profitable.  By leaving them in the ground, Gruber was not acting like a prudent miner.  As a result, the IBLA acted irrationally when it

---

[12] This was one of many errors reflected by Gruber's analysis.  *See Collord*, 128 IBLA at 320 (Byrnes, C.J., concurring in part and dissenting in part) ("[T]he amount and manner of mining of particular ore bodies is left to the discretion of the miner.").

relied on Gruber's opinions in ruling that the BLM presented a *prima face* case.[13]  Therefore, this

Court should hold unlawful and set aside the IBLA's decision.

### E.    Gruber Failed To Apply The Group Claim Rule.

It is well established that a group of mining claims may be considered together for

purposes of determining whether discovery exists on each of the claims.  *Schlosser v.*

*Pierce*, 93 I.D. 211, 223-25 (1986).  To establish discovery for a group of mining claims

under the Group Claim Rule:

> [A] claimant must prove that a *valuable mineral* is actually present on each of the
> claims.  Once mineral is demonstrated to be present, the proof of sufficient quality
> and quantity of mineral to warrant development can take into consideration the
> overall mining operation.

*Cactus Mines Limited*, 79 IBLA at 32 n.2 (Mullen, J., concurring) (emphasis added).  In other

words, a claimant must demonstrate that locatable minerals are present on each claim and then

the minerals from those claims, as well as the minerals from other properties held by the

claimant, may be aggregated for purposes of determining whether there is a reasonable prospect

of success in developing one valuable mine.  *Collord*, 128 IBLA at 348 (Mullen, J., concurring

in part and dissenting in part). ("The test [is] . . . whether a prudent man would develop a mine,

rather than would he develop a claim.")

In the instant case, Gruber concluded that the eight valid claims would support a mine.

AR 938 ("Definable quantities of ore sufficient to support a mine are present on eight claims.").

Gruber also admitted that ELAM had exposed gold and silver (*i.e.*, "valuable minerals") on each

of the Six Contested Claims.  AR 971.  Thus, under the Group Claim Rule, Gruber should have

---

[13] If a mineral examiner cannot discharge the Government's burden of proof by showing that a
claimant's imprudent mine plan will fail, *Collord*, 128 IBLA at 346 n. 22 (Mullen, J., concurring
in part and dissenting in part), neither should he be able to discharge the Government's burden of
proof by designing an imprudent plan himself.

aggregated the gold and silver from the Six Contested Claims and the other property interests held by ELAM (*e.g.*, the Malvina and the No. 1 Placer) with the ore that would be mined from the eight valid claims to determine whether there was reasonable prospect of success in developing one paying mine covering all the property held by ELAM.  *See* AR 427 n.4 (ALJ Sweitzer recognizing that, under the Group Claim Rule, the Malvina and the No. 1 Placer need to be considered.).  Because Gruber failed to do so, his opinions were not based on either a correct interpretation of the Mining Law or "probative evidence."

Defendants argue that ELAM's analysis "ignore[s] a critical aspect of the group claim rule[,]" to wit:

> "[T]he recovery expected from each claim must not only exceed the costs of mining, transporting, milling and marketing the particular *deposit* on that claim but each claim must also bear a proportionate share of the development and capital costs attributable to the combined operations."

Defs' Memo. at 32 (quoting *Collord,* 128 IBLA at 287 (lead opinion)) (emphasis supplied by Defendants).  The flaw with this argument is that the IBLA did not base its decision on the above-quoted portion of the lead opinion in *Collord.*

ALJ Sweitzer, after quoting from the lead opinion in *Collord*, ruled: "Contestees made no showing that the alleged deposit on each of the contested claims is sufficient to bear at least a proportionate share of the development and capital costs."  AR 438-39.  On appeal, ELAM argued that ALJ Sweitzer's interpretation the Group Claim Rule, that each claim must "bear at least a proportionate share of the development and capital costs[,]" was incorrect.  AR 486-87.  In addressing ELAM's argument, the IBLA explained that whether each claim must bear a proportionate of the development and capital costs "is an element of the argument about cutoff grade and that aspect of the decision which we rejected above."  AR 748 n.24.  Thus, instead of embracing the above-quoted portion of the lead opinion in *Collord* as suggested by Defendants

(Defs' Memo. at 33), the IBLA rejected the rationale contained therein when it reversed ALJ Sweitzer's ruling regarding cutoff grade.  AR 748 n.24.  Therefore, Defendants may not now rely on the above-quoted portion of the lead opinion in *Collord*.[14]  *Motor Vehicle Manufactures Ass'n.,* 463 U.S. at 50 ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.").

Defendants also argue that ELAM's analysis ignores that the Group Claim Rule "requires the demonstration of a 'deposit' on each claim to be grouped for mining."  Defs' Memo. at 33 (citing *Collord*, 128 IBLA at 287 (lead opinion)).  This is a baffling argument.  To the extent that Defendants are arguing that a "deposit" was not exposed on each of the Six Contested Claims, this argument is specious.  Indeed, gold and silver have been exposed on each of the Six Contested Claims and, thus, each claim contains a "deposit" (*Feezor I*, 74 IBLA at 75), although "nonvaluable" in the eyes of the IBLA.  *See* AR 742.  To the extent that Defendants are arguing that a "valuable mineral deposit" must be proven to exist on each of the Six Contested Claims before the Group Claim Rule may be applied, this would defeat the whole purpose of the Group Claim Rule.  In fact, such an argument would be another articulation of the "independent mine rule" that the IBLA expressly rejected in *Schlosser.*

In *Schlosser*, the ALJ ruled that discovery required a "show[ing] that a valuable mineral deposit had been found within the limits of each individual claim."  *Schlosser*, 93 I.D. at 217.  In so doing, the ALJ rejected the argument that "discovery exists where evidence shows a group of claims can be mined and marketed at a profit where each claim in the group contains significant

---

[14] Defendants also criticize ELAM's allocation of most of the costs to the C&A ores and, thereby, allowing the ROM ores to be mostly "carried."  Defs' Memo. at 16.  This is another meaningless criticism because the IBLA did not base its decision on this issue.  AR 751 ("[w]e need not address this difficult issue").  In any event, if one valid claim may "carry" most of the

signs of mineralization." *Id*. Based upon these rulings, the ALJ declared invalid two groups of eight contiguous mining claims. *Id*. at 217-219.

On appeal, the claimant argued that the "independent mine rule" applied by the ALJ was not the test for discovery. *Id*. at 217-18. Importantly, the BLM filed an *amicus curiae* brief in support of the claimant in which it explained that "a single claim of low-grade, high-tonnage material rarely will contain a deposit which can be mined and marketed on an individual basis and without regard to other claims." *Id*. at 218. The BLM also noted that the "judicial and administrative decisions regarding discovery . . . do[] not establish a requirement that each claim be capable of supporting an independent mine." *Id*.

Based upon the BLM's *amicus* brief and its own review of the law of discovery (*id*. at 218-223), the IBLA rejected the "independent mine rule" and adopted the Group Claim Rule:

> [M]ining claims may be considered together as a group for the purpose of ascertaining the validity of individual claims, *so long as valuable mineral is shown to exist on each claim*."

*Id*. at 223 (emphasis added). Thus, under the Group Claim Rule, a "valuable mineral deposit" need not be exposed on each claim in a group. Instead, a claimant must simply prove that:

> "[A] valuable mineral is actually present on each of the claims. Once mineral is demonstrated to be present, the proof of sufficient quality and quantity of mineral to warrant development can take into consideration the overall mining operation. There is little question that circumstances exist in which a group of mining claims containing low grade ore can support a mining operation, and thus demonstrate a discovery on each claim, even though taken individually the claims might not contain sufficient quantity of ore of sufficient quality to support discovery. However, that fact does not relieve the claimant from the responsibility for presenting the proof of mineralization and the suitability of the project to low grade high tonnage extraction."

---

costs of an adjacent claim, *see* Collord, 128 IBLA at 321-22 (Byrnes, C.J., concurring in part and dissenting in part), why may not one type of ore "carry" another?

*Id.* at 224-25 (quoting *Cactus Mines Limited*, 79 IBLA 20, 32-33 n.2 (Mullen, J. concurring)).[15]

In short, Gruber's entire analysis and all his opinions based thereon were "fatally defective" because Gruber failed to properly analyze the Six Contested Claims, the eight valid claim, and ELAM's other property interests under the Group Claim Rule. As a result, the IBLA's ruling that his opinions established a *prima facie* case was arbitrary, capricious, not in accordance with law, and unsupported by substantial evidence. Therefore, this Court should hold unlawful and set aside the IBLA's decision.

## IV. THE IBLA'S RULING THAT ELAM DID NOT PROVE A DISCOVERY ON EB 6 WAS ARBITRARY, CAPRICIOUS, NOT IN ACCORDANCE WITH LAW, AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE.

It is undisputed that Gruber's Block 3 is a valuable mineral deposit that exists within northern part of B 48 and extends northwest across an approximately 10-foot-wide sliver of EB 6, and continues on into EB 5. AR 975, 1061, 1065-66; *see also* AR 739 (IBLA recognizing that the "BLM admitted that a valuable mineral deposit existed, and even that an exposure of mineral was found on the RE 2 and EB 6 claim."); AR 419 (ALJ Sweitzer noting that Gruber's "reserve base and ore reserves included a small deposit in the East Gold Zone which crosses the sliver of the contested EB6 claim . . . .") (citing AR 975, 978, 1061). Gruber also determined that Block 3 contains 4,723 tons of reserves and that 120 tons, 276 tons, and 4,327 tons could be mined from B 48, EB 6, and EB 5, respectively. AR 909, 978; *see also* ELAM's Memo. at 37. Importantly, because the relevant portion of EB 6 contains reserves and is bracketed by two valid claims held by ELAM and upon which the same valuable mineral deposit exists, a discovery exists on EB 6 under both the "independent mine rule" and the Group Claim Rule.

---

[15] Importantly, ELAM proved all these requirements were satisfied with respect to its Six Contested Claims, eight valid claims, and other property interests. AR 1167-1470.

Notwithstanding these undisputed facts and the necessary conclusions that result there from, the IBLA ruled that no discovery had been made on EB 6 because of its "finding" that ELAM had not exposed minerals on EB 6 within Gruber's valuable mineral deposit.  AR 744-746.  In short, the IBLA ruled that if a claimant does not expose minerals within a valuable mineral deposit determined by the government's expert to exist on the claim, there is no discovery on that claim.  *See* ELAM's Memo. at 37-38.  As previously demonstrated, this ruling is unprecedented and has no support in the Mining Law or the facts.  *Id*. at 37-40.  Thus, this Court must hold unlawful and set aside the IBLA's ruling that EB 6 was invalid for lack of discovery.

In an attempt to avoid this result, Defendants first argue that Block 3 is not really a "valuable mineral deposit" because its existence is only inferred.  Defs' Memo. at 37 ("Plaintiffs attempt to prove discovery of a valuable mineral deposit on [EB 6] based on Gruber's inference[] of [a] deposit thereon); *id*. (Gruber's "inference of a 276 ton deposit").  This argument lacks merit.

To the extent that Defendants are arguing that the portion of Block 3 that lies within EB 6 is not a valuable mineral deposit because its existence and the amount of reserves therein are "inferred" (as that term is used in a non-geological sense), that argument must fail.  Indeed, all valuable mineral deposits are "inferred" (as that term is used in a non-geological sense) until they are actually being mined or, at a minimum, until they are "blocked out."  The Prudent Man Rule, however, has never required actual mining operations or even that a deposit be "blocked out" in order for there to be a valuable mineral deposit.  *Hooker*, 48 IBLA at 30-31.  Similarly, all "reserves" are "inferred" (as that term is used in a non-geological sense) until they are actually mined.  Once the ore is mined though, it no longer qualifies as "reserves."  AR 1090

30

(defining "reserves" as ore that *could be* economically extracted or produced") (emphasis added).

To the extent that Defendants are arguing that the portion of Block 3 that lies on EB 6 is not a valuable mineral deposit because it existence was determined, in part, by geological inference, that argument must also fail. *Larsen*, 9 IBLA at 262 ("While geologic inference may not be relied upon to establish the existence of a mineral deposit, it may be accepted as evidence of the extent of a deposit" and whether such deposit is a valuable mineral deposit.). In conducting his validity examination, Gruber analyzed the sample data provided to him by ELAM and then used his purported expertise and principles of geological inference to conclude that six valuable mineral deposits exist on ELAM's claims, one of which is Block 3. AR 977. Based, in part, on these six valuable mineral deposits, Gruber determined that eight of ELAM's claims were valid. AR 977-980. Importantly, Gruber's conclusion that Block 3 is a valuable mineral deposit contributed to his determination that both EB 5 and B 48 were valid claims. AR 977-980. More importantly, Defendants have accepted Gruber's determination as to the validity of ELAM's eight claims, including EB 5 and B 48, based, in part, upon the existence of his valuable mineral deposits thereon. Defs' Memo. at 6 n.3 ("The BLM conceded the validity of Plaintiffs' remaining eight claims.") (citing AR 692); *see also* AR 45, 689. Thus, Defendants' argument, that the portion of Block 3 that lies on EB 6 is not a valuable mineral deposit because it was determined, in part, by geological inference, is directly contrary to the position they took with respect to EB 5 and B 48.[16]

---

[16] Indeed, a valuable mineral deposit, just like prudent miner, does not recognize claim boundaries. *See Collord*, 128 IBLA at 347 n.24 (Mullen, J. concurring in part and dissenting in part ("A prudent miner will mine all of the mineral that can profitably be mined, regardless of where the internal claim boundaries might lie.").

Defendants next argue that the samples from TCE-2 do not constitute an exposure of Gruber's valuable mineral deposit on EB 6 because those samples were taken below Gruber's deposit and because they were from a purported sulfide zone. Defs' Memo. at 38-40. This argument reflects the same mistake made by the IBLA.

The IBLA ruled that no discovery existed on EB 6 because of its "finding" that ELAM had not exposed minerals on EB 6 within Gruber's valuable mineral deposit. AR 744-47. The IBLA's "finding," however, was based solely on the samples ELAM recovered from TCE-2. *Id*. As a result, this "finding" was clearly erroneous because, notwithstanding the samples taken from TCE-2, ELAM exposed minerals on EB 6 within Gruber's valuable mineral deposit.[17] ELAM Memo. at 38-40.

To determine the grade of Block 3, Gruber took the average of three of ELAM's surface samples, *i.e.*, MTL R 852 (2,530 ppb), MTL R 853 (960 ppb), and MTL R 854 (960 ppb). AR 1006. Importantly, MTL R 854 was taken from EB 6. AR 1328; *see also* AR 2104 ("[A]t least one sample of 960 ppb plots on EB-6."); *compare* AR 1066 (showing Gruber erroneously plotted this sample as being on EB 5). Clearly, Gruber would not have used MTL R 854 to determine the grade of a valuable mineral deposit if he did not intend to mine the area where the sample was taken. In addition to MTL R 854, the four gold-bearing samples that were recovered from TCE-1 as it penetrated through Gruber's valuable mineral deposit on EB 6 also qualify as exposures. ELAM's Memo. at 39-40. Thus, the IBLA's "finding" that ELAM had not exposed

---

[17] Although ELAM submits that the samples from TCE-2 constitute an exposure of the valuable mineral deposit on EB 6 and that a prudent man would, indeed, mine down to their levels, these samples have lost much of their significance. ELAM's Memo. at 40 n.21. The test adopted by the IBLA in this case presumably requires only one exposure within a mineral examiner's valuable mineral deposit. *See* AR 744-746. This test was satisfied by surface sample MTL R 854 and four samples taken from TCE-1. Thus, ELAM will not spend any further time addressing Defendants' disparagement of the samples taken from TCE-2.

minerals on EB 6 within Gruber's valuable mineral deposit is arbitrary, capricious, not in

accordance with law, and unsupported by substantial evidence. Therefore, this Court should hold

unlawful and set aside the IBLA's ruling that EB 6 was invalid for lack of discovery.

Defendants try to avoid this result by twisting ELAM's argument. Specifically,

Defendants argue:

> Plaintiffs claim that the IBLA fashioned a new test in determining the invalidity
> of their claims when it required Plaintiffs to demonstrate *that a sample bearing*
> *valuable amounts of gold be identified within a deposit in order for such a deposit*
> *to be considered valuable*. *See* Pltfs' Mem. at 37-38.

Defs' Memo. at 37 (emphasis added). How Defendants could have interpreted ELAM's

argument in this manner is unfathomable. Indeed, Defendants' statement *"that a sample bearing*

*valuable amounts of gold be identified within a deposit in order for such a deposit to be*

*considered valuable"* is just a rewording of Gruber's and ALJ Sweitzer's cutoff grade

requirement. As repeatedly explained, the IBLA expressly rejected this cutoff grade

requirement.[18] ELAM's Memo. at 13, 20.

> In keeping with their reworded cutoff grade requirement, Defendants then argue:

> The standard applied by the IBLA in this case only recognizes the obvious – that
> a high grade sample surface sample found on top of a mineral deposit, cannot be
> used to demonstrate that such a deposit, not physically connected to the surface
> samples, is "valuable" despite drill hole samples *within* the deposit that
> demonstrate low gold values. *Compare* Pltfs' Mem. at 39 (discussing surface
> samples on EB 6 with gold values of 2530 ppb, 960 ppb and 960 ppb) *with* Pltfs'
> Mem. at 39 (discussing drill hole values within the "deposit" on EB 6 of 360 ppb,
> 222 ppb, 220 ppb and 210 ppb. . . .).

Defs' Memo. at 37-38 (emphasis in original). If one ignores the incorrect statement that a

deposit is not "physically connected" to a sample that was taken from its surface, this is very

---

[18] Defendants also argue that their reworded cutoff grade requirement "is a mere reflection of the
Mining Law which provides for the location of claims containing "'valuable mineral deposits.'"
Defs' Memo. at 37. What part of the IBLA's ruling, "that Judge Sweitzer went too far in
adopting cutoff grade as if it were a rule of law" (AR 740), do Defendants not understand?

interesting argument.  In fact, this argument proves the validity of EB 6 because Defendants

concede that ELAM exposed minerals within Gruber's valuable mineral deposit on EB 6 *via* a

"surface sample found on top of a mineral deposit" and *via* "drill hole samples *within* the

deposit[.]"  Therefore, this Court should hold unlawful and set aside the IBLA's ruling that EB 6

was invalid for lack of discovery.

**V.    THE IBLA'S RULING THAT ELAM DID NOT PROVE A DISCOVERY ON RE 2 WAS ARBITRARY, CAPRICIOUS, NOT IN ACCORDANCE WITH LAW, AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE.**

It is undisputed that Gruber identified a large valuable mineral deposit in his South Fork

Gold Zone.  AR 976-78.  It is also undisputed that a portion of this valuable mineral deposit

exists on RE 2.  AR 1063, 1067, 1094; *see also* AR 419 (ALJ Sweitzer noting that Gruber's

"reserve base and ore reserves . . . included a large[] deposit in the South Fork Gold Zone which

crosses a very small portion of the southeast corner of the contested RE2 claim.") (citing AR

975, 978, 1061)).  Notwithstanding these undisputed facts, the IBLA ruled that no discovery had

been made on RE 2 because of its belief that ELAM had not exposed minerals on RE 2 within

Gruber's valuable mineral deposit.  AR 746-47.  As previously demonstrated, the samples taken

by ELAM in the southeast corner of RE 2 prove that ELAM exposed minerals within Gruber's

valuable mineral deposit.  ELAM's Memo. at 40-42.  Therefore, this Court should hold unlawful

and set aside the IBLA's ruling that RE 2 was invalid for lack of discovery.

In an attempt to avoid this result, Defendants argue that any portion of the valuable

mineral deposit in the South Fork Gold Zone that lies on RE 2 is not really a valuable mineral

deposit because its existence is only inferred.  Defs' Memo. at 37.  This is the same argument

Defendants made as to the portion of Gruber's valuable mineral deposit that exists on EB 6.  As

demonstrated above, this argument is devoid of merit and will not be independently addressed

*vis-à-vis* RE 2. *See* AR 427 (ALJ Sweitzer noting that Gruber's use of geological inference to determine that a portion of the South Fork valuable mineral deposit exists on RE 2 was appropriate).

Defendants also argue that the two purported "high grade" samples taken from the southwest corner of RE 2 cannot be considered an exposure of Gruber's valuable mineral deposit. Defs' Memo. at 41. Although ELAM submits that these two purported high grade sample are relevant and should not have been summarily rejected by Gruber and the IBLA, what is more compelling are the other samples taken by ELAM from RE 2.

As previously demonstrated, five samples were taken on RE 2 approximately 75 feet from Gruber's valuable mineral deposit. ELAM's Memo. at 41. Importantly, because some of these samples may have been mined under Gruber's model if he had not incorrectly placed his pit slope within his valuable mineral deposit, they should constitute an exposure of Gruber's valuable mineral deposit. ELAM's Memo. at 41. In addition, the 692 ppb sample, around which Gruber drew the boundary of his valuable mineral deposit, also qualifies as an exposure within Gruber's valuable mineral deposit on RE 2. *Id*. at 40-41. Defendants' silence regarding these samples is deafening. Therefore, this Court should hold unlawful and set aside the IBLA's ruling that RE 2 was invalid for lack of discovery.

## VI.    THE IBLA'S RULING THAT ELAM DID NOT PROVE A DISCOVERY ON THE SIX CONTESTED CLAIMS WAS ARBITRARY, CAPRICIOUS, NOT IN ACCORDANCE WITH LAW, AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE.

In his Report and through testimony, Mr. Lehmann demonstrated that a low-grade, large-tonnage, disseminated gold deposit covered the Six Contested Claims, the eight valid claims, and the surrounding property interests held by ELAM (*e.g.*, the Malvina and the No. 1 Placer). AR 1456, 2043. Mr. Lehmann explained that two types of gold mineralization are within the Tootsie

Creek Deposit:  (1) a carbonate-hosted contact metamorphic gold deposit; and (2) a large volume, low-grade stockwork gold deposit.  AR 1226-27, 1229, 1251, 2016-20, 2043-44, 2082-83.  Because of the close proximity of the two types of mineralization, Mr. Lehmann concluded, based on his decades of experience, that they could be profitably mined in a single, large-volume, open pit operation covering nearly the entire unpatented claim block, most of the Malvina, and a portion of the No. 1 Placer.[19]  AR 1229-30, 1251, 2082; *see also* AR 1465-70 (depicting proposed pit).  Accordingly, Mr. Lehmann designed a sophisticated, but conservative, open-pit mine model (AR 1230-31, 2084-86).

Under Mr. Lehmann's model, the mine would operate for 10.89 years, during which time 98 million tons of ore would be processed and 1,087,000 ounces of gold equivalent (gold plus silver) recovered.  AR 1236-41, 1251-52.  The mine would generate $434,915,000 in total revenues, $77.7 million of which would be profit (before income tax), resulting in an internal rate of return of 11.95 percent.  AR 1251-52.  Based upon this analysis, Mr. Lehmann concluded that a "prudent man would be justified in expending more money, with a reasonable prospect of success, in developing a valuable mine with the Six Contested Claims, the eight valid claims, and the other property interests held by ELAM.  AR 1252 *see also* AR 2325-26 (Mr. Lehmann's model "has a sound, reasonable geologic basis" and ELAM has "a reasonable prospect of developing a mine.").  Accordingly, the IBLA's decision declaring the Six Contested Claim invalid for lack of discovery should be held unlawful and set aside as being arbitrary, capricious, not in accordance with law, and unsupported by substantial evidence.

---

[19] P 15 was not included in Mr. Lehmann's proposed pit (see AR 1465) simply because "[t]he area would be too narrow to mine" without additional claims to the west.  AR 2129.

## A.    The Prudent Man Rule Does Not Require Proof That Success Is Guaranteed.

The IBLA rejected Mr. Lehmann's model for one reason, *i.e.*, the model did not prove that success was guaranteed. AR 750-751. Contrary to the belief of the IBLA, the Prudent Man Rule does not require a showing that a mine would be successful. Instead, the inquiry is whether "a person of ordinary prudence would be justified in the further expenditure of his labor and means, with *a reasonable prospect of success*, in developing a valuable mine . . . ." *Castle*, 19 L.D. at 457 (emphasis added). In fact, the Prudent Man Rule purposefully requires less than "guaranteed success" in order to encourage the investment of capital in the development of the Nation's mineral resources. *Castle*, 19 L.D. at 457. Moreover, just as the "prudent man" need not prove guaranteed success, he also need not prove a certain return on investment. *Collord*, 128 IBLA at 321 (Byrnes, C.J., concurring in part and dissenting in part). Instead, the "'prudent man' can and will take reasonable economic risks[,]" "otherwise he [w]ould not be in the business of mining." *Id*. Thus, the "reasonable prospect of success" component of the Prudent Man Rule necessarily includes the "possibility of failure." *Id*. at 348 (Mullen, J. concurring in part and dissenting in part). Therefore, contrary to the belief of the IBLA, the Prudent Man Rule does not require that ELAM prove that a successful mine is guaranteed.[20]

---

[20] Because ELAM need not prove that a successful mine is guaranteed, Defendants' attack on ELAM's use of a gold price of $400.00/oz is petty, at best. Defs' Memo. at 16-17 (suggesting Mr. Lehmann should have used $387.00/oz or $378.52 in his model to reflect the purported price of gold at the date of the hearing and segregation, respectively). First, the IBLA utilized $387.00/oz in its analysis. AR 741, n.20. Second, any purported differences caused by using $400.00/oz gold versus $387.00/oz gold are offset by Mr. Lehmann's use of a lower silver price: $4.15/oz versus Gruber's $5.40/oz. *Compare* AR 1245 *with* AR 937. Third, Mr. Lehmann's model demonstrates that any price above $329.00/oz would result in profits. AR 1241, 1247.

**B.      The "Marketability Test" Cannot Be Used To Impose A "Present
        Profitability" Requirement.**

Defendants attempt to rely on the "marketability test" from *Coleman* for the proposition

that ELAM had to prove that mining the Six Contested Claims would be "presently profitable."

Defs' Memo. at 2.  In fact, Defendants go so far as to suggest that the profit level must be

comparable to that of a "commercial venture."[21]  Defs' Memo. at 2-3 (citations omitted).  As

previously demonstrated, the "marketability test" does not apply to valuable minerals that are

inherently marketable, such as gold and silver.  ELAM's Memo. at 36-37; G. Reeves, *The Origin

and Development of the Rules of Discovery*, VIII Land and Water L. 1, 5-14 (1973) (explaining

that the original purpose of the "marketability test" was to determine whether nonmetallic

minerals were locatable); D. Sherwood, *Mineral Discovery: Is The Prudent Man Dead?*, 44

Rocky Mt. Min. L. Inst., 10-1, 10-5 to 10-11 (1998) (describing how then-Solicitor of the

Interior Frank Berry manipulated a simple building stone case into the *Coleman* decision to

further his own anti-Mining Law agenda).  Indeed, the only question in *Coleman* was whether

there was a "market" for the building stone on the claims.  G. Reeves, *The Origin and

Development of the Rules of Discovery*, VIII Land and Water L. at 54-55.  In fact, the

narrowness of the issue in *Coleman* was reflected in the Question Presented:

> Whether the Secretary of the Interior exceeded his statutory authority in ruling
> that, to establish the discovery of a "valuable" mineral deposit within the meaning
> of the mining laws (30 U.S.C. § 22), *an applicant for a patent to public lands
> must show that the stone on which the claim is based can be marketed at a profit*.

---

[21] This is a *non sequitur*.  Not all commercial ventures are profitable.  Even if they were, what
type of "commercial venture" should one consider?  Is the profit level of Microsoft the relevant
inquiry?  Or, may one consider a "mom and pop" mining operation?  *See Collord*, 128 IBLA at
357 (Mullen, J., concurring in part and dissenting in part) (Recognizing the legitimacy of "mom
and pop" mining operations because "[t]here is nothing in the law that dictates that only giant
corporations can hold mining claims.").

Brief for the Petitioners, *United States v. Coleman,* 390 U.S. 599 (1968), 1968 WL 129308, *2 (emphasis added).

Even if the "marketability test" applies to inherently marketable minerals such as gold and silver, it does not mean that proof of "present profitability" is an absolute prerequisite for discovery. *See Lara v. Secretary of the Interior*, 820 F.2d 1535, 1540-41 (9th Cir. 1987) (reversing an IBLA decision that held claimant had to prove mining of gold would be presently profitable). At most," present profitability" is just one factor that may be considered in determining whether discovery exists.[22] *See Coleman*, 390 U.S. at 602-03 ("profitability is an important consideration in applying the prudent-man test"); *accord, Lara*, 802 F.2d at 1541. Accordingly, this Court should reject Defendants' attempt to rely on the "marketability test" to impose a "present profitability" requirement and hold unlawful and set aside the IBLA's decision.

## C.    Defendants Fail To Understand Principles Of Geological Inference.

Defendants next attack Mr. Lehmann's model by arguing that the IBLA determined it was premised on "the incorrect use of geological inference." Defs' Memo. at 35-36. In support of this argument, Defendants cite *Feezor III* for the proposition that geological inference may only be used after a deposit has been exposed on a claim and the claimant shows that the mineral "values have been high and relatively consistent." Defs' Memo. at 35. Based upon their

---

[22] Because "present profitability" is not the talisman that Defendants belief it to be, their arguments regarding oxidation/leachability are largely irrelevant. *See* Defs' Memo. at 38-40. In fact, the oxidation/leachability issue was created by Gruber to justify his "high-grading" of the Tootsie Creek Deposit. ELAM's Memo. at 32-34  The same is true with respect to their arguments about reclamation. Defs' Memo. at 39-40. Noticeably absent from the "marketability test" in *Coleman* is the word "reclamation." In any event, ELAM recognized that reclamation would begin before leaching was complete. AR 1246; *see also* AR 1223 (ELAM noting that reclamation bonds would be necessary). Moreover, the cash flow from leaching after cessation of operations (*e.g.*, over $21 million during year 15 of the project's life (AR 1248)) would be

interpretation of *Feezor III*, Defendants conclude that ELAM's use of geological inference to infer a valuable mineral deposit on the Six Contested Claims was inappropriate. Defs' Memo. at 35. Specifically, Defendants contend that "no reliable exposures of a deposit were made" on RE 1 and P 14-16. Defs' Memo. at 35-36. With respect to EB 6 and RE 2, Defendants contend that, assuming "a deposit was disclosed on those claims," at best, the values were consistently low. Defs' Memo. at 36. These contentions reveal that it is Defendants who fail to understand principles of geological inference, or geology for that matter.

First, contrary to Defendants' contention, "mineral deposits" were exposed on Six Contested Claims, including RE 1 and P 14-16. In fact, Gruber conceded this when he concluded that a "physical exposure of a valuable mineral exists upon each of the 14" unpatented claims held by ELAM. AR 938; AR 971 ("Each unpatented mining claim contains a physical exposure of in-place mineralized rock – a prerequisite for satisfying the 'test of discovery[.]'"). Defendants' confusion in this regard, comes from their failure to grasp the difference between a "mineral deposit" and a "valuable mineral deposit." The term "mineral deposit" simply means "that a mineralized area in a vein or lode has been disclosed." *Feezor I*, 74 IBLA at 75. On the other hand, the term "valuable mineral deposit" means that which may be determined to exist after principles of geological inference and the Prudent Man Rule have been applied to an exposed mineral deposit. *Id*.

More importantly, it was only after Gruber concluded that mineral deposits were exposed on all Six Contested Claim did Mr. Lehmann apply principles of geological inference to determine the exposed mineral deposits were indeed valuable:

---

more than sufficient to cover reclamation costs without materially affecting the net present value of the project.

> **According to the Mineral Examiner an occurrence of valuable mineral exists on each claim** (Gruber, 1995 p. 2). By our analysis also, each claim has valuable mineral in place. Thus it is appropriate, permissible and prudent to utilize other geologic data and geologic inference to estimate the size and extent of the indicated mineral deposit on the claim group and other lands controlled by [ELAM]. . . .

AR 1235-36 (emphasis in original).

Second, contrary to Defendants' contention, ELAM submits that values do not always have to be "high and relatively consistent" before geological inference may be used.[23] This is especially true in a low-grade, large-tonnage, disseminated gold deposit such as the Tootsie Creek Deposit, which, by its nature, is not going to "have high and relatively consistent values." Instead, such a deposit is going to have generally low values interspersed with zones of high values. AR 2041-46 (Mr. Lehmann explaining that mineralization throughout the Tootsie Creek Deposit was consistent even though the values varied); AR 566 (Mr. Lehmann explaining that because of the distribution of values he used all the values (low and high) in his analysis.). Thus, the use of geological inference depends on the nature of the particular deposit.[24] *See Norman Whittaker*, 95 IBLA 271, 282 (1987) ("Whether [use of] geological inference is warranted . . . depend[s] upon the specific facts in each case . . . ."); *see also* R.W. Mullen, *The "Prudent Man" Ain't What She Used To Be Many Years Ago*, 49 Rocky Mt. Min. L. Inst., 10-1, 10-25 to 10-28 (2003) (noting that rulings in IBLA cases applying the Prudent Man Rule are often deposit specific).

---

[23] In fact, such a standard would prohibit the use of geological inference with most mineral deposits. *See* H.E. McKinstry, *Mining Geology* 36 (Prentice Hall 1948) ("An orebody is a mixture of minerals in proportions that vary in different parts of the mass. As a consequence the proportion of contained metals also varies from place to place.").

[24] In *Feezor*, the copper was within a sedimentary deposit where one might expect to find high and relatively consistent values. *Feezor III*, 130 IBLA at 199. Here, the gold is within the igneous intrusive rocks and the metamorphosed limestone. AR 1226-27. Although limestone is a sedimentary rock, that is where the similarities between the deposit in *Feezor* and the deposits in the instant case end.

Accordingly, Mr. Lehmann properly used principles of geological inference in his model. Thus, the IBLA rejection of Mr. Lehmann's model was arbitrary, capricious, not in accordance with law, and unsupported by substantial evidence. Therefore, this Court should hold unlawful and set aside the IBLA's ruling that ELAM's Six Contested Claims were invalid for lack of discovery.

## VII.    THE IBLA ERRED IN DECLARING THE SIX CONTESTED CLAIMS INVALID BECAUSE THE BLM PREVENTED ELAM FROM ACQUIRING FURTHER EVIDENCE TO CONFIRM DISCOVERY.

It is well established that a mining claim may not be declared invalid for lack of discovery when the BLM has prevented the claimant from acquiring the evidence necessary to prove discovery. *United States v. Mavros*, 122 IBLA 297, 310 (1992). Thus, following a withdrawal, a claimant must be allowed to test and sample his claims to gather evidence that his pre-withdrawal exposures constituted a discovery. *Foresyth II*, 100 IBLA at 207 ("[I]f there was a *disclosure of mineral* at the date of withdrawal from mineral entry, that disclosure is a discovery of valuable mineral if subsequent sampling, assaying, and testing confirm the fact that the disclosed mineral is valuable.") (emphasis added).

In the instant case, ELAM submitted the 1992 Plan of Operations to further delineate and develop the Tootsie Creek Deposit. AR 1201-03, 1963-67. Specifically, the 1992 Plan of Operations, as modified, contemplated road building and trenching on all of the Six Contested Claims and the drilling of three drill holes on the RE 1 claim, one drill hole on the EB 6 claim, and two drill holes each on P 15 and P 16. AR 1454, 1964-65, 2123-24. Undoubtedly, if this work had been allowed to occur, ELAM would have acquired further evidence to prove that its pre-existing exposures on the Six Contested Claims constituted discoveries.[25]

---

[25] For example, the trenching and drill holes on RE 1 would have provided further evidence of the previously exposed "contact zone" that runs through, *inter alia*, the center portion of both

The BLM, however, refused to approve the 1992 Plan of Operations because of an anti-mining attitude that existed within the Washington Office of the BLM.  After the BLM released the draft EIS for the 1992 Plan of Operations, in which it recommended that the 1992 Plan of Operations be approved (AR 1202, 1967), Josh Drew, Special Assistant to the Director of the BLM, wrote an memorandum to the Director regarding the 1992 Plan of Operations, in which he unlawfully advised that "[w]ith careful handling, the approval [of the 1992 Plan of Operations] could be delayed many months or even years."  AR 1142.  Mr. Drew also outrageously recommended that the BLM "actively pursue measures to prevent mineral activity in [the Sweet Grass Hills]."  AR 1143.  In short, Mr. Drew's memorandum ended any chance that the 1992 Plan of Operations would be approved.  *See* ELAM's Memo. at 5-8, 42-44.  Therefore, because the BLM intentionally impeded ELAM's efforts to acquire additional evidence to confirm its pre-existing discovery, the IBLA erred as a matter of law when it declared ELAM claims invalid for lack of discovery.  *Mavros*, 122 IBLA at 310.

Defendants try to defend the IBLA's decision by arguing that post-withdrawal drilling may occur only if a valuable mineral deposit is exposed prior to a withdrawal.[26]  Defs' Memo. at 45 ("Plaintiffs had not *exposed* on the contested claims a valuable discovery prior to the withdrawal.") (emphasis in original).  This argument simply begs the question:  Why would one need to conduct post-withdrawal drilling if sufficient evidence of a valuable mineral deposit already existed?  That is why the relevant inquiry is whether minerals have been exposed prior to

---

RE 1 and RE 2.  AR 1454 (depicting proposed trenches and drill holes; *compare with* AR 1062 (Gruber's depiction of contact zone); *see also* AR 955-62, 973-75, 1636-37 (Gruber recognizing this exposed "contact zone" and its high mineral potential); AR 1455-56 (cross section depicting ELAM's interpretation of the mineralization in the "contact zone").

[26] Defendants suggest that because delineation drilling was planned, no pre-existing discovery could have existed.  Defs' Memo. at 45; *see also* Defs' Memo. 17 n.10 (proffering a definition of

the withdrawal. If the answer is yes, as in the instant case, then post-withdrawal drilling must be allowed to confirm discovery. *United States v. Foresyth*, 15 IBLA 43, 61 (1974) ("*Foresyth I*") (a segregation of lands from mineral entry and location may "not foreclose the right of the claimant[] to take samples or other evidence to prove the existence of a discovery on each claim prior to [the segregation].")

Defendants also use a letter written by Manhattan Minerals that mentions the word "exploration" to argue that the 1992 Plan of Operations was for exploration – not to confirm a pre-existing discovery. AR 755-56. Contrary to the belief of Defendants and the IBLA, mere mention of the word "exploration" does not *ipso facto* mean lack of discovery. *Winters*, 78 I.D. at 198 ("[M]ere reference in testimony to a need for further 'exploration' is not in itself, determinative of an absence of discovery, but must be considered in the proper context and in the light of the other evidence adduced."); *Converse v. Udall*, 399 F.2d 616, 620-21 (9th Cir. 1968) (recognizing that some forms of exploration may occur after discovery.); s*ee also*, R.W. Mullen, *The "Prudent Man" Ain't What She Used To Be Many Years Ago*, 49 Rocky Mt. Min. L. Inst., at 10-33 (noting that the BLM would often wrongfully prevail in contests by pressing unwary claimants into admitting more exploration was necessary); AR 1072 (simultaneous exploration and development drilling at the Zortman and Landusky Mines). In fact, Secretary Smith recognized that exploration would occur after discovery when he established the Prudent Man Rule. *Castle*, 19 L.D. at 457; ELAM's Memo. at 44-45.

Thus, the IBLA's ruling that the 1992 Plan of Operations was not to confirm a pre-existing discovery, but to make a discovery, was arbitrary, capricious, not in accordance with

---

"delineation drilling"). There is no requirement that a deposit be "blocked out" for a discovery to exist. *Hooker*, 48 IBLA at 29-31.

law, and unsupported by substantial evidence.  Therefore, this Court should hold unlawful and set aside the IBLA's decision.

## CONCLUSION

To effectuate the intent of Congress in 1872, one of the men first charged with administering the Mining Law declared:

> [W]here minerals have been found and the evidence is of such a character that a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine, the requirements of the statute have been met.

*Castle*, 19 L.D. at 457.  The standards applied by the IBLA in the instant case, however, cannot be found in the language of the statute or Secretary Smith's interpretation thereof.  Accordingly, this Court should hold unlawful and set aside the IBLA's decision so that the intent of Congress in 1872 and Secretary Smith's interpretation thereof may be accorded the proper respect to which they are due.

Dated this 25th day of February 2008.

Respectfully Submitted By:

MOUNTAIN STATES LEGAL FOUNDATION


/s/ Steven J. Lechner
Steven J. Lechner, D.C. Bar No. AZ 0001
William Perry Pendley, Esq.
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)
lechner@mountainstateslegal.com

Attorneys for Plaintiffs

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 25th day of February 2008, I filed the foregoing Plaintiffs' Memorandum Of Points And Authorities In Opposition To Defendants' Cross-Motion For Summary Judgment And In Reply To Defendants' Opposition To Plaintiffs' Motion For Summary Judgment electronically through the CM/ECF system, which caused the following to be served by electronic means:

Mark T. Romley, CA Bar #240655
U.S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
Natural Resources Section
Ben Franklin Station, P.O. Box 663
Washington, D.C. 20044-0663
Tel: (202) 305-0436
Fax: (202) 305-0506
mark.romley@usdoj.gov

/s/ Steven J. Lechner